# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

PAUL BOVEE,

                                    Plaintiff,

            v.                                    5:24-CV-1138
                                                  (DNH/MJK)

AUBURN POLICE DEPARTMENT, et al.,

                                    Defendants.

---

PAUL BOVEE, Plaintiff, pro se

MITCHELL J. KATZ, U.S. Magistrate Judge

TO THE HONORABLE DAVID N. HURD, U.S. DISTRICT JUDGE:

## ORDER and REPORT-RECOMMENDATION

The Clerk has sent to the court for review a pro se complaint filed by plaintiff Paul Bovee, in which he has sued various defendants based on several civil rights claims pursuant to 42 U.S.C. § 1983.  (Dkt. No. 1) ("Compl.").  Plaintiff has also moved to proceed in forma pauperis ("IFP"). (Dkt. No. 9).

## I.    IFP Application

Plaintiff declares in his IFP application that he is unable to pay the filing fee. (Dkt. No. 9).  After reviewing his application and supporting documents, this court finds that plaintiff is financially eligible for IFP status.

However, in addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or

1

malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915 (e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and 28 U.S.C. § 1915. Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward pro se litigants and must use extreme caution in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

In addition, Fed. R. Civ. P. 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Although Rule 8 does not require detailed factual allegations, it does "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Houston v. Collerman*, No. 9:16-CV-1009 (BKS/ATB), 2016 WL 6267968, at *2 (N.D.N.Y. Oct. 26, 2016) (quoting *Ashcroft*, 556 U.S. at 678).  A pleading that contains allegations that "'are so vague as to fail to give the defendants adequate notice of the claims against them' is subject to dismissal." *Id.* (citing *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009)).  The court will now turn to a consideration of plaintiff's complaint under the above standards.

## II. <u>Complaint</u>

Plaintiff alleges that on May 9, 2024, he was "punched and suffered a fractured hand" by defendant Police Officer ("P.O.") Parker, "after being pulled out of the backseat of a vehicle," while "face down handcuffed on the ground [sic]."  (Compl. at 4).  Plaintiff further alleges that defendant P.O. Parker's "violent[ ] assault[ ]" was recorded, and the "excruciating pain caused [plaintiff] to" pass out.  (*Id.*).

Plaintiff states that defendants P.O. Gray, P.O. Wetherell, and Sergeant ("Sgt.") Young "allowed [defendant] Parker to br[eak] my right hand, discovered by Auburn Memorial Medical Hospital medical staff[.]"  (Compl. at 4).  Plaintiff was "admitted" for the injuries he sustained, which required a cast on his right hand.  (*Id.*).

3

**DISCUSSION**

**III.**    <u>**Excessive Force/Failure to Intervene**</u>

"Where . . . [an] excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . ." *Graham v. Connor*, 490 U.S. 386, 394 (1989); *see also, e.g., Shamir v. City of New York*, 804 F.3d 553, 556 (2d Cir. 2015) (explaining, "the use of excessive force renders a seizure of the person unreasonable and for that reason violates the Fourth Amendment."). Here, to the extent the alleged constitutional violation occurred when plaintiff was "pulled out of the backseat of a vehicle" by law enforcement officers, his excessive force claim is properly assessed under the Fourth Amendment. *See Graham*, 490 U.S. at 394. When analyzing such a claim, the relevant "question is whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citing *Scott v. United States*, 436 U.S. 128, 137-139 (1978)) (additional citation omitted).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the court recommends that plaintiff's excessive force claim against defendant P.O. Parker survive sua sponte review and require a response.  *See Lopez v. Gerace,* No. 5:18-CV-00952 (MAD/ATB),

2019 WL 1260508, at *3 (N.D.N.Y. Mar. 19, 2019) (finding that "[d]espite its brevity, the complaint plausibly alleges that defendant used excessive force in effecting plaintiff's arrest[.]").  In doing so, the court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

On the other hand, plaintiff fails to adequately plead a failure-to-intervene claim against defendants P.O. Gray, P.O. Wetherell, and/or Sgt. Young. To state a failure-to-intervene claim, a plaintiff must allege that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008). To determine whether the defendant had a realistic chance to intervene, courts in this Circuit consider a number of factors, including "(1) the number of police officers present; (2) the officers' relative placement; (3) the environment in which the officers acted; [and] (4) the nature of the assault." *Johnson v. City of New York*, No. 15-CV-6915, 2019 WL 294796, at *9 (S.D.N.Y. Jan. 23, 2019) (citing *Figueroa v. Mazza*, 825 F.3d 89, 107-08 (2d Cir. 2016)). The duration of the alleged violation "will always be relevant and will frequently assume great importance." *Id.*; *see also, e.g.*, *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (finding that officers did not have realistic opportunity to intervene where another officer hit the plaintiff three times in rapid succession); *Ross v. Willis*, No. 16-CV-6704, 2021 WL 3500163, at

*15 (S.D.N.Y. Aug. 9, 2021) (same where another officer pepper sprayed the plaintiff, because the spraying lasted only seconds); *Arminio v. Holder*, No. 15-CV-5812, 2019 WL 176804, at *6 (S.D.N.Y. Jan. 11, 2019) ("On some occasions, as in this case, the seconds it takes for excessive force to occur are not enough to provide an officer with a realistic opportunity to intervene.").

Here, the complaint merely states that these defendants "allowed" P.O. Parker to break plaintiff's right hand. (Compl. at 4). Plaintiff provides no facts to support an inference that there was a sufficient opportunity for these defendants to intervene, much less to support the inference that these defendants were even present for the underlying alleged assault. Accordingly, plaintiff's failure-to-intervene claim should be dismissed.

## IV.    **Fourteenth Amendment - Equal Protection**

"Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, the Second Circuit has long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 6 (S.D.N.Y.), *aff'd*, 705 F. App'x 50 (2d Cir. 2017) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)) (cleaned up). There exist two theories for this kind of Equal Protection violation: "selective enforcement" and "class of one" discrimination. *Bristol v. Town of Camden*, 669 F. Supp. 3d 135, 154 (N.D.N.Y. Apr.

19, 2023) (citing *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005)). However, both selective enforcement and class-of-one claims require the plaintiff to "make a showing of different or unequal treatment." *Bristol*, 699 F. Supp. 3d at 154.

Here, plaintiff has asserted a Fourteenth Amendment claim, identifying his claim as seeking relief for the violation of his equal protection rights. (Compl. at 5). However, plaintiff has failed to allege that he is a member of an identifiable group, or that he was treated differently from a comparable plaintiff. Accordingly, his equal protection claims must fail. *See e.g., MacPherson v. Town of Southampton*, 738 F. Supp. 2d 353 (E.D.N.Y. 2010) (finding plaintiff's equal protection claim deficient as a matter of law because plaintiff's complaint "failed to identify any comparators or similarly situated entities at all").

## V.    <u>Deliberate Indifference to Medical Care</u>

"The Due Process Clause . . . does require the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). "In fact, the due process rights of a person in [the arrestee's] situation are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 535, n. 16 (1979)). Such a plaintiff's claims for deliberate indifference to a serious medical need are governed by the same standard as a pretrial detainee when their claim arises from their arrest. *See*

*Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 394-95 (S.D.N.Y. 2020). Accordingly, plaintiff's claim, to the extent it is construed[1] as one for deliberate indifference to medical care, is governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See Yancey v. Robertson*, 828 F. App'x 801, 803 (2d Cir. 2020) (citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)). "This, in turn, requires a two-step inquiry . . . . First, the plaintiff must satisfy the 'objective prong' by showing a sufficiently serious need . . . . Second, the plaintiff must meet the 'subjective prong' which requires the officer to have acted with 'deliberate indifference' to the challenged condition." *Id.* (citing *Darnell*, 849 F.3d at 29) (international citations omitted). However, a claim for " 'deliberate indifference' does not require proof of 'a malicious or callous state of mind' and is instead akin to recklessness, requiring a plaintiff to show that the official knew or should have known of the excessive risk to the plaintiff's health." *Id.* at 803, n.2.

Here, plaintiff has failed to plausibly allege a claim for deliberate indifference to his medical needs. At the outset, plaintiff has failed to allege any facts to show which, if any, of the defendants were involved in his medical care, or alternatively denied him access to medical care. *See Burton v. Lynch,* 664 F. Supp. 2d 349, 358 (S.D.N.Y. 2009)

---

[1] Plaintiff asserts a claim for "deliberation to take me to medical needs for the injuries I suffered the week long before I was seen by medical." (Compl. at 5).

(dismissing deliberate indifference claims where the plaintiff "alleged no facts whatsoever linking [the defendant] to any alleged denial of medical care"); *O'Dell v. Kajawski*, No. 9:23-CV-1092 (TJM/DJS), 2023 WL 7986132, at *3 (N.D.N.Y. Nov. 17, 2023) (dismissing deliberate indifference claim where the court found "no basis to plausibly infer from the allegations in the amended complaint that defendant denied plaintiff access to medical treatment out of deliberate indifference to his serious medical needs."). Nor has plaintiff alleged that the purportedly culpable defendant(s) knew, or should have known, that the week-long delay in treatment subjected plaintiff to a significant risk of serious harm. Because the complaint fails to plausibly allege both that plaintiff suffered an objective, sufficiently serious deprivation of medical care and that any defendant was deliberately indifferent toward plaintiff's medical condition, plaintiff's deliberate medical indifference claim should be dismissed.

## VI.  **Defendant Auburn Police Department**

"Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located." *White v. Syracuse Police Dep't,* No. 5:18-CV-1471(GTS/DEP), 2019 WL 981850, at *1 (N.D.N.Y. Jan. 7, 2019), *report and recommendation adopted*, 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008)); *see also Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357 (GLS/ATB), 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26,

9

2014). Accordingly, the complaint as against defendant Auburn Police Department must be dismissed for failure to state a claim upon which relief may be granted.

Even if the court were to construe plaintiff's claims against the Auburn Police Department as against the City of Auburn, dismissal would still be warranted. A municipality may only be named as a defendant in certain circumstances. Pursuant to the standard for establishing municipal liability laid out in *Monell*, in order to set forth a cognizable claim for municipal liability under Section 1983, a plaintiff must plead and prove that a deprivation of his constitutional rights "was caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell*, 436 U.S. 658); *see also Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer.").

A municipality may be liable for deprivation of constitutional rights under Section 1983 for policies or customs resulting in inadequate training, supervision, or hiring when the failure to train, supervise, or hire amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989). A plaintiff must also establish a causal connection - an affirmative link - between the policy and the deprivation of his constitutional rights. *Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985). Indeed, municipalities may only be held liable when the municipality itself deprives

an individual of a constitutional right; it "may not be held liable on a theory of respondeat superior." *Jeffes v. Barnes*, 208 F.3d 49, 56 (2d Cir. 2000).

In this case, plaintiff has offered no evidence that any such officer was acting pursuant to a policy or custom of the City of Auburn during the underlying incident. Accordingly, the city cannot be held liable for the constitutional violations alleged by plaintiff.

## VII.  Opportunity to Amend

Generally, before the court dismisses a pro se complaint or any part of the complaint sua sponte, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

Here, the court is recommending dismissal with prejudice as to defendant Auburn Police Department, because the department may not be sued under § 1983. With respect to the remainder of plaintiff's claims for which dismissal is recommended, the court cannot say at this early stage of the litigation that plaintiff would be unable to amend his complaint to state a viable claim. Thus, the court recommends providing plaintiff the opportunity to amend his complaint for the limited purpose of asserting those claims alleging constitutional violations surrounding his arrest and detention as set forth in his complaint, against the appropriate defendants. Plaintiff is reminded that

11

if he intends to name the City of Auburn as a defendant, he must plead, and ultimately prove, that a deprivation of his constitutional rights was caused by a custom, policy, or usage of the municipality.  Likewise, plaintiff must specifically identify the individual law enforcement officer, or any other defendant, he is alleging violated his constitutional rights, and provide facts sufficient to plausibly allege said defendant's personal involvement in the deprivation.

If the court approves this recommendation and allows plaintiff to submit a proposed amended complaint, plaintiff should be warned that any amended complaint must be a ***complete and separate pleading***.  Plaintiff must state all of his claims in the new pleading, including his excessive force claim against defendant P.O. Parker, and may not incorporate by reference any part of his original complaint.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 9) is **GRANTED**,[2] and it is

**RECOMMENDED**, that plaintiff's claim for excessive force as against defendant P.O. Luke Parker proceed. However, the court will defer service on this defendant until the District Judge has the opportunity to review this Order and Report-Recommendation and plaintiff has had the opportunity to amend his complaint, if appropriate, and it is

---

[2]Although his IFP Application has been granted, plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**RECOMMENDED,** that this action be **DISMISSED WITH PREJUDICE** as against named defendant **AUBURN POLICE DEPARTMENT**, and it is

**RECOMMENDED**, that plaintiff's complaint otherwise be **DISMISSED WITHOUT PREJUDICE,** and that, if the District Court adopts this recommendation, plaintiff be given thirty (30) days to amend his complaint to the extent authorized, and that plaintiff be advised that any amended pleading must be a **COMPLETE PLEADING, WHICH WILL SUPERSEDE THE ORIGINAL**, and that plaintiff must include all remaining facts and causes of action in the amended complaint.  No facts or claims from the original complaint may be incorporated by reference, and it is

**RECOMMENDED**, that if the District Court adopts this recommendation, and plaintiff does not elect to amend his complaint within the imposed deadline, the case be referred back to me for orders relating to service, and it is

**RECOMMENDED**, that if the District Court adopts this recommendation, and plaintiff files a proposed amended complaint, the proposed amended complaint be returned to me for review, and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on plaintiff by regular mail.[3]

---

[3] The Clerk shall also provide plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

13

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: October 29, 2024

Mitchell J. Katz
U.S. Magistrate Judge

14

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 15 of 77

Lopez v. Gerace, Not Reported in Fed. Supp. (2019)

2019 WL 1260508

2019 WL 1260508
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jason LOPEZ, Plaintiff,

v.

Eric GERACE, Defendant.

5:18-CV-00952 (MAD/ATB)
|
Signed 03/19/2019

**Attorneys and Law Firms**

OF COUNSEL: MICHAEL A. CASTLE, ESQ., OFFICE OF
MICHAEL A. CASTLE, 110 West Albany Street, Herkimer,
New York 13350, Attorney for Plaintiff.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

**I. INTRODUCTION**

\*1 On August 13, 2018, Plaintiff Jason Lopez ("Plaintiff")
commenced this action pursuant to 42 U.S.C. §§ 1983 and
1988. See Dkt. No. 1 at 1. On October 15, 2018, Plaintiff made
a request for entry of default, which was entered by the Clerk
of the Court that same day. See Dkt. No. 7.

Currently before the Court is Plaintiff's motion for entry of a
default judgment against Defendant pursuant to Rule 55(b) of
the Federal Rules of Civil Procedure.

**II. BACKGROUND**

According to the complaint, on April 13, 2017, Defendant,
police officer Eric Gerace ("Defendant"), along with several
other officers not named in this suit, approached Plaintiff at
his residence. See Dkt. No. 1 at 2-3. While on the premises,
Defendant allegedly assaulted Plaintiff by "punching the
Plaintiff in the right side of his face, causing him to fall
to the ground, and then punch[ed] the Plaintiff in the left
side of [his] body." Id. at 3. Further, Plaintiff asserts that
as a result of Defendant's actions, Plaintiff sustained severe
personal injuries. Id. While the complaint does allege that

Defendant acted without "justification, excuse, or consent,"
the complaint fails to allege why officers were dispatched to
Plaintiff's home. Id. at 2-3.

On September 17, 2018, while at the Onondaga County
Sheriff's Office, Deputy Sheriff Douglas Roser served
Defendant with the summons and complaint. See Dkt. No.
5. Despite being served, Defendant has failed to answer the
complaint or appear in this matter. See Dkt. No. 7.

**III. DISCUSSION**

**A. Standard of Review**

"Generally, 'Federal Rule of Civil Procedure 55 provides
a two-step process that the Court must follow before it
may enter a default judgment against a defendant.' " United
States v. Carpineta, No. 3:14-CV-0517, 2015 WL 500815, \*1
(N.D.N.Y. Feb. 5, 2015) (quotation omitted). " 'First, under
Rule 55(a), when a party fails to "plead or otherwise defend ...
the clerk must enter the party's default.' " " Id. (quotation
omitted); Fed. R. Civ. P. 55(a). "Second, under Fed. R. Civ. P.
55(b)(1), '[u]pon request of the plaintiff, a default judgment
may be entered by the clerk when (1) the plaintiff's claim
against the defendant is for a sum certain, (2) the plaintiff
has submitted an affidavit of the amount due, and (3) the
defendant has been defaulted for failure to appear.' " Id.

"When a default is entered, the defendant is deemed to have
admitted all of the well-pleaded factual allegations in the
complaint pertaining to liability." Bravado Int'l Group Merch.
Servs. v. Ninna, Inc., 655 F. Supp. 2d 177, 188 (E.D.N.Y.
2009) (citing Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty
Corp., 973 F.2d 155, 158 (2d Cir. 1992) ). "While a default
judgment constitutes an admission of liability, the quantum of
damages remains to be established by proof unless the amount
is liquidated or susceptible of mathematical computation."
Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974) (citations
omitted); see also Bravado Int'l, 655 F. Supp. 2d at 189-90
(citation omitted). "[E]ven upon default, a court may not
rubber-stamp the non-defaulting party's damages calculation,
but rather must ensure that there is a basis for the damages
that are sought." Overcash v. United Abstract Group, Inc.,
549 F. Supp. 2d 193, 196 (N.D.N.Y. 2008) (citing Credit
Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d
Cir. 1999) ). "The burden is on the plaintiff to establish its
entitlement to recovery." Bravado Int'l, 655 F. Supp. 2d at
189 (citing Greyhound Exhibitgroup, Inc., 973 F.2d at 158).
"While 'the court must ensure that there is a basis for the

Lopez v. Gerace, Not Reported in Fed. Supp. (2019)
2019 WL 1260508
Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 16 of 77

damages specified in a default judgment, it may, but need not, make the determination through a hearing.' " *Id.* at 190 (quotation omitted).

**\*2**  When seeking a default judgment, the Local Rules require the party to submit an affidavit attesting to the following:

> 1. The party against whom it seeks judgment is not an infant or an incompetent person;
>
> 2. The party against whom it seeks judgment is not in the military service, or if unable to set forth this fact, the affidavit shall state that the party against whom the moving party seeks judgment by default is in the military service or that the party seeking a default judgment is not able to determine whether or not the party against whom it seeks judgment by default is in the military service;
>
> 3. The party has defaulted in appearance in the action; [and]
>
> 4. Service was properly effected under Fed. R. Civ. P. 4....

N.D.N.Y. L.R. 55.2(a).

In the present matter, the Court finds that Plaintiff complied with the procedural requirements necessary for the Court to grant the motion for default judgment. *See* Dkt. No. 5. Specifically, Plaintiff affirmed that Defendant is not an infant or an incompetent person and that he is not in military service. *See* Dkt. No. 5. Further, Defendant was properly served in accordance with Rule 4(e)(2)(A) of the Federal Rules of Civil Procedure when Deputy Sheriff Douglas Roser delivered a copy of the summons and complaint to Defendant personally. *See id.* Despite being properly served, Defendant has defaulted in this action. *See* Dkt. No. 6.

Plaintiff has established through his complaint and attached exhibits that he is entitled to judgment in his favor. The complaint and summons were properly served on September 17, 2018, *see* Dkt. No. 5, and Defendant has failed to answer the complaint or otherwise appear in this matter. Plaintiff has complied with the requirements set forth in Local Rule 55.2(b) to the extent required for the Court to grant Plaintiff's motion as to liability. As such, Defendant has defaulted within the meaning of Rule 55(b)(2) of the Federal Rules of Civil Procedure. *See United States v. Beam*, No. 6:12-CV-0087, 2012 WL 1802316, \*2 (N.D.N.Y. May 17, 2012) (holding that by failing to answer the plaintiff's complaint or respond to the motion, the defendant "has effectively conceded" that he is subject to the factual allegations asserted in the complaint).

## B. Application

To permit a court to enter default judgment " 'there must be a sufficient basis in the pleadings for the judgment entered.' " *Ortiz v. Lasker*, 590 F. Supp. 2d 423, 425 (W.D.N.Y. 2008) (quotation and other citations omitted). Plaintiff brings this action pursuant to 42 U.S.C. § 1983, noting that his Fourth and Fourteenth Amendment rights were violated. *See* Dkt. No. 1 at 1. In order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must allege "(1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state ... law.' " *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ). To demonstrate a violation of one's rights pursuant to the Fourteenth Amendment's Due Process Clause, an arrestee "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). In evaluating whether the force used against an individual was objectively unreasonable, the facts and circumstances of each case must be assessed. *See id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989) ).

**\*3**  Plaintiff alleges that Defendant, an officer of the City of Syracuse Police Department, while acting in his official capacity, used excessive force "without justification, excuse, or consent." Dkt. No. 1 at 3. Further, Plaintiff alleges that, as a result of Defendant's actions, he has sustained various injuries requiring "surgical repair." *Id.* The complaint does not indicate why the officers were at Plaintiff's residence the night of the alleged incident. *See* Dkt. No. 1. Despite its brevity, the complaint plausibly alleges that Defendant used excessive force in effecting Plaintiff's arrest in violation of the Fourth and Fourteenth Amendments. As such, Plaintiff has sufficiently alleged that Defendant, a police officer, deprived Plaintiff of a federal right, and that Defendant acted under color of state law. Thus, the complaint sufficiently alleges a *prima facie* case pursuant to 42 U.S.C. § 1983.

## C. Damages

"Damages, which are neither susceptible of mathematical computation nor liquidated as of the default, usually must be established by the plaintiff in an evidentiary proceeding in which the defendant has the opportunity to contest the amount." *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158 (citations omitted). As relevant, Rule 55(b)(2) provides that "[t]he court may conduct hearings ... when, to enter or effectuate judgment, it needs to: (A) conduct an accounting;

(B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2).

In the present matter, in support of Plaintiff's request for damages, he alleged, in his complaint, that he was harmed in the following ways: (1) "Plaintiff sustained severe personal injuries to the face and jaw; bilateral mandibular body extending to the root of tooth 11, and fracture of the right mandibular angle extending to the root of tooth 1;" (2) "possible fractures of the nasal spine if the maxilla;" (3) "extreme pain;" (4) "humiliation;" (5) "fright and severe emotional distress;" (6) "was otherwise seriously injured, bruised and wounded;" (7) "has received considerable medical care and attention;" (8) "has and will incur considerable bills for said care and attention;" (9) "has experienced great physical pain and mental anguish;" and (10) "has been prevented from attending to his normal occupation and has suffered considerable loss of earnings." Dkt. No. 1 at 3-4. Plaintiff seeks an award for $2,500,000.00, but offers no evidence to substantiate his claim of damages. *See id.* at 3-4.

The Court finds that the evidence submitted is insufficient to support an award of damages without an evidentiary hearing. The requested amount is unsupported by any evidence. As such, the Court denies without prejudice Plaintiff's motion insofar as it seeks damages. An evidentiary hearing will be scheduled so that Plaintiff can present evidence in support of his application.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth herein, the Court hereby

**ORDERS** that Plaintiff's motion for default judgment against Defendant (Dkt. No. 7) is **GRANTED IN PART** as to liability, pending a hearing on damages; and the Court further

**ORDERS** that the Clerk of the Court shall schedule a damages inquest at the earliest convenience of the parties; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1260508

---

**End of Document**© 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  3

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 18 of 77

2019 WL 294796
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

J-Quan JOHNSON, Plaintiff,

v.

The CITY OF NEW YORK; the New York City Police
Department; Police Officer Dwight Powell, Shield
Number 9038; Sgt. Vicente Perez, Shield Number 3173;
Police Officer Emmanuel Valerio, Shield Number 20335;
Police Officer Steve Tirado, Shield Number 22659;
Police Officer James Burke, Shield Number 28483;
Police Officer Gerard Staples, Shield Number 24526;
Police Officer Robert Stapleton, Shield Number 17814;
Police Officer Jose Joseph, Shield Number 14133; John
Doe New York City Police Officer Number One; John
Doe New York City Police Officer Number Two; John
Doe New York City Police Officer Number Three;
John Doe New York City Police Officer Number Four;
and John Doe New York City Police Officer Number
Five, All "John Doe" Names Being Fictitious and
Representing New York City Police Officers Whose
Actual Names Remain Unknown to Plaintiff, Defendants.

15 Civ. 6915 (ER)
|
Signed 01/23/2019

**Attorneys and Law Firms**

Brian J. Isaac, Pollack, Pollack, Isaac & De Cicco, New York,
NY, Michael Ira Braverman, Getz & Braverman, P.C., Bronx,
NY, for Plaintiff.

Alison Sue Mitchell, Evan Craig Brustein, New York City
Law Department, New York, NY, for Defendants.

## OPINION AND ORDER

Edgardo Ramos, U.S.D.J.

**\*1** On September 2, 2015, Plaintiff J-Quan Johnson
("Johnson") filed the instant action against the City of New
York (the "City"), the New York City Police Department
("NYPD"), and several NYPD officers (collectively with the
City and NYPD, "Defendants"), in which he alleges that
the NYPD officers assaulted and arrested him unjustifiably

at a neighborhood block party. Doc. 1. Before the Court
is Defendants' motion for partial summary judgment. Doc.
79. For the reasons stated below, Defendants' motion is
GRANTED in part and DENIED in part.

# I. BACKGROUND

## 1. **Factual Background** [1]

[1]

> The following facts are recounted in the light
> most favorable to Johnson, the nonmovant.
> *See Edelhertz v. City of Middletown, 943 F.
> Supp. 2d 388, 393 (S.D.N.Y. 2012), aff'd,
> 714 F.3d 749 (2d Cir. 2013)* (per curiam).
> The facts are drawn from Plaintiff's Response
> to Defendants' Statement of Undisputed Facts
> Pursuant to Local Rule 56.1 ("Pl.'s 56.1 Resp."),
> *see* Doc. 83; Defendants' Counterstatement to
> Plaintiff's Statement of Additional Material Facts
> Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1
> Counterstatement"), *see* Doc. 86; and the parties'
> supporting submissions—including transcripts of
> the parties' deposition testimonies. References in
> this Opinion to the parties' Rule 56.1 Statements
> incorporate the evidentiary citations therein.

On June 7, 2014, Johnson ruptured the Achilles tendon in his
left leg while playing a pickup game of basketball. *See* Pl.'s
56.1 Resp. ¶ 2. As a result of this injury, Johnson underwent
several surgeries on his leg. *See id.* ¶¶ 3, 5; *see also* Deposition
of J-Quan Johnson ("Johnson Dep."), Doc. 83 Ex. A, at
72:10–74:16, 84:3–11.

On August 30, 2014, Johnson decided to attend a back-to-
school block party on West 164th Street, between Edgecombe
Avenue and Amsterdam Avenue, in Washington Heights,
New York. Johnson Dep. 53:23–54:13. Johnson walked to
the block party on crutches, accompanied by his mother, and
arrived at the party between 4:00 p.m. and 6:00 p.m. *Id.* at
58:9–59:9.

Roughly 10 to 20 people were still setting up for the block
party when Johnson arrived. *Id.* at 67:13–23. However, by
9:00 p.m., there were roughly 300 to 400 people in attendance.
*Id.* at 67:5–68:1. Many attendees, including Johnson, were
drinking alcohol and listening to music in the street. *Id.* at
69:1–9. Some attendees were also smoking marijuana in the
street. *Id.* at 69:11–19. Johnson, however, was not smoking.
*Id.* at 69:11–21.

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 19 of 77

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

The block party's organizers did not have a valid permit to host the large street gathering. *Id.* at 58:4–8.

Between 8:40 p.m. and 9:00 p.m., Johnson observed NYPD officers arrive at the block party and attempt to disperse the crowd. *Id.* at 134:3–8. For at least twenty minutes, Johnson heard the officers order all partygoers to disperse from the block. Johnson, however, remained seated in a chair. *Id.* at 139:7–18. When most partygoers refused to leave, the officers returned to their cars and turned on their sirens for about two to five minutes. *Id.* at 139:14–140:7. Johnson interpreted the sirens as another attempt to disperse the crowd. *Id.* at 140:5–7. However, in response to the sirens, Johnson remained seated. *Id.* at 140:8–9. Eventually, the officers left the block. *Id.* at 139:14–140:7.

**\*2** Officers returned to the block party two to four minutes after they initially tried—and failed—to disperse the crowd. *Id.* at 142:10–16. Once again, Johnson noticed officers walking up to people and telling them to leave. *Id.* at 143:16–144:19. Yet Johnson, once again, remained seated. *Id.* at 144:24–145:5.

Johnson then witnessed "chaos" break out when an officer tried to arrest someone at the block party. *Id.* at 145:9–12, 146:4–147–9. Some partygoers started to throw glass bottles at or near the officers. *Id.* at 147:4–20, 167:3–15. Others yelled and cursed at the officers. *Id.* Johnson, for his part, remained in the same spot. *Id.* at 148:14–19. Two minutes later, a police officer approached Johnson directly and asked him to leave the scene. *Id.* at 149:1–21. Johnson told the officer that he was on crutches and therefore was waiting for the crowd to lighten before walking up the street. *Id.* at 149:14–17.

Approximately thirty seconds later, Johnson started to walk up the street. *Id.* at 150:15–23. After walking roughly two buildings' length up the street, Johnson stopped to observe officers converse with a man nearby. *Id.* at 152:25–154:7–21. During the officers' conversation with the man, the block party crowd was still "hostile," *id.* at 166:22–167:18; and people in the crowd were still yelling and cursing at the officers, *id.* at 167:16–18. While observing officers talk to the man, Johnson exclaimed aloud that the officers needed to "get a fucking permit." *Id.* at 167:19–168:10.

At a certain point the conversation between the man and the officers, one officer—Defendant Powell—ordered the man to "back up" and then pushed him. *Id.* at 165:6–16.

Falling backward, the man bumped into Johnson's leg. *Id.* Johnson then stumbled backward a few steps and exclaimed—aloud, but to no one in particular—"Oh, what the fuck." *Id.* at 168:11–23. Johnson then turned to Officer Powell and said, "Yo, watch what you're doing." *Id.* at 168:11–14. Officer Powell responded, "I don't give a fuck about your foot." *Id.* at 171:5–8. The two men subsequently exchanged words when, suddenly, Officer Powell reached out with his hands and pushed Johnson's head back. *Id.* at 171:6–172:7.

Seconds later, three or four police officers, in addition to Officer Powell, jumped on Johnson. *Id.* at 172:10–19. The officers punched him repeatedly. *Id.* at 174:19–175:23. Johnson raised his hands in front of his face to protect himself from the blows. Pl.'s 56.1 Resp. ¶ 63. The officers eventually wrestled him to the ground. Johnson Dep. 178:23–25. While on the ground, the officers continued to punch him and commanded him to "stop resisting." *Id.* at 178:13–18. In response to the officers' commands, Johnson exclaimed, "I am not resisting, you all are laying on me, you got my arms. How can I resist. I am not resisting, I can't move." *Id.* at 179:23–180:2. As he lay on the ground, Johnson felt someone stomp on his left leg and at least four hits from a baton. *Id.* at 180:8–16.

The police officers eventually handcuffed Johnson. *Id.* at 194:12–15. After being handcuffed, the officers dragged Johnson by his shirt collar down the street and seated him on the ground next to an ambulance. *Id.* at 207:7–210:4. While Johnson was seated next to the ambulance, one officer walked up and punched him in the face. *Id.* at 210:22–211:6.

**\*3** Johnson was then placed in the ambulance and transported to New York Presbyterian Hospital. *See* Third Amended Compl. ¶ 43. After discharge from the hospital, Johnson was charged with the crime of Assault in the Second Degree, due to his alleged assault upon Officer Powell. *Id.* ¶ 44. Approximately 11 months later, on August 3, 2015, all charges against him were dismissed. *Id.* ¶ 45.

### 2. Procedural Background

Johnson filed the instant action on September 2, 2015. Doc. 1. He subsequently amended his complaint three times, with his Third Amended Complaint filed on November 29, 2016. Doc 36. In his Complaint, Johnson names as defendants the following: The City; NYPD; Sergeant Vicente Perez; and Officers Emmanuel Valerio, Steve Tirado, James Burke, Gerard Staples, Robert Stapleton, Jose Joseph, and Dwight Powell. Johnson asserts federal law claims against

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 20 of 77

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

the individual defendants for excessive force and a *Monell* claim against the City and NYPD. Johnson also asserts against the individual defendants claims under state law for assault, battery, and intentional infliction of emotional distress; and he asserts against the City and NYPD a claim under state law for *respondeat superior* liability.

Johnson claims that he suffered severe and permanent injuries, including the re-rupturing of his left Achilles tendon and severe emotional distress, resulting from the acts of Defendants. *See* Third Amended Compl. ¶ 46. Following extensive discovery, Defendants moved for partial summary judgment on March 26, 2018. *See* Doc. 79. Defendants, however, did not move for summary judgment with respect to Johnson's excessive force claims against Officers Powell, Staples, and Joseph.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." *Fed. R. Civ. P. 56(a).* "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) ). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing, e.g., *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ).

In deciding a motion for summary judgment, the Court construes the facts in the light most favorable to the nonmovant and resolves all ambiguities and draws all reasonable inferences against the movant. *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). The nonmovant, however, may not rely on unsupported assertions or conjecture in opposing summary judgment. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Rather, the nonmovant "must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."

*Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986) ).

**\*4** Finally, "[w]hile it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citation omitted).

## III. DISCUSSION

### 1. Johnson's Claims against the NYPD

Defendants argue that Johnson's claim against the NYPD must be dismissed because the NYPD is a non-suable entity. *See* Defs.' Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Defs.' Mem.") at 8–9, Doc. 82. Johnson does not oppose dismissal of his claims against the NYPD, and, in any event, the Court agrees with Defendants' argument. *See Grant v. Am. Soc'y for the Prevention of Cruelty to Animals*, 16 Civ. 2675 (ER), 2017 WL 1229737, at *9 n.13 (S.D.N.Y. Mar. 31, 2017); N.Y. City Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."). Accordingly, Johnson's claims against the NYPD are dismissed.

### 2. Johnson's Claims for False Arrest

Defendants argue that Johnson's claims for false arrest should all be dismissed. After careful consideration of the parties' arguments, the Court agrees with Defendants.

#### A. *Legal Standard: False Arrest, Probable Cause, and Qualified Immunity*

"[A] § 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). To establish a § 1983 claim for false arrest, a plaintiff must show that "(1) the defendant intended to confine the

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

Case 5:24-cv-01138-DNH-MJK   Document 12   Filed 10/29/24   Page 21 of 77

plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." [2] *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

[2]   "The elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law." *Hygh v. Jacobs*, 961 F.2d 359, 366 (internal quotations marks omitted).

Generally, confinement is "privileged" when there is probable cause to make an arrest. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). In other words, "[t]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or § 1983." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal quotation marks and citation omitted).

Probable cause to make an arrest "exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). "[T]he probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Jaegly*, 439 F.3d at 153 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ).

**\*5**   As the Second Circuit has emphasized, "probable cause is a fluid standard that does not demand hard certainties or mechanistic inquiries; nor does it demand that an officer's good-faith belief that a suspect has committed or is committing a crime be correct or more likely true than false." *Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) (internal quotation marks omitted). "Rather, it requires only facts establishing the kind of fair probability on which a reasonable and prudent person, as opposed to a legal technician, would rely." *Id.* (internal quotation marks and brackets omitted). In determining whether probable cause existed to support an arrest, courts must consider the totality of the circumstances, including the facts available to the arresting officer both immediately before and at the time of arrest. *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015).

Even if a court concludes that an arresting officer lacked probable cause to arrest, the officer is entitled to qualified immunity if the officer establishes that "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Williams v. City of New York*, No. 17 Civ. 4391 (ER), 2018 WL 4189515, at *2 (S.D.N.Y. Aug. 31, 2018) (internal quotation marks omitted). Put differently, an officer is entitled to qualified immunity if there is "arguable probable cause," a concept that turns on whether "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well[-]established law." *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (citation omitted).

## B. *Analysis*

Defendants argue that Johnson's claim for false arrest fails because there was probable cause to arrest him both for obstructing governmental administration ("OGA") under New York Penal Law § 195.05; [3] and for three types of disorderly conduct under New York Penal Law §§ 240.20(1), (3), and (6). [4] *See* Defs.' Mem. at 9–11. Moreover, Defendants argue that even if probable cause did not exist, *arguable* probable cause existed and, therefore, qualified immunity shields the officers from liability. *Id.* at 13–15.

[3]   § 195.05 provides, in relevant part, the following: "A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act." N.Y. Penal Law § 195.05 (McKinney 1998).

[4]   Those provisions in § 240.20 provide, in relevant part, the following: "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: (1) [h]e engages in fighting or in violent, tumultuous or threatening behavior; or ... (3) [i]n a public place, he uses

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

abusive or obscene language, or makes an obscene gesture; or ... (6) [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." N.Y. Penal Law §§ 240.20(1), (3), and (6).

Naturally, Johnson disagrees with Defendants and instead claims that there are triable issues of fact as to whether probable cause existed to arrest him.

Ultimately, the Court need not answer definitively whether there was probable cause to arrest Johnson for OGA and disorderly conduct because, at minimum, there was arguable probable cause to arrest him for both offenses. Accordingly, the claims against the NYPD officers are barred by the doctrine of qualified immunity, entitling Defendants to summary judgment on these claims as a matter of law.

i. Obstructing Governmental Administration ("OGA")

**\*6** "Under New York law, [OGA] has four elements: (1) prevention or attempt to prevent (2) a public servant from performing (3) an official function (4) by means of intimidation, force or interference." *Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010) (internal quotation marks omitted). Relevant here, "[a]n officer has probable cause to arrest for [OGA] where a person refuses to comply with an order from a police officer." *Marcavage v. City of New York*, No. 05 Civ. 4949 (RJS), 2010 WL 3910355, at \*10 (S.D.N.Y. Sept. 29, 2010) (quoting *Johnson v. City of New York*, No. 05 Civ. 7519 (PKC), 2008 WL 4450270, at \*10 (S.D.N.Y. Sept. 29, 2008) ), *aff'd*, 689 F.3d 98 (2d Cir. 2012).

In this case, Defendants contend that there was, at minimum, arguable probable cause to arrest Johnson for OGA when he failed to comply with numerous police orders to leave the block party. Defs.' Mem. at 11. The Court agrees. It is undisputed that Johnson first observed officers trying to disperse the block party crowd around 9:00 p.m., yet Johnson failed to leave at that time. *See supra* Part I.1. Indeed, Johnson testified that he remained seated at the block party throughout the approximately twenty minutes the police officers initially spent attempting to disperse the crowd. Moreover, Johnson acknowledges that he remained seated after the police officers returned to their vehicles and turned on their sirens—actions Johnson understood as further attempts to disperse the crowd. Johnson also acknowledges that he initially remained seated when the officers returned to the block party and directly asked him to leave. Under these facts, even viewing them in

a light most favorable to Johnson, no reasonable factfinder could conclude that he was compliant with the officers' lawful commands at this point in the evening.

Johnson argues, however, that there was not probable cause to arrest him for two reasons: (1) he did not "physically interfere" with the officers' performance of an official function; and (2) viewing the facts in a light most favorable to him, he was in the process of walking up the street when the officers arrested him. Pl.'s Mem. of Law in Opp. ("Pl.'s Mem.") at 11–12, Doc. 84. The Court disagrees with both arguments.

At the outset, the Court notes that Johnson is correct when he argues that an OGA arrest cannot be sustained based on a theory of *verbal* interference alone. *See Uzoukwu v. City of New York*, 805 F.3d 409, 414–15 (2d Cir. 2015). As the Second Circuit has observed, "[i]t is axiomatic that only *physical* interference is encompassed in [that] method of obstruction." *Id.* (emphasis added) (internal quotation marks, citations, and alterations omitted). That said, the physical interference requirement is construed broadly, and it is satisfied "when an individual intrudes himself into, or gets in the way of, an ongoing police activity." *Kass v. City of New York*, 864 F.3d 200, 210 (2d Cir. 2017) (brackets omitted), *cert. denied*, 138 S. Ct. 487 (2017). And here, the Court finds the physical interference requirement easily satisfied.

*Marcavage* is instructive. In that case, NYPD officers arrested two anti-abortion protestors and charged them with disorderly conduct after the protestors failed to comply with orders to move from a public sidewalk to a designated demonstration area during the 2004 Republican National Convention in New York City. 2010 WL 3910355 at \*1–3. After their charges were dismissed, the protestors sued the City for, among other claims, false arrest. *Id.* The district court granted summary judgment in favor of the City, concluding that "[p]laintiffs' repeated refusal to follow lawful dispersal orders created probable cause to arrest [p]laintiffs for [OGA] pursuant to N.Y. Penal Law § 195.05." *Id.* at \*10.

**\*7** The Second Circuit affirmed. 689 F.3d at 109–10. Importantly, while the Second Circuit noted that the plaintiffs were hostile and noncompliant toward the NYPD officers, *see id.*, its finding of probable cause did not turn on whether plaintiffs physically touched any of the officers; nor did it turn on whether plaintiffs attempted to intimidate the officers in any way. Rather, the Second Circuit found the existence of probable cause based on plaintiffs' repeated failures to comply

2019 WL 294796

with lawful orders to disperse. *Id.*; *see also Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 544–55 (E.D.N.Y. 2015) (finding probable cause to arrest plaintiff for OGA where plaintiff refused to comply with officer's lawful order to disperse); *Johnson*, 2008 WL 4450270, at *10 (finding probable cause to prosecute plaintiff for OGA where plaintiff ignored police orders to open the door and show his hands); *Allen v. City of New York*, 480 F. Supp. 2d 689, 715 (S.D.N.Y. 2007) (finding probable cause to arrest for OGA where inmate refused to obey correction officers' orders to move).

The facts in this case mirror those of *Marcavage* and others. On August 30, 2014, Johnson had ample time to leave the block party: He first observed police officers ordering everyone to leave the block party around 9:00 p.m., more than thirty minutes *before* his eventual arrest. And, while Johnson disputes that he cursed at any police officers directly that night, he admits that he stopped walking and remarked aloud that the officers "need[ed] to get a fucking life" *after* an officer had approached him and told him to leave for the second time. Based on these facts and the totality of circumstances—which included Johnson loitering among a crowd of partygoers that were yelling, cursing, and, at least in some instances, throwing glass bottles at officers trying to disperse an unpermitted block party—a police officer could reasonably have concluded that Johnson was refusing to comply with a lawful police order and therefore obstructing governmental administration. *See Kass*, 864 F.3d at 210.

Moreover, while Johnson testifies that he initially started to leave the block, the record is clear that he was not in the process of leaving immediately prior to his arrest. On the contrary, viewing the facts in the light most favorable to Johnson—in fact, relying *solely* on his own deposition testimony—the Court finds the following: After police officers returned to the block party, an officer directly ordered Johnson to leave. Johnson Dep. at 150:5–151:11. Johnson, however, waited roughly thirty seconds before he started to walk. *Id.* He then walked roughly two buildings away from his original spot, at which point he stopped and loitered among a hostile crowd of partygoers to watch an altercation between police officers and another man. *Id.* at 152:21–153:9. Johnson, at this point, was non-compliant with a lawful order. In addition, while still loitering, Johnson remarked aloud that the officers needed to "get a fucking life." *Id.* at 167:19–168:3. Johnson, at this point too, was non-compliant with a lawful order. Consequently, Johnson's refusal to leave the block party despite the officers' repeated attempts to disperse the crowd comfortably distinguishes this case from those in

which courts have found triable issues of fact as to whether a plaintiff was in the process of complying with police orders at the time of arrest. *See, e.g., Bryant v. Serebrenik*, No. 15 Civ. 3762 (ARR) (CLP), 2016 WL 6426372, at *4 (E.D.N.Y. Oct. 28, 2016) (finding summary judgment unwarranted where there was a dispute as to whether plaintiffs' children were attempting to comply with officers' orders immediately prior to arrest); *Gogol v. City of New York*, No. 15 Civ. 5703 (ER), 2017 WL 3449352, at *5 (S.D.N.Y. Aug. 10, 2017) (denying summary judgment to defendant-officer where there was a dearth of undisputed evidence demonstrating that the time between the officer's first order to leave and when plaintiff started to leave created an interference with the officer's attempts to clear the area).

**\*8** On these facts, the Court concludes that, at minimum, arguable probable cause existed to arrest Johnson for OGA, notwithstanding that Johnson started to comply with police orders before deciding to stop. [5] Consequently, Johnson's false arrest claims against Defendants are barred by the doctrine of qualified immunity and must be dismissed.

[5]     In reaching this conclusion, the Court does *not* hold that an individual's failure to comply *expeditiously* with a police officer's lawful request to disperse from the area always gives rise to arguable probable cause to arrest that individual for OGA pursuant to N.Y. Penal Law § 195.05.

### ii. Disorderly Conduct

Defendants also argue that there was, at minimum, arguable probable cause to arrest Plaintiff for disorderly conduct, pursuant to §§ 240.20(1), (3), and (6) of New York Penal Law. The Court agrees.

The analysis here is straightforward. To prove the crime of disorderly conduct under § 240.20, the following must be established: "(i) the defendant's conduct must be 'public' in nature, (ii) it must be done with 'intent to cause public inconvenience, annoyance or alarm' or with recklessness as to 'a risk thereof,' and (iii) it must match at least one of the descriptions set forth in the statute." *Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001). The statute sets forth seven separate descriptions of actions that constitute disorderly conduct. Relevant here, a person is guilty of disorderly conduct under § 240.20(1) when the person "engages in fighting or in violent, tumultuous or threatening

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 24 of 77

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

behavior." N.Y. Penal Law § 240.20(1) (McKinney 1965). A person is guilty under § 240.20(3) when, "[i]n a public place, he uses abusive or obscene language, or makes an obscene gesture." *Id.* § 240.20(3). And a person is guilty under § 240.20(6) if the person "congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." *Id.* § 240.20(6). Of course, in each of these scenarios, the person must also have acted with the requisite intent—that is, intent to cause public inconvenience, annoyance, or alarm—or with recklessness as to a risk thereof.

Here, the Court easily concludes that the officers had, at minimum, arguable probable cause to arrest Johnson for disorderly conduct under § 240.20(6). [6] To violate that provision, Johnson must have (1) congregated with others in (2) a public place and (3) refused to comply with (4) a lawful police order to disperse. *Id.* Johnson—as an attendee at a block party that drew hundreds of partygoers—undoubtedly was "congregating with others" at the time of arrest, satisfying the first prong of § 240.20(6). *See People v. Carcel*, 144 N.E.2d 81, 85 (N.Y. 1957) (explaining that the phrase "congregates with others," as used in the statute, "requires at the very least three persons assembling at a given time and place."). Johnson also was out in public at the time of arrest, satisfying the second prong of § 240.20(6). And Johnson does not dispute the legality of the police officers' myriad orders to disperse from the block party. Thus, the fourth prong of § 240.20(6) is satisfied.

[6]    Because the Court concludes that there was probable cause to arrest Johnson for disorderly conduct pursuant to N.Y. Penal Law § 240.20(6), it need not consider whether there was probable cause to arrest Johnson under other provisions of the statute.

**\*9**  Johnson, however, contends that there is a triable issue of fact as to whether he refused to comply with the police officers' order to disperse. The Court disagrees. As discussed above, the record shows that whereas Johnson eventually started to walk away from the block party, he stopped walking soon thereafter and was not in the process of leaving the block party at the time of his arrest. And given the size of the crowd, by failing to disperse Johnson recklessly created, at minimum, the risk of public inconvenience, annoyance, and alarm. Accordingly, an officer could reasonably have concluded that Johnson was refusing to comply with a lawful order to disperse and thus was in violation of § 240.20(6). *See*

*Caravalho v. City of New York*, No. 13 Civ. 4174 (PKC), 2016 WL 1274575, at \*7–8 (Mar. 31, 2016), *aff'd*, 732 F. App'x 18 (2018). Consequently, arguable probable cause existed to arrest him, entitling the defendant officers in this case to qualified immunity. [7]

[7]    Because the Court concludes that there was at least arguable probable cause to arrest Johnson, the Court need not consider Defendants' alternative contention that certain of the individual defendants were not "personally involved" in his arrest and thus cannot be held liable for false arrest. *See* Defs.' Mem. at 16–17.

### 3. Johnson's Claims for Excessive Force

#### A. *Legal Standard: Direct Participation and Failure to Intervene*

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Cox v. Fischer*, 248 F. Supp. 3d 471, 479 (S.D.N.Y. 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989) ). Where, as here, the plaintiff's excessive force claims arise from an arrest by police officers, courts should examine the reasonableness of the officers' use of force against the plaintiff's Fourth Amendment right to be free from unreasonable seizures. *Graham*, 490 U.S. at 394–95. This inquiry "require[s] a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Id.* at 396. In undertaking such an inquiry, the Supreme Court has instructed lower courts to give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [wa]s actively resisting or attempting to evade by flight." *Id.* at 396. The inquiry is objective: "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397. Put differently, "it is not relevant whether the officers thought the amount of force used was really necessary or were provoked to use that amount of force because of the abusive language they contend [the plaintiff] directed at them." *Brown v. City of New York*, 798 F.3d 94, 101 n.10 (2d Cir. 2015).

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 25 of 77

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

Moreover, it is well settled that a defendant in a § 1983 action may not be held liable for an award of damages to a plaintiff absent "personal involvement" in the conduct resulting in a constitutional violation. *See Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016). Personal involvement may be shown by two alternate methods. First, "[p]ersonal involvement may be shown by 'direct participation,' which requires in this context 'intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal.' " *Id.* (quoting *Provost*, 262 F.3d at 155).

Alternatively, personal involvement may be shown under a "failure to intervene" theory. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Mack v. Town of Wallkill*, 253 F. Supp. 2d 552, 559 (S.D.N.Y. 2003). Consequently, liability attaches to any police officer who was (1) present during the plaintiff's assault yet (2) failed to intervene on the plaintiff's behalf notwithstanding (3) a reasonable opportunity to do so. *See Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), *aff'd sub nom. Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). The Second Circuit has identified several illustrative factors to consider when addressing the question whether an officer had a realistic chance to intervene, including: (1) the numbers of police officers present; (2) the officers' relative placement; (3) the environment in which the officers acted; (4) the nature of the assault; and (5) the assault's duration, which the Second Circuit noted "will always be relevant and will frequently assume great importance." *Figueroa*, 825 F.3d at 107–08 (citation omitted).

**\*10** "The ability to proceed under the alternate theories of direct participation and failure to intervene is especially important 'where the acts complained of by the plaintiff, if true, (e.g., mace to the eyes, standing on back, 'mushing' face into the ground) are likely to have prevented plaintiff from identifying which of [the] defendant officers specifically engaged in the bad acts.' " *Gonzalez v. Waterbury Police Dep't*, 199 F. Supp. 3d 616, 622 (D. Conn. 2016) (citation omitted). At base, "[t]he essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a 'tacit collaborator' in the unlawful conduct of another." *Figueroa*, 825 F.3d at 107–08. Of course, much like proceeding under a theory of direct participation, a plaintiff proceeding under a failure-to-intervene theory must show that

the officer, at the time of his or her failure to act, observed or had reason to know that the plaintiff's constitutional rights were being violated at the hands of an official. *Mack*, 253 F. Supp. 2d at 559.

## B. *Analysis*

### i. Claims against Sergeant Perez and Officers Burke and Stapleton

Defendants argue that the excessive force claims should be dismissed summarily against Sergeant Perez and Officers Burke and Stapleton because those individuals never had physical contact with Johnson and therefore could not have directly participated in any use of force, much less excessive force, against him. Defs.' Mem. at 17–18. Moreover, Defendants contend that Johnson waived any opportunity to proceed under a failure-to-intervene theory because he failed to advance such a theory in his Third Amended Complaint. *Id.*

Johnson's response is twofold. First, he claims that there are genuine issues of material fact concerning whether Perez, Burke, and Stapleton had physical contact with him, considering all three defendants either placed themselves at the scene of his arrest and subsequent removal from the area or were identified by others as having been at the scene. Pl.'s Mem. at 16. Second, and alternatively, Johnson argues that he has properly advanced a failure-to-intervene theory of liability that survives summary judgment. *Id.* at 16–17. Below, the Court addresses each argument in turn.

To begin, the Court dismisses the notion that there are triable issues of fact as to whether Perez, Burke, or Stapleton interacted physically with Johnson. Johnson has failed to put forth *any* evidence, much less genuinely disputed evidence, tending to show that the aforementioned officers made physical contact with him. What's more, the Court concludes that Johnson has waived any right to challenge Defendants' factual assertions on this point—at least with respect to Sergeant Perez and Officer Stapleton—by failing to controvert the assertions adequately in his Response to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1. *See* Pl.'s 56.1 Resp. ¶¶ 70 (failing to controvert adequately Defendants' assertion that Officer Stapleton neither arrested Johnson nor assisted in his arrest), 85 (failing to controvert adequately Defendants' assertion that the first time Perez saw Johnson was as he was being carried to the ambulance by others), 88 (failing to controvert

Case 5:24-cv-01138-DNH-MJK   Document 12   Filed 10/29/24   Page 26 of 77

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

adequately Defendants' contention that Perez neither saw nor interacted with Johnson after watching him be carried off to an ambulance).[8]

[8]   In answering a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, litigants in this District are required by our Local Rules to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support their position by citing to admissible evidence in the record. *See* Local Rule 56.1(b)–(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). This Court's Individual Practices further require the nonmovant to reproduce each entry in the movant's Rule 56.1 Statement and to set forth a response directly beneath the entry. *See* Individual Practices R. 2(C)(i).

These rules—simple to understand and to apply—are designed to assist the Court by narrowing the scope of issues to be decided in a motion for summary judgment and by identifying the facts material and admissible to that decision-making process. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."). Unfortunately, Johnson's counsel has failed to comply with these straightforward requirements.

Johnson's 56.1 Response is deficient in several significant respects. *First*, his 56.1 Response frivolously purports to deny certain factual assertions that Johnson either has admitted in sworn testimony or has otherwise relied on in his opposition papers. See, for example, paragraph 55 of his Response: In that paragraph, Johnson reproduced a 56.1 entry by Defendants that asserted both that he cursed prior to his interaction with Officer Powell and that he exclaimed that the officers needed to get a life. *See* Pl.'s 56.1 Resp. ¶ 55. Defendants cited Johnson's deposition transcript at 167:19–168:1, which plainly states as much. *Id.* Yet, remarkably, in his 56.1 Response Johnson denies that he was cursing and denies that he exclaimed that the officers needed to

get a life—a denial that that contradicts his deposition transcript. Even more remarkable is the fact that Johnson, in support of his denials, cited the *same exact transcript pages* as Defendants. See also, as another example, paragraphs 100 through 102 of Johnson's 56.1 Response: In those paragraphs, Johnson reproduced 56.1 entries by Defendants that asserted both that Officer Tirado was the person who escorted Johnson to the hospital in an ambulance, and that Johnson "has no complaints against the officer that escorted him to the hospital." *See id.* ¶¶ 101–02. In response to these entries, Johnson "admits that the above testimony was given but does not concede the truth of the testimony." Importantly, however, Johnson does not point to *any* competent evidence suggesting Officer Tirado was not the officer who accompanied him to the hospital, and *Johnson's own deposition transcript*—cited by Defendants—plainly states that Johnson has no issues with the officer who accompanied him to the hospital. *See* Johnson Dep. at 212:21–214:25. Consequently, Johnson's hesitance to admit to these assertions are as perplexing to the Court as they are troubling.

*Second*, Johnson's 56.1 Response fails to comply with Fed. R. Civ. P. 56(c) and Local Rule 56.1 in that it fails to support many of Johnson's purported denials with citations to admissible evidence. On the contrary, in response to several of Defendants' factual assertions supported by record citations, Johnson states that he "admits that the above testimony was given but does not concede the truth of the testimony," notwithstanding that (1) he provides no record citations supporting a contrary conclusion, and (2) many of Defendants' assertions are drawn from or consistent with his deposition testimony and moving papers. *See, e.g.*, Pl.'s 56.1 Resp. ¶¶ 8 (refusing to concede that "[o]n August 30, 2014, there was a block party on West 164th Street between Amsterdam Avenue and Edgecombe Avenue, in Manhattan," while stating the same exact thing in his moving papers), 27 (refusing to concede that the crowd at the block party was hostile, cursing, and failed to disperse, notwithstanding his deposition testimony describing the crowd exactly as such), 39 (refusing to concede that bottles were being thrown at officers, notwithstanding his own deposition testimony describing the scene exactly as such), 51

Case 5:24-cv-01138-DNH-MJK   Document 12   Filed 10/29/24   Page 27 of 77

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

(refusing to concede that the block party crowd was hostile and telling officers, "Fuck out of here, go parole [sic] some real crime," notwithstanding his own deposition testimony stating as much).

*Third*, and finally, Johnson's 56.1 Response improperly interjects arguments and/or immaterial facts in response to factual assertions made by Defendants and supported by the record, without specifically controverting those assertions. *See, e.g.*, Pl.'s 56.1 Resp. ¶¶ 22, 104–05, 107, 121–22; *see also Costello v. N.Y. State Nurses Ass'n, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011)* (disregarding plaintiff's responses to defendants' Rule 56.1 Statement where plaintiff responded with conclusory assertions and legal arguments).

Such flagrant disregard of the Court's Rules cannot stand. *See Holtz, 258 F.3d at 74* (explaining that where a 56.1 Statement includes factual citations unsupported by the record, those factual assertions should be disregarded); *Costello, 783 F. Supp. 2d at 661 n.5* (disregarding plaintiff's responses to defendants' Rule 56.1 statement where plaintiff failed to refer to evidence in the record). "Responses of this nature, which do not point to any evidence in the record that may create a genuine issue of material fact, do not function as denials, and will be deemed admissions of the stated fact." *Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454, 458 n.1 (S.D.N.Y. 2011); Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 n.42 (S.D.N.Y. 2011)* ("56.1 statements not explicitly denied by plaintiff are deemed admitted"); *Geoghan v. Long Island R.R., No. 06 Civ. 1435 (CLP), 2009 WL 982451, at *5–6 (E.D.N.Y. Apr. 9, 2009)* ("Since plaintiff's response does not dispute the accuracy of the assertion, the assertion is deemed to be admitted by plaintiff for purposes of this motion.").

Although the Court is not required to search the record for genuine issues of material fact that Johnson's counsel failed to bring to the Court's attention, *Holtz, 258 F.3d at 73*, the net result of counsel's deficiencies has been to impose on the Court and its limited resources the burden of parsing the entirety of the voluminous record in the case to ensure that his client's claims receive thorough and just consideration. Accordingly, when analyzing the instant motion, the Court has, at times, disregarded averments in Johnson's 56.1 Response that are not supported by citations to admissible evidence in the record, or that are contradicted by other admissible evidence in the record, or that are improper legal arguments. To the extent that any assertions in Johnson's Statement of Additional Material Facts Pursuant to Local Civil Rule 56.1 are supported by admissible evidence in the record sufficient to create a triable issue of fact as to one of Defendants' factual assertions, the Court will, of course, consider such assertions. Moreover, where possible, and in the interests of justice, the Court has relied on uncited record evidence creating genuine disputes of material fact—such as uncited testimony from Johnson's deposition transcript—where relevant facts were not included in either of the parties' Rule 56.1 submissions.

In the future, it simply will not do for counsel to say that genuine issues of material fact exist and then rely on the Court to go find them. Much more is expected from an experienced member of the bar of this Court and will henceforth be *strictly* required.

**\*11** Next, the Court turns to whether excessive force claims can be sustained against Perez, Burke, and Stapleton based on a failure-to-intervene theory. At the outset, the Court dismisses Defendants' argument that Johnson has failed to advance such a theory in his complaint. Instead, the Court concludes that Johnson included in his complaint enough details of the contours of his excessive force claim to provide fair and adequate notice to Defendants. *See* Third Amended Compl. ¶¶ 22 ("At all times relevant to this Complaint, all defendants acted in concert and conspired together through both their acts and *omissions* and are jointly and severally liable for the harms caused to plaintiff." (emphasis added) ), 46 ("As a direct and proximate result of the acts and *omissions* of defendants, plaintiff sustained severe and permanent injuries" (emphasis added) ). Pleading an excessive force claim is enough; Johnson need not define with particularity at the pleading stage the exact theories of liability he will employ at trial.

Notwithstanding the propriety of advancing a failure-to-intervene theory, the Court concludes that Johnson cannot sustain his claim against Sergeant Perez on this theory because it is undisputed that Perez witnessed neither the alleged force used during Johnson's initial takedown and arrest nor the alleged punch suffered by Johnson next to the ambulance. *See* Pl.'s 56.1 Resp. ¶¶ 70, 88. Rather, the uncontroverted evidence in this case reveals that immediately

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 28 of 77

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

prior to Johnson's confrontation with Defendant Powell, Perez was "struck in the face with a bottle, fracturing two teeth;" and while Johnson was being carried away by other officers, Perez was tending to Powell, who had also been hit with a bottle. *See Id.* ¶¶ 41, 85–88.

The Court concludes, however, that summary judgment in favor of Officers Burke and Stapleton is unwarranted. Defendants have not moved for summary judgment against Officers Powell, Staples, and Joseph, appropriately conceding that there are triable issues of fact with respect to whether those officers used excessive force in effectuating Johnson's arrest. Given that the deposition testimony and video evidence proffered tend to place Burke and Stapleton within proximity of Powell, Staples, Joseph, viewing the facts in the light most favorable to Johnson, a reasonable factfinder could very well conclude that the former group of officers observed a constitutional violation initiated by the latter group; that they had time to intervene; and that they failed to do so nonetheless. *See Id.* ¶¶ 69, 72–73; Defs.' 56.1 Counterstatement ¶ 29. The cases in this district denying summary judgment on similar facts are legion. *See, e.g., Fischl v. Armitage,* 128 F.3d 50, 56–57 (2d Cir. 1997) (holding that plaintiff-inmate had produced a triable issue of material fact as to the personal involvement of defendant-officer in an unconstitutional assault by other inmates where the admissible record would permit a reasonable juror to conclude that defendant-officer had been in the vicinity of the attack, heard plaintiff's screams, yet did nothing to stop the attack); *Rivera v. Madan,* No. 10 Civ. 4136 (PGG), 2013 WL 4860116, at *10 (S.D.N.Y. Sept. 12, 2013) ("Here, it is undisputed that Officer Roberson did not use force against Plaintiff ..., but there is evidence that she was present when Officer Madan allegedly slammed Plaintiff's head into the floor, and did not intervene.... Construing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Officer Roberson violated her duty to intervene to prevent other officers from violating Rivera's constitutional rights."); *Vesterhalt v. City of New York,* 667 F. Supp. 2d 292, 297–98 (S.D.N.Y. 2009) (denying summary judgment to defendant-officers where plaintiff testified that she could not identify which officer assaulted her but defendant-officers' testimonies revealed that they were all present during the assault, and "it is possible that all of the officers saw what happened" to her, yet failed to intervene"); *Younger v. City of New York,* 480 F. Supp. 2d 723, 731–33 (S.D.N.Y. 2007) (denying summary judgment to certain officers where record evidence tended to place the officers at the scene of plaintiff's alleged beating and the officers conceded that there

were triable disputes of fact surrounding the force used in effectuating plaintiff's arrest by others at the scene); *Usavage v. Port Auth. of New York & New Jersey,* 932 F. Supp. 2d 575, 599–600 (S.D.N.Y. 2013) ("[S]ummary judgment is inappropriate when there are genuine disputes of material fact concerning what the officers who failed to intervene observed regarding the other officers' alleged violations of plaintiffs' constitutional rights." (internal quotation marks omitted) ); *Skorupski v. Cty. of Suffolk,* 652 F. Supp. 690, 694 (E.D.N.Y. 1987) (denying summary judgment on excessive force claims to almost named defendants where "[a]ll the named defendants, with the exception of [one], ha[d] admitted being present during the arrest, and two ... admit[ted] physical contact with plaintiff"). Consequently, the excessive force claims against Officers Burke and Stapleton may proceed to trial on a failure-to-intervene theory of excessive force.

### ii. Claims against Officers Tirado and Valerio

**\*12** The Court now turns to the excessive force claims against Officers Tirado and Valerio. At the outset, the Court dismisses the excessive force claim against Officer Tirado, given that Johnson has expressly disavowed all claims against the officer who accompanied him to the hospital, and he has not produced any evidence to controvert Tirado's statements that *he* was the officer who accompanied Johnson to the hospital. *See supra* note 8. The claim against Valerio, however, requires further analysis.

With respect to Valerio, Defendants seek summary judgment on the ground that there exists a dearth of record evidence suggesting Valerio had personal involvement of any kind with the alleged acts of excessive force exacted upon Johnson. The Court disagrees. For one thing, Defendants concede that Valerio had his baton drawn while in some (albeit disputed) proximity to Johnson during Johnson's struggle and eventual arrest. Defs.' 56.1 Counterstatement ¶ 30. Defendants also concede—as they must—that Valerio, along with others, helped carry Johnson to an ambulance soon after he was handcuffed. *See id.* ¶ 28. And Johnson contends that he was punched by an unidentified officer soon after being dragged and seated on the ground next to the ambulance. Given Valerio's physical involvement with Johnson during this time and viewing the facts in a light most favorable to Johnson, a rational factfinder could conclude that Valerio helped exact excessive force upon him. Moreover, even assuming arguendo that Valerio lacked physical contact with Johnson, Valerio's proximity to Johnson both at the time of

Case 5:24-cv-01138-DNH-MJK   Document 12   Filed 10/29/24   Page 29 of 77
Johnson v. City of New York, Not Reported in Fed. Supp. (2019)
2019 WL 294796

his arrest and at the time he was seated by the ambulance creates an issue of triable fact as to whether Valerio failed to intervene during any of the alleged assaults. [9] That Johnson cannot identify which officers exacted excessive force against him is, therefore, of no moment. *See Jeffreys*, 275 F. Supp. 2d at 474 ("A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene."); *Vesterhalt*, 667 F. Supp. 2d at 297–98; *Gonzalez*, 199 F. Supp. 3d at 622 (explaining same). Rather, it is enough that there exists admissible evidence tending to place Valerio —in addition to Officers Burke and Stapleton—near the scene of Johnson's alleged assaults.

[9]     The Court notes that while Defendants assert—and Johnson does not adequately dispute—that (1) Valerio first observed Johnson while he was already on the ground and in the process of being arrested, *see* Pl.'s 56.1 Resp. ¶ 74, and that (2) Valerio was performing crowd control while other officers arrested Johnson, *see* Pl.'s Resp. ¶ 75, neither assertion negates the genuine disputes as to (1) whether Valerio imposed excessive force upon Johnson while he was being arrested (or thereafter), and (2) whether Valerio failed to intervene after observing officers use excessive force upon Johnson. Defs.' 56.1 Counterstatement ¶¶ 28–30.

\* \* \* \* \*

In sum, the Court will grant summary judgment to Defendants as to Johnson's claims excessive force claims against Perez and Tirado, and the Court will deny summary judgment to Defendants as to Johnson's excessive force claims against Burke, Stapleton, and Valerio.

### 4. Johnson's State Law Claims

Defendants contend that Johnson's state law claims are all barred because he failed to comply with the mandatory conditions precedent to suit contained in Sections 50-e and 50-h of the New York Consolidated Laws, General Municipal Law. Below, the Court addresses each argument in turn.

### A. *Compliance with N.Y. Municipal Law § 50-e(6)*

**\*13**  Defendants contend that Johnson failed to comply with the conditions precedent set forth in § 50-e of the New York's

General Municipal Law because he filed a defective notice of claim against the City. Specifically, Defendants contend that Johnson filed a notice of claim that contained: (1) the wrong address—stating that his alleged beating by police officers occurred on August 31, 2014, instead of August 30, 2014; and (2) the wrong location—stating that the alleged beating occurred in Washington Heights, New York, at or near the intersection of Edge*wood* Avenue and West 164th Street, as opposed to Edge*combe* Avenue and West 164th Street. Johnson's failure to provide the correct date and location of the alleged beating allegedly prejudiced Defendants because the defects did not enable the City to investigate Johnson's claims. Defs.' Mem. at 22–23. The Court disagrees.

It is well settled that federal courts entertaining state law claims against municipalities are obligated to apply any applicable state law notice-of-claim provisions. *See Perez v. City of New York*, 07 Civ. 10319 (RJS) (KNF), 2009 WL 1616374, at \*12 (S.D.N.Y. June 8, 2009). "Under New York law, a plaintiff must file a notice of claim before suing municipal defendants in a personal injury action." *Rentas v. Ruffin*, 816 F.3d 214, 226–27 (2d Cir. 2016). The notice must be served within 90 days after the claim arises. N.Y. Gen. Municipal Law § 50-e(1)(a) (McKinney 2013). Among other things, the notice must set forth the following: "(1) the name and post-office address of each claimant, and of his attorney, if any; (2) the nature of the claim; (3) *the time when, the place where and the manner in which the claim arose*; and (4) the items of damage or injuries claimed to have been sustained." *Id.* § 50-e(2) (emphasis added). "Notice of claim requirements are construed strictly by New York state courts," and "[f]ailure to comply with these requirements ordinarily requires dismissal for failure to state a cause of action." *Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 793–94 (2d Cir. 1998) (citations omitted). That being said, "[a]t any time after the service of a notice of claim ..., a mistake, omission, irregularity or defect made in good faith ... may be corrected, supplied or disregarded, as the case may be, in the discretion of the court, provided it shall appear that the other party was not prejudiced thereby." N.Y. Gen. Municipal Law § 50-e(6).

Here, Johnson failed to adhere to the clear and unambiguous requirements of 50-e, in that he failed to provide the City with the exact date and location of his alleged beating. However, Defendants hardly lacked information sufficient to embark on an investigation of Johnson's claims. A cursory glance of a New York City map would quickly apprise a reasonable investigator that Johnson's notice of claim likely referred to the intersection between West 164th Street and Edge*combe*

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 30 of 77

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

Avenue, not Edge*wood* Avenue—especially considering that Johnson identified Washington Heights, New York, as the location of the incident. Johnson's notice also states that officers with the NYPD's 33rd Precinct attacked him, further narrowing the universe of potential incidents. The scope of any such investigation would also be limited in nature, given that Johnson provided a date close in time to the actual date of his arrest and alleged beating. Moreover, the record is devoid of evidence suggesting that Johnson's defective notice was the product of bad faith. Nor does the record evidence suggest that the City was prejudiced by Johnson's errors. Accordingly, the Court will exercise its discretion under § 50-e(6) and disregard the defects in Johnson's notice of claim.

**B. Compliance with N.Y. Gen. Municipal Law § 50-h**

Defendants contend that Johnson failed to comply with § 50-h and, therefore, Johnson's claims under state law should be dismissed. The Court agrees.

**\*14** In relevant part, § 50-h(1) provides that "[w]herever a notice of claim is filed against a city, ... the city ... shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made." N.Y. Gen. Municipal Law § 50-h(1) (McKinney 2013). Going further, § 50-h(5) provides that "[w]here a demand for examination has been served[,] ... no action shall be commenced against the city ... against which the claim is made unless the claimant has duly complied with such demand for examination." The City is required to reschedule a 50-h hearing if the claimant requests an adjournment or postponement of the hearing. *Id.* However, "[s]everal courts have held ... that a plaintiff's failure to attend a [§] 50-h [h]earing—*no matter the reason*—is a complete bar to his state law claims against the City." *Duncan v. City of New York*, 11 Civ. 3901 (ENV), 2018 WL 3421312, at \*3 (E.D.N.Y. July 13, 2018) (quoting *Kennedy v. Arias*, No. 12 Civ. 4166 (KPF), 2017 WL 2895991, at 13 (S.D.N.Y. July 5, 2017) ).

In this case, the City demanded a § 50-h hearing, which was originally scheduled for November 14, 2014. Pl.'s 56.1 Resp. ¶ 109. Johnson's representative requested, and the City granted, adjournments on at least two separate occasions after the original hearing date. *Id.* ¶¶ 112, 117.

Johnson's last scheduled hearing was for July 28, 2015. *Id.* ¶ 119. However, Johnson's representative called the City on

July 27, 2015, and informed them that Johnson would not be appearing for the July 28 hearing. *Id.* ¶ 121. Defendants claim that Johnson's representative did not request another adjournment. Consequently, as Defendants see it, because Johnson neither appeared for his § 50-h hearing nor requested an adjournment prior to filing the instant action, Johnson failed to comply with the condition precedent to suit set forth in § 50-h(5).

Johnson, on the other hand, argues that his representative did, in fact, request an adjournment of the § 50-h hearing, and he blames the City for failing to reschedule it. Pl.'s Mem. at 20–22. In support of his position, Johnson attached to his moving papers an affidavit of Ms. Maria Ortega, a former paralegal for Johnson's counsel, who was at one time assigned to Johnson's case. *See* Doc 83-22. In her affidavit, Ms. Ortega acknowledges that she has "no independent recollection" of requesting an adjournment of the July 28 hearing. Nevertheless, she avers that, pursuant to the law firm's "set procedure," if a client, like Johnson, had a pending criminal matter, she would have requested an adjournment of the § 50-h hearing until the criminal matter concluded. She further averred that, following the criminal matter's conclusion, she would have requested that the City schedule a § 50-h hearing. She claims to have never waived a client's § 50-h hearing.

After careful consideration, the Court finds that there are quintessential factual disputes concerning whether Johnson's representative did, in fact, request an adjournment. [10] However, the Court does not find these factual disputes material. In particular, the Court finds the reasoning in *Gilliard v. City of New York* persuasive:

> Although the Second Circuit has not definitively decided the issue, courts have placed the burden on the plaintiff to resolve any discrepancies regarding the rescheduling of a 50–h Hearing in accordance with the Second Circuit's directive to construe Notice of Claim requirements "strictly." Disregarding any proffered reason is also good policy: while the City must handle the rescheduling of thousands of 50–h Hearings, a plaintiff is only concerned with her own and is in a better position to ensure that the parties are

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 31 of 77

on the same page. For these reasons, Plaintiff's failure to attend the 50–h Hearing—no matter the reason—is a complete bar to his state law claims against the City.

**\*15** No. 10 Civ. 5187 (NGG), 2013 WL 521529, at \*16 (E.D.N.Y. Feb. 11, 2013) (internal citations omitted); *see also Duncan*, 2018 WL 3421312, at \*3; *Kennedy*, 2017 WL 2895901, at \*13. The logic of this approach is sound.[11] Johnson is suing the City, and Johnson is the one responsible for prosecution of this action. Accordingly, Johnson is in a better position to ensure that all conditions precedent have been met prior to filing suit. Because he has failed to adhere to this condition precedent prior to filing suit, his state law claims are dismissed.

10    For example, while Defendants contend that the Office of the Comptroller of the City of New York does not accept verbal requests for adjournments, *see* Defs.' Mem. at 10 n.6, it is undisputed that the City granted Johnson adjournments on two separate occasions, and there is no record evidence suggesting that the adjournments resulted from formal written requests.

11    The Court notes that neither federal nor New York state courts within this Circuit are consistent on this point. *Compare, e.g., Kennedy v. Arias*, No. 12 Civ. 4166 (KPF), 2017 WL 2895901, at \*13 (S.D.N.Y. July 5, 2017); *Bernoudy v. Cty. of Westchester*, 837 N.Y.S.2d 187 (App. Div. 2007) (2d Dep't) ("The Supreme Court properly granted the defendants' motion to dismiss the complaint, since the hearing pursuant to General Municipal Law § 50-h was adjourned at the plaintiff's request, and he commenced this action without rescheduling a new hearing date after the last adjournment."); *Best v. City of New York*, 468 N.Y.S.2d 7, 8 (App. Div. 1983) (1st Dep't); *with, e.g., Anderson v. Liberty Lines Transit, Inc.*, 31 N.Y.S.3d 882 (App. Div. 2016) (1st Dep't) (Liberty's motion to dismiss the complaint on the ground that plaintiff failed to attend a [§ 50-h] hearing was properly denied. The record established that Liberty granted plaintiff an adjournment of the hearing, did not set a

subsequent date, and never sought to reschedule the hearing.").

**5. <u>Johnson's Claim for Municipal Liability</u>**
In his Third Amended Complaint, Johnson alleges that the City is liable for his § 1983 claims for false arrest and excessive force because the City "developed and maintained policies and/or customs exhibiting deliberate indifference to the constitutional rights of persons incarcerated in the custody of the [NYPD], which policies and/or customs caused the violation of [his] rights." Third Amended Compl. ¶ 54, Doc. 36. Johnson claims that "it was the policy and/or custom" of the City "to improperly or inadequately investigate complaints of people in the custody of the [NYPD], and acts of abuse, excessive force, and misconduct were instead tolerated, encouraged, and ratified by" the City. *Id.* ¶ 55.

In their motion for summary judgment, Defendants argue that Johnson's municipal liability claim is "entirely conclusory and unsupported by anything in the record." Defs.' Mem. at 20. Johnson, in response, maintains that the "[t]he record supports this claim based on the pervasive use of excessive force against the plaintiff and others on the night of August 30, 2014." Pl.'s Mem. at 19. Defendants' motion for summary judgment on this claim is granted.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In other words, a municipality cannot be held liable for the tort of its employees based on the doctrine of *respondeat superior*. *Coon v. Town of Springfield*, 404 F.3d 683, 686–87 (2d Cir. 2005) (citing *Monell*, 436 U.S. at 694); *see also Hunter v. Town of Mocksville*, 897 F.3d 538, 553–54 (4th Cir. 2018) (explaining that "a municipality cannot be held liable *solely* because it employs a tortfeasor" (internal quotation marks and citation omitted) ). Consequently, isolated acts of excessive force by non-policymaking municipal employees are insufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability. *Villante v. Dep't of Corr.*, 786 F.2d 516, 519 (2d Cir. 1986). "On the other hand, such acts would justify liability of the municipality if, for example, they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of

Case 5:24-cv-01138-DNH-MJK   Document 12   Filed 10/29/24   Page 32 of 77

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Jones v. Town of E. Haven,* 691 F.3d 72, 81 (2d Cir. 2012).

**\*16** Here, while Johnson contends that his municipal liability claim is "based on a policy implemented by the City," pursuant to which the City failed to investigate claims of excessive force, resulting in officers customarily using excessive force without fear of reprisal, *see* Pl.'s Mem. at 18–19, he has produced no evidence to support this assertion. Defendants' motion for summary judgment is therefore granted on this claim.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part. Specifically:

(1) The Court GRANTS summary judgment to Defendants on Johnson's claims against the NYPD;

(2) The Court GRANTS summary judgment to Defendants on Johnson's claims for false arrest under state and federal law;

(3) The Court GRANTS summary judgment to Defendants on Johnson's claims against Sergeant Perez and Officer Tirado for excessive force;

(4) The Court DENIES summary judgment to Defendants on Johnson's claims of excessive force against Officer Burke, Officer Stapleton, and Officer Valerio; [12]

(5) The Court GRANTS summary judgment to Defendants on Johnson's claim for municipal liability under 42 U.S.C. § 1983; and

(6) The Court GRANTS summary judgment to Defendants on Johnson's remaining claims under state law for failure to comply with conditions precedent to suit.

Defendants did not move for summary judgment with respect to Johnson's excessive force claims against Officers Powell, Staples, and Joseph. Thus, those claims will also proceed to trial.

[12]  The Court reiterates that Johnson may prove his claims against Burke and Stapleton at trial on a failure-to-intervene theory of liability only, as there is no genuine issue of fact with respect to whether those defendants exacted any force *physically* upon Johnson. *See supra* Part III.3.B.i.

The parties are directed to appear for a status conference on Tuesday, February 26, 2019, at 10:00 A.M. The Clerk of Court is respectfully directed to terminate the motion, Doc. 79.

It is SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2019 WL 294796

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 33 of 77

Ross v. Willis, Not Reported in Fed. Supp. (2021)
2021 WL 3500163

2021 WL 3500163
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Antoine ROSS, Plaintiff,
v.
Captain Dion WILLIS, Correction Officer
George, Shield #732, Correction Officer
Genoves, Shield # 17683, Defendants.

16 Civ. 6704 (PAE) (KNF)
|
Signed 08/09/2021

**Attorneys and Law Firms**

Justin M Ellis, Lauren F. Dayton, Sara Ellen Margolis, MoloLamken LLP, New York, NY, for Plaintiff.

Joshua Alan Weiner, Herzfeld & Rubin, P.C., William Thomas GoslingPhilip Rudolph DePaul, Qiana Charmaine Smith, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

OPINION & ORDER

Paul A. Engelmayer, United States District Judge

 **\*1** Plaintiff Antoine Ross ("Ross") brings this action under 42 U.S.C. § 1983 alleging that, while in pretrial detention on Rikers Island, defendants Captain Dion Willis ("Willis"), Correction Officer Sadoc Genoves ("Genoves"), and Correction Officer Rochaurd George ("George") violated his constitutional rights. The incident in question occurred when defendants entered Ross's cell so as to produce him for court. Willis sprayed Ross in the face with an MK-9 chemical agent, which, due to his asthma, caused him significant distress. Ross brings § 1983 claims against Willis for excessive force, against George and Genoves for failure to intervene, and against all defendants for deliberate indifference to the risk of serious injury or illness.

Defendants now move for summary judgment on all claims. For the reasons that follow, the Court denies defendants' motion as to the excessive force and failure intervene claims, which will now proceed to trial. The Court grants defendants' motion as to the deliberate indifference claims.

**I. Background**

**A. Factual Background** [1]

[1] This factual account draws primarily from the parties' submissions on defendants' motions for summary judgment, including the Joint Statement of Undisputed facts, Dkt. 144 ("JSF"), defendants' Local Rule 56.1 statements, Dkts. 146-2 ("Willis 56.1"), 151 ("CO 56.1"), Ross's response to Willis's Rule 56.1 statement, Dkt. 183 at 1–11 ("Ross-Willis Counter 56.1"), Ross's response to Genoves's and George's Rule 56.1 statement, Dkt. 183 at 12–18 ("Ross-CO Counter 56.1"), Ross's Rule 56.1 statement of additional relevant facts, Dkt. 183 at 19–30 ("Ross 56.1"), defendants' Rule 56.1 reply statements, Dkts. 174 ("Willis Reply 56.1"), 178 ("CO Reply 56.1"), and the declarations (with accompanying exhibits) of James Frankie, Esq., Dkts. 146-3 ("Frankie Decl."), 172 ("Frankie Reply Decl."), Joshua Weiner, Esq., Dkts. 150 ("Weiner Decl."), 177 ("Weiner Reply Decl."), and Sarah Margolis, Esq., Dkt. 184 ("Margolis Decl."). The Court also relies on a handheld video capturing some events at issue, Margolis Decl., Ex. 1 ("Video") (filed with the Court), and a joint stipulated transcript of the video, Dkt. 145 ("Video Tr.").

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

### 1. The Parties

**\*2** On June 14, 2016, Ross was a pretrial detainee at Otis Bantum Correctional Center ("OBCC") at Rikers, and was being housed in 1 West, cell 30, within OBCC. JSF ¶¶ 2–4. 1 West was designated as Enhanced Supervision Housing ("ESH"), which is used for inmates who pose a security or safety risk to other inmates. *Id.* ¶ 5; *see also* Frankie Decl., Ex. L (New York City Charter, Title 40, Board of Correction § 1-16, Enhanced Supervision Housing). Ross was formerly a member of the Bullets, a gang affiliated with the Bloods. Willis 56.1 ¶ 2; Ross-Willis Counter 56.1 ¶ 2; Ross Tr.[2] at 173. The parties dispute whether, as of June 14, 2016, Ross was still affiliated with the gang. *See* Willis 56.1 ¶ 2; Ross-Willis Counter 56.1 ¶ 2.

[2]      For simplicity, the Court collectively refers to all excerpts of Ross's deposition as "Ross Tr." *See* Frankie Decl., Ex. I; Weiner Decl., Ex. A; Margolis Decl., Ex. 2; Frankie Reply Decl., Ex. S.

Willis was appointed a Correction Officer on June 2, 2005, and was promoted to Captain on January 17, 2014. Willis 56.1 ¶ 3; Ross-Willis Counter 56.1 ¶ 3. On June 14, 2016, he was assigned to the OBCC command as intake captain. JSF ¶ 2; Willis 56.1 ¶ 6; Ross-Willis Counter 56.1 ¶ 6. George was appointed a Correction Officer on August 27, 2009. Willis 56.1 ¶ 4; Ross-Willis Counter 56.1 ¶ 4. CO Genoves was appointed a Correction Officer on November 10, 2005. Willis 56.1 ¶ 5; Ross-Willis Counter 56.1 ¶ 5. On June 14, 2016, George and Genoves were assigned to the OBCC command as intake correction officers in OBCC. JSF ¶ 2; Willis 56.1 ¶ 6; Ross-Willis Counter 56.1 ¶ 6.

### 2. Ross's Medical History

Ross was first diagnosed with asthma as a child. JSF ¶ 6. As an adult, Ross visited the emergency room multiple times as a result of his asthma symptoms, including in May 2013, January 2015, and June 2015. *Id.* ¶ 7.

On January 29, 2016, after Ross entered DOC custody, DOC medical staff diagnosed him with "asthma with acute exacerbation" from having been exposed to a "chemical agent." *Id.* ¶ 8. Medical staff prescribed "Qvar 80 MCG/ACT Aerosol Solution," a "maintenance medication" that Ross was to take every day; Ross's medical records indicate that

he was still prescribed this medication as of June 14, 2016. *Id.* ¶¶ 9–10. Ross was also prescribed an inhaler, a "rescue medication," which he was to carry with him at all times. *Id.* ¶ 10.

On April 7, 2016, DOC mental health staff diagnosed Ross with depression, and, on May 6, 2016, prescribed him Remeron, which he had previously been prescribed for depression. *Id.* ¶ 11. Between May 12, 2016 and June 14, 2016, Ross was prescribed 45 mg of Remeron, to be taken at bedtime. *Id.* Larry Blackmore ("Blackmore"), a physician's assistant at DOC, *id.* ¶ 10, testified that Remeron can cause "drowsiness, fatigue, and dizziness," *id.* ¶ 12. Ross testified that, on the night of June 13, 2016, he had been given Remeron at "around sevenish, eightish" at night. *Id.* ¶ 13. Ross testified that the Remeron was given to him in the evening to help him sleep. *See* Ross Tr. at 59.

### 3. DOC Use of Force and Prisoner Production Policies

DOC has developed policies related to use by its officers of force on inmates, use of chemical agents by DOC officers on inmates, and production of inmates to court. JSF ¶ 14; Frankie Decl., Ex. A ("DOC Prisoner Prod. Dir."); *id.*, Ex. B ("DOC Chemical Agents Dir."); *id.*, Ex. C ("DOC UOF Dir."). "DOC's policies, including directives, operations orders, and teletypes, are mandatory for all DOC personnel to follow, including members of probe teams." JSF ¶ 15.

As of June 14, 2016, DOC officers were required to intervene if they saw any officer, "including a captain, violating a DOC policy." *Id.* ¶ 16. Chief Kenneth Stukes ("Stukes"), DOC's 30(b)(6) witness, testified that all DOC officers receive training on use of force, anticipated use of force events, the use of chemical agents, and how to handle an inmate who refuses to go to court. Stukes Tr. at 52–53, 124–25, 161, 224–26.[3] All three defendants received such training. *See* Ross 56.1 ¶ 24; Willis Reply 56.1 ¶ 24; CO Reply 56.1 ¶ 24.

[3]      For simplicity, the Court collectively refers to all excerpts of Stukes's deposition as "Stukes Tr." *See* Frankie Decl., Ex. F; Margolis Decl., Ex. 9.

**\*3** On the date of a scheduled court appearance, OBCC staff usually wake up the inmate between approximately 4 a.m. and 5 a.m.; the inmate is given an opportunity to gather legal papers, eat breakfast, and shower before his appearance. *See* JSF ¶ 21; Willis 56.1 ¶ 11; Ross-Willis Counter 56.1 ¶ 11; *see*

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 35 of 77

*also* Stukes Tr. at 50. The buses that transport inmates to the courthouse typically arrive between 6 a.m. and 7 a.m., and continue to arrive throughout the day as necessary. JSF ¶ 21. Inmates are not required to wake up for breakfast. *See* Monroe Tr. [4] at 85. When an inmate refuses to go to court, the area supervisor is supposed to first determine whether the inmate's reason for refusal is one that is "recognized by an agency." Stukes Tr. at 51; *see also* Ross 56.1 ¶ 39. [5]

[4]    For simplicity, the Court collectively refers to all excerpts of Monroe's deposition as "Monroe Tr." *See* Frankie Decl., Ex. E; Weiner Decl., Ex. E; Margolis Decl., Ex. 7; Frankie Reply Decl., Ex. T.

[5]    Willis disputes this statement on the grounds that this requirement is conditioned on the inmate's cooperation and that a probe team captain is not an area supervisor. *See* Willis Reply 56.1 ¶ 39. However, Willis's counter-statement does not include a citation to the record supporting these factual claims.

An inmate refusing to go to court is an "anticipated use of force" event. Stukes Tr. at 53; DOC UOF Dir. § IV.C.2. When there is an anticipated use of force event in which an extraction is required, the supervising captain, before using force, should attempt to contact DOC mental health personnel. Stukes Tr. at 20–26, 168–69; DOC UOF Dir. § V.A.2. "If the opportunity presents itself," supervising captains are directed to maintain dialogue with tour commanders to determine whether an inmate has a "contraindicator," such as asthma, that would preclude use of chemical agents. DOC UOF Dir. § IV.D; Stukes Tr. at 207–08 (asthma is contraindicator for use of chemical agents).

DOC policy designates use of hand-held chemical agents as a lesser degree of force than physical contact, *see* DOC Chemical Agents Dir., but it prohibits chemical agents from being used against inmates who have a contraindication to chemical agents, *see* Stukes Tr. at 22–26, 116–18, 225. Officers who carry chemical agents receive annual training on their use, *id.* at 226, 232–33; Willis received such training, Willis Tr. at 22, 24, 29, 41. Chemical agents are not supposed to be used at a distance under six feet. Stukes Tr. at 219–20.

### 4. Events of June 14, 2016

#### a. Ross's Initial Refusal to Go to Court

On June 14, 2016, Ross had a scheduled court appearance in Bronx County, New York. JSF ¶ 22; Willis 56.1 ¶ 7; Ross-Willis Counter 56.1 ¶ 7; *see also* Margolis Decl., Ex. 10 (court record from the Supreme Court of New York, Bronx County). Captain Latonia Monroe ("Monroe") testified that, that day, a correction officer informed her that Ross was refusing to go to court. JSF ¶ 23; Monroe Tr. at 74, 84. Monroe testified that, at approximately 6:40 a.m., she went to speak to Ross about why he was refusing to go to court, *see* JSF ¶ 24; Monroe Tr. at 74; Ross, however, does not recall interacting with Monroe at all that morning, *see* Ross Tr. at 55. Monroe testified that when she reached Ross's cell, she saw him lying on his bed, but could not recall in what position. JSF ¶ 25; Monroe Tr. at 77–78. She testified that she attempted to speak to him several times but that she was unable to get any information from Ross other than that he did not want to go to court. Monroe Tr. at 77–80. She eventually left Ross's cell to continue her work but testified that she made additional attempts to produce him for court. JSF ¶ 27. She also informed her tour commander of the issue. *Id.* ¶ 28; *see also* Monroe Tr. at 79, 91.

**\*4**  Monroe testified that she later returned to Ross's cell to capture his refusal to go to court on video. Monroe Tr. at 79, 91. Monroe's use of force report for June 14, 2016 indicates that she returned to his cell with the camera at approximately 6:40 a.m. Frankie Decl., Ex. G ("Monroe UOF Report"). This process is called "refusal on video." Stukes Tr. at 69–70. DOC captures inmate refusals to go to court on video to help them explain to the court why the inmate did not appear. *Id.* at 70. Monroe testified that Ross was not physically aggressive when she interacted with him and that she did not feel threatened by him. Monroe Tr. at 94–95.

#### b. Probe Team and Pepper Spray

At approximately 7 a.m., an OBCC "probe team"—consisting of five officers, Willis, George, Genoves, and two non-party officers, Jordan and Phillips—arrived at Ross's cell to produce him for court. JSF ¶¶ 29, 31. A probe team consists of one captain and four officers at most. *Id.* ¶ 30.

How the probe team came to be called to Ross's cell is in dispute. Monroe testified that her tour commander, Assistant Deputy Warden Sharma Dunbar ("Dunbar"), activated an institutional alarm and dispatched the probe team, but she

Ross v. Willis, Not Reported in Fed. Supp. (2021)
Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 36 of 77
2021 WL 3500163

could not recall whether Dunbar did so before or after speaking to Monroe; Monroe testified that Dunbar could have been watching the situation unfold on the surveillance cameras. Monroe Tr. at 95, 97. Willis and Genoves testified that the probe team was called in response to an alarm. *See* Willis Tr. [6] at 74; Genoves Tr. [7] at 69–70. George did not recall hearing an alarm himself but testified that he might have heard from Willis that there was an alarm. George Tr. [8] at 64–65. However, per DOC policy, an extraction team, rather than a probe team, should have been assembled to address the situation. *See* Stukes Tr. at 257–58. An extraction is a planned event, *id.* at 168, one that a probe team could not execute without assembling an extraction team, *id.* at 130. In such an event, Stukes testified, it was the captain's job to contact mental health personnel and medical personnel to request contraindicators, *id.* at 168–69. [9]

[6]   For simplicity, the Court collectively refers to all excerpts of Willis's deposition as "Willis Tr." *See* Frankie Decl., Ex. H; Weiner Decl., Ex. D; Margolis Decl., Ex. 3; Frankie Reply Decl., Ex. R; Weiner Reply Decl., Ex. N.

[7]   For simplicity, the Court collectively refers to all excerpts of Genoves's deposition as "Genoves Tr." *See* Weiner Decl., Ex. C; Margolis Decl., Ex. 4; Frankie Reply Decl., Ex. Q.

[8]   For simplicity, the Court collectively refers to all excerpts of George's deposition as "George Tr." *See* Weiner Decl., Ex. B; Margolis Decl., Ex. 5.

[9]   Willis argues that this statements conflicts with the DOC's UOD Directive, but does not point to specific contradictions in the directive. *See* Willis Reply 56.1 ¶ 32.

The probe team wore "protective vests, helmets, and gas masks." JSF ¶ 33. Willis wore a white helmet and a vest numbered 064; Genoves wore a vest numbered 028; and George wore a vest numbered 026. *Id.* Phillips operated a handheld video camera and captured some video and audio of the events at issue. *See* JSF ¶ 32; *see also* Video. However, due to Phillips's position relative to Ross's cell, much of the video is obscured by probe team officers, and some of the audio is unintelligible. *See* Video; Video Tr.

When the probe team arrived at Ross's cell, Willis, George, and Genoves entered; Jordan stood inside the cell near the doorway, and Phillips stood in the back with the video camera.

JSF ¶ 34; Video. Ross was lying face-down on his bed. JSF ¶ 35; Willis Tr. at 81. Ross testified that he was awoken when the officers entered his cell. Ross Tr. at 55, 63. Willis and George told Ross that they needed to take him out of the cell for his court appearance. *See* JSF ¶ 37; Video at 0:31–0:56; Video Tr. at 0:31–0:56. Ross replied that he was "going to sleep" and told the officers "do not touch me bro, do not touch me, bro." Video at 0:59–1:03; Video Tr. at 0:59–1:03. Willis again told Ross that he needed to leave the cell. Video Tr. at 1:03–1:05. Willis told someone on the probe team to "grab him." *Id.* at 1:06–1:10.

**\*5**  Either George or Genoves (or both) attempted to grab Ross's arm to place him in handcuffs. JSF ¶ 40. Ross again told the officer not to touch him. *Id.*; Video Tr. at 1:05. Ross testified that he was trying to tell the officers that because he had been given a sedative, he was unable to get up. Ross Tr. at 57, 101, 118. He further testified that although he understood that he could not refuse to go to court, he did not intend to refuse to go at all; rather, his sedative prevented him from getting up. *See id.* at 207. On the video, Ross can be heard saying, "Grabbing me ... grabbin' my arm while I'm on drugs, boy.... What's wrong with you, boy? Is you crazy? ... What's wrong with you, son?" Video at 1:10–1:14; Video Tr. at 1:10–1:14.

The parties dispute whether, during this time, Ross resisted the officers' attempts to handcuff him. Ross recalled that someone was tugging on his arm, but he did not remember whether he pulled his arm away. Ross Tr. at 101–03. Willis testified that after instructing staff to grab Ross's arms, Ross pulled his arm away. Willis Tr. at 89.

Willis then told Ross that he "need[ed] to take [Ross] out or [he was] gonna spray [Ross]." Video Tr. at 1:14–1:21. Willis told Ross he was going to give him "one opportunity." *Id.*; JSF ¶ 41. Ross asked, "Spray me for what?" Video Tr. at 1:22–1:23. Willis told him it was "[f]or [Ross] to come out." *Id.* at 1:24–1:25. George and Genoves testified that they heard Willis tell Ross he was going to spray him if Ross did not comply. JSF ¶ 42. George testified that at this time, he was not certain that Willis actually would spray Ross, because sometimes inmates comply after being warned that they may be sprayed, and sometimes they do not. George Tr. at 146–47.

Ross then stated: "Y'all niggas is crazy son. Y'all niggas is crazy." Video at 1:26–1:30. Approximately one second later, Willis sprayed Ross once in the face with MK-9 handheld chemical agent ("pepper spray" or "OC spray"). *Id.*

Ross v. Willis, Not Reported in Fed. Supp. (2021)
2021 WL 3500163

Case 5:24-cv-01138-DNH-MJK   Document 12   Filed 10/29/24   Page 37 of 77

at 1:30–1:31; JSF ¶ 44. Willis told the other officers to "[c]uff him," Video Tr. at 1:32. George handcuffed Ross using flex cuffs, JSF ¶ 45.

Willis testified that he did not consider Ross's refusal to go to court an "emergency." Willis Tr. at 86. He further testified that he did not at any point think that Ross was a threat to himself, other inmates, Willis himself, or other members of the probe team, *id.* at 130, and that he "did not spray [Ross] because he was a threat," *id.* at 169. However, Willis did testify that, in general, he views all inmates as threats, in particular when responding to an area as an alarm supervisor. *Id.* at 85. George did not consider Ross a threat to himself, but testified that he did not know whether Ross was a threat to others. George Tr. at 114–15, 122–23. Genoves testified that he felt Ross was "somewhat of a threat" in the sense that he did not know what Ross's "intentions" were in allegedly failing to comply with the officers' orders. Genoves Tr. at 88–89. However, although he "did not want to get hurt," Genoves testified that he would "not ... say threatened personally," *id.* at 89, and he did not feel that Ross was a threat to other inmates or himself, *id.* at 91, 120. When asked whether Willis sprayed Ross "even though [Ross] was not a threat," Genoves answered, "Correct." *Id.* at 123.

Approximately 25 seconds after Willis sprayed him, Ross told the officers he was asthmatic. Video Tr. at 1:58; JSF ¶ 46. All three defendants testified that they had not been aware of Ross's medical history or his history of asthma. JSF ¶ 36. Probe teams are not generally informed about patients' medical histories or conditions, *see* Stukes Tr. at 158–59, but captains can request, and in non-emergency anticipated-use-of-force scenarios should request, contraindicators of chemical agents, *see id.* at 24, 116–18, 168–69. Ross testified that it "slipped [his] mind" to tell the officers that he was asthmatic before being sprayed because he "was just more worried about the fact that [the officers were] spraying him ...." Ross Tr. at 185.

 **\*6** The probe team escorted Ross out of his cell toward the intake area. JSF ¶ 47; Video at 2:30–5:43. On the video, Ross can be heard gasping for air. Video at 2:31–3:31. While walking down a hallway, led by officers, Ross told the officers, "I can't breathe. I can't breathe." *Id.* at 3:44–49; JSF ¶ 48. Approximately 20 seconds later, Ross again told the officers he could not breathe. Video at 4:08; Video Tr. at 4:08; JSF ¶ 49.

The officers then lifted Ross, put him on a gurney, and wheeled him the rest of the way to the intake area. Video at 4:11–5:43; JSF ¶¶ 50–51. Ross waited face-down on the gurney for several minutes while the probe team obtained the keys to the decontamination shower. JSF ¶¶ 52–53; Video at 5:44–7:22. Ross testified that during this time, he experienced symptoms similar to those he has experience during asthma attacks, including trouble breathing, tightness in his chest, and pain. Ross Tr. at 70–71, 116. The video reflects that, less than a minute after arriving in the intake area, Ross began shaking and coughing. Video at 6:15. Phillips then told the officers to turn Ross on his side. *Id.* at 6:30–6:34; Video Tr. at 6:30–6:34.

At 7:22 of the video, the probe team obtained the keys to the decontamination shower. Video at 7:22; JSF ¶ 52. Ross was gasping and screaming as he was taken to the decontamination shower. Video at 7:22–8:18. Genoves and Jordan lifted Ross off the gurney and put him in the shower. JSF ¶ 54. Genoves then cut off Ross's flex cuffs and told him to walk to the back of the shower and push the button to turn the shower on. *Id.* ¶ 55; Video at 9:01–9:21. Ross testified that although the decontamination shower did not eliminate all effects of the OC spray, it did help with the most "extreme effects"; he then told an officer that he felt "relieved" and "would like to see medical." Ross Tr. at 75–76.

### c. Ross's Medical Treatment and Injuries

At approximately 10:20 a.m., Ross was seen at the medical clinic by DOC physician's assistant Larry Blackmore ("Blackmore"). JSF ¶ 57; *see also* Margolis Decl., Ex. 11 ("Ross Injury Report"). The injury report indicates that Ross presented to the clinic in "no distress," that no chemical agent was present, and that "no injury [was] noted." Ross Injury Report; JSF ¶ 58. Ross testified that he did not receive treatment at the medical clinic, although Blackmore examined him. Ross Tr. at 82–83; Ross Injury Report ("No treatment indicated. Patient education on injury given.").

Ross testified that he continues to experience emotional distress as a result of this incident, which has contributed to his depression. Ross Tr. at 119, 121; 203.

After his examination at the medical clinic, Ross was taken to his scheduled court appearance. JSF ¶ 60.

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

Case 5:24-cv-01138-DNH-MJK   Document 12   Filed 10/29/24   Page 38 of 77

### 5. DOC Investigation of Probe Team's Actions

Although a report created by Stukes and Dunbar concluded that "[f]orce was required and unavoidable," Frankie Decl., Ex. M, DOC conducted a separate investigation into the events of June 14, 2016, *see* Ross 56.1 ¶ 105; Willis Reply 56.1 ¶ 105; CO Reply 56.1 ¶ 105; *see also* Margolis Decl., Ex. 14 ("Longi Report"). Willis was interviewed as a part of the investigation. JSF ¶ 62. The investigation concluded that Willis was aware that this was a use of force scenario and that he "violated the anticipated UOF directive by not assembling a proper extraction team, not notifying mental health services and never requesting contra indicators from the on duty tour commander for Inmate Ross prior to utilizing chemical agents." Longi Report at 8. The investigation also concluded that Ross's asthma diagnosis "would have prevented Captain Willis from being able to use chemical agents as a means to gain compliance from Ross." *Id.*

**\*7** Through a negotiated plea agreement, Captain Willis pled to charges that he violated the DOC's UOF Directive and chemical agents policy. *See* Margolis Decl., Ex. 16.

### B. Procedural History

On August 25, 2016, Ross, proceeding *pro se*, filed the complaint naming New York City, Captain Willis, and three John Doe officers as defendants. Dkt. 2. On May 11, 2017, the Court directed the New York City Law Department to give Ross the identities of the John Doe defendants. Dkt. 12. On June 2, 2017, Ross filed an amended complaint including three John Doe defendants. Dkt. 14. On June 26, 2017, the Court referred the case to Magistrate Judge Fox for general pretrial supervision. Dkt. 20. The Court also ordered Ross to file a second amended complaint naming the John Doe defendants. Dkt. 21.

On August 24, 2017, Judge Fox granted the City's motion to stay the case pending a DOC investigation of Ross's allegations. Dkt. 28. On November 1, 2017, Ross filed a second amended complaint which named the individual officers. Dkt. 34. On November 14, 2017, the City filed a motion to dismiss Ross's claims against it. Dkts. 35–36. On December 28, 2017, Ross filed a third amended complaint, Dkt. 39, and on January 5, 2018, a fourth amended complaint, Dkt. 40.

On November 14, 2018, the Court directed defendants to inform the Court whether, in light of the fourth amended complaint, they intended to rely on their original motion to dismiss, and to notify the Court if there was a reason the stay should not be lifted. Dkt. 44. On November 20, 2018, the City informed the Court that it intended to rely on its original motion to dismiss, Dkt. 45; the Court lifted the stay, Dkt. 47. The Court referred the pending motion to dismiss to Judge Fox for a report and recommendation. Dkt. 46.

Ross opposed the City's motion to dismiss through the series of letters dated December 3, 2018, Dkt. 51, December 17, 2018, Dkt. 49, and December 22, 2018, Dkt. 50. On March 11, 2019, Judge Fox issued the Report, recommending that the Court grant the motion to dismiss. Dkt. 52. After receiving no objections, the Court adopted the Report and dismissed all claims against the City. Dkt. 54.

On April 1, 2019, Willis answered the fourth amended complaint, including a cross-claim against the City for indemnification, alleging that any injuries to Ross had been caused by the wrongdoing or negligence of the City and its agents. Dkt. 58. On April 3, 2019, Ross filed the fifth amended complaint. Dkt. 59.

On April 15, 2019, Ross filed an application for the Court to request pro bono counsel. Dkt. 60. The same day, the City answered Willis's cross-claim. Dkt. 62. On April 17, 2019, the City moved to dismiss the fifth amended complaint, Dkts. 63–65.

On April 29, 2021, Ross filed objections to the Report, Dkt. 67, and on May 7, 2019, wrote a letter to the Court explaining why he had not been able to object on time, Dkt. 69, and filed a motion seeking "reinstatement" of his case, Dkts. 71–72. On May 9, 2021, this Court construing Ross's objections as a motion for reconsideration, denied Ross's motion. Dkt. 73.

On September 23, 2019, Judge Fox granted Ross's application for pro bono counsel. Dkt. 78. On September 27, 2019, Willis answered the Fifth Amended Complaint, Dkt. 79, and on October 3, 2019, George and Genoves answered, Dkt. 82.

**\*8** On February 11, 2020, pro bono counsel appeared on Ross's behalf. Dkts. 107–09. Following the close of discovery, which Judge Fox continued to supervise, the remaining defendants—Willis, George, and Genoves—filed letters indicating that they intended to move for summary judgment. Dkts. 134–35. On November 3, 2020, Ross filed

Ross v. Willis, Not Reported in Fed. Supp. (2021)

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 39 of 77

2021 WL 3500163

letters indicating that he would oppose both motions. Dkts. 137–38.

On November 23, 2020, the Court held a pre-motion conference. On December 10, 2020, the parties filed the JSF and the joint stipulated transcript of the video taken on June 14, 2016. Video Tr. On December 21, 2020, Willis filed a motion for summary judgment. Dkt. 146, 146-1 ("Willis Mem."). On December 24, 2020, George and Genoves filed a motion for summary judgment. Dkts. 149, 152 ("CO Mem."). On January 14, 2021, Ross filed a consolidated opposition to the motions. Dkt. 157. On January 29, 2021, the Court ordered that Ross re-file his opposition and supporting documents without redactions, except as to Willis's disciplinary history. Dkt. 170; *see also* Dkt. 182 ("Ross Opp'n"). On January 30, 2021, Willis filed a reply, Dkt. 171 ("Willis Reply"), and on February 1, 2021, George and Genoves filed a reply, Dkt. 176 ("CO Reply"). On February 4, 2021, counsel for Ross filed a corrected declaration that included pages inadvertently omitted from the original declaration. Margolis Decl.

## II. Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III. Discussion

Ross brings three sets of claims under § 1983: (1) an excessive force claim against Willis; (2) a failure to intervene claim against George and Genoves; and (3) a claim for deliberate indifference against all three officers.

### A. Excessive Force

**\*9** Willis moves for summary judgment on the claim against him for using excessive force.

#### 1. Legal Standards

##### a. Objectively Unreasonable Force

Section 1983 provides redress for the deprivation of federally protected rights by persons acting under color of state law. 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

"While the Eighth Amendment's protection does not apply 'until after conviction and sentence,' the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment[.]" *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (citation omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989)). Excessive force claims under the Eighth and Fourteenth Amendments are subject to different standards. In contrast to such claims brought under the Eighth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). [10]

[10]    The Second Circuit previously required pretrial detainees asserting excessive force claims "satisfy

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 40 of 77

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

two requirements: the 'subjective requirement' that a defendant had a 'sufficiently culpable state of mind' and the 'objective requirement' that the 'deprivation alleged is objectively sufficiently serious or harmful enough.' " *Carmona v. City of New York*, No. 13 Civ. 3273 (WHP), 2016 WL 4401179, at *2 (S.D.N.Y. Mar. 1, 2016) (quoting *Walsh*, 194 F.3d at 49–50). However, in *Kingsley*, the Supreme Court removed the subjective component for pretrial detainees. 576 U.S. at 396–97.

Whether the force used was objectively unreasonable "turns on the facts and circumstances of each particular case," and is to be evaluated "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* at 397 (cleaned up). The Supreme Court has identified a number of non-exclusive factors that bear on the reasonableness of force used: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* Consistent with the "fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

Because running a prison "is an inordinately difficult undertaking," *Kingsley*, 576 U.S. at 399 (cleaned up), courts must "afford prison officials some latitude to make 'good-faith effort[s] to maintain or restore discipline,' " *Taylor v. Nieves*, No. 17 Civ. 7360 (AJN), 2020 WL 7028907, at *2 (S.D.N.Y. Nov. 30, 2020) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997)). And "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a [plaintiff's] constitutional rights." *Mesa v. City of New York*, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *18 (S.D.N.Y. Jan. 3, 2013) (cleaned up).

### b. Qualified Immunity

**\*10** Qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Its purpose is to "give government officials breathing room to make reasonable but mistaken judgments" and to protect "all but the plainly incompetent or those who knowingly violate the law." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (cleaned up).

A constitutional right was clearly established if, at the time of the officer's conduct, "the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up). The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 590 (quotation omitted). Although a "case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Fabrikant v. French*, 691 F.3d 193, 213 (2d Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The clearly established right "must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). Defining the right as "right to be free of excessive force" is "far too general." *Id.* "Even if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Summary judgment should be granted on the basis of qualified immunity only if "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[ ], could conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (cleaned up).

Because qualified immunity is an affirmative defense, defendants bear the burden of proof. *See Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011).

### 2. Application

"The use of pepper spray 'constitutes a significant degree of force' and can in certain cases form the basis of a

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

constitutional violation." *Quinones v. Rollison*, No. 18 Civ. 1170 (AJN), 2020 WL 6420181, at \*4 (S.D.N.Y. Nov. 1, 2020) (quoting *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010)); *see also Tracy*, 623 F.3d at 98 ("Unquestionably, infliction of pepper spray on an arrestee has a variety of incapacitating and painful effects[.]"). Here, viewing the evidence in the light most favorable to Ross, a reasonable factfinder could conclude that Willis's use of pepper spray was objectively unreasonable and hence an excessive use of force.

First, there is no genuine dispute that Ross did not present a threat to the probe team, other inmates, or even himself. All three officers testified that they did not personally feel threatened by Ross, *see* Willis Tr. at 130; George Tr. at 114–15, 122–23; Genoves Tr. at 89; all three further testified that he was not a threat to himself, *see* Willis Tr. at 130; George Tr. at 114; Genoves Tr. at 120; Willis and Genoves testified that he was not a threat to the other probe team members, *see* Willis Tr. at 130; Genoves at 120; and Willis and Genoves testified that Ross was not a threat to other inmates, *see* Willis Tr. at 130; Genoves Tr. at 91.

 **\*11** To be sure, notwithstanding this testimony, Willis also testified that generically he views all inmates, particularly those in ESH, as threats. *See* Willis Mem. at 16; Willis Tr. at 85 (Willis views all inmates as threats, particularly when responding to an alarm). And Genoves testified that Ross was "somewhat of a threat" because he "did not know [Ross's] intentions." CO Mem. at 3; *see also id.* at 11 (arguing that the "need to use force was high as [Ross], a maximum security inmate, repeatedly refused verbal orders ... then escalated his resistance"). But these generalized arguments reach too far. To find that Ross present an imminent threat to officers solely because of his status as an ESH detainee "would place few restrictions on officers' treatment of individuals with extensive disciplinary records" or those in ESH. *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 255 (2d Cir. 2020).

In any event, the officers' testimony makes clear that, whatever concerns they generically have as to detainees in the ESH, these played no role in the decision here. Willis, who made the decision to use the pepper spray, unequivocally testified that he did not spray Ross based on the view that Ross posed a threat, *see* Willis Tr. at 169, and that he never viewed Ross a threat to himself or others:

Q: At any point during the incident was Mr. Ross a threat?

A: No.

Q: Did you feel he was a threat to the other members of the probe team?

A: No.

Q: Did you feel he was a threat to himself?

A: No.

Q: Did you feel he was a threat to other inmates?

A: No.

Willis Tr. at 130. Genoves also testified multiple times to the same effect:

Q: At this point [when Ross said "don't touch me bro"] did you think he was a physical threat to you?

A: No.

Q: Did you think he was a physical threat to the other members of the probe team?

A: No....

Q: Was he a physical threat to himself?

A: No....

Q: ... And so Captain Willis talked to Mr. Ross for about a minute and four seconds before he sprayed Mr. Ross with a chemical agent, correct?

A: Correct.

Q: And that was even though he was not a threat, correct?

A: Correct.

Genoves Tr. at 120, 123 (objections omitted).

Second, there is a genuine dispute as to whether and to what degree Ross resisted the probe team's one or more attempts to handcuff him. The only evidence to which defendants point in support of their argument that Ross actively resisted being handcuffed is Willis's testimony that, at one point, he instructed the probe team to grab Ross's arms, and Ross "pulled away and said don't fucking touch me." Willis Tr. at 89. [11] Ross, for his part, testified that although he remembers that someone from the probe team touched him, he cannot remember whether he pulled his arm away. Ross Tr. at 101– 03. Defendants are correct that, in general, a party's inability

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

to recall certain events is not sufficient to raise a genuine dispute of fact. *See Creighton v. City of New York*, No. 12 Civ. 7454 (PGG), 2017 WL 636415, at *40 (S.D.N.Y. Feb. 14, 2017); *Faruki v. City of New York*, No. 10 Civ. 9614 (LAP), 2012 WL 1085533, at *5 (S.D.N.Y. Mar. 30, 2012). But that principle does not carry the day here. Ross attests that he had been given medication by DOC at night in part to help him sleep, *see* JSF ¶ 13; Ross Tr. at 59, which appears to have affected his ability to stay alert during his encounter with defendants. And jury could credit that pepper spray was used on Ross—as is undisputed—while choosing to disbelieve Willis's uncorroborated description of Ross's as having pulled his arm away. In any event, as Ross notes, even if it were undisputed that Ross had "pulled away" a single time when officer(s) grabbed him, a reasonable jury could conclude that that was not an act of or signifying actively resistance. *See Brown v. City of New York*, 798 F.3d 94, 103 (2d Cir. 2015) (denying summary judgment on excessive force claim where plaintiff refused to put her hands behind her back to be handcuffed because this "non-threatening form of resistance" was "only one factor to be considered"). Moreover, as the video reflects, Ross told the officers prior to the application of peppers spray that he was "on drugs." Video Tr. at 1:10–1:11. A jury could infer that a reasonable officer would have understood that Ross might be inhibited in his ability to comply with the officers' commands.

[11]   Willis asserts that it is undisputed that Ross pulled away multiple times, *see* Willis 56.1 ¶ 28 ("Members of the probe team took hold of Inmate Ross' wrist in an effort to handcuff him, but each time Ross pulled away ...."), but that is not supported by the citation to Willis's deposition, *see* Willis Tr. at 89.

**\*12**  Although not themselves accused of using excessive force, George and Genoves make arguments bearing on this claim, in light of the derivative claims (for deliberate indifference and failure to intervene) brought against them. The cases on which they rely, however, are factually inapposite. In *Frost*, the Second Circuit upheld a grant of summary judgment to the defense on an excessive force claim in which the plaintiff "resisted the officers and tried to prevent them from entering the area where he was located by holding the door shut with his arm." 980 F.3d at 256. In *Berman v. Williams*, No. 17 Civ. 2757 (JGK), 2019 WL 4450810 (S.D.N.Y. Sept. 17, 2019), the use of pepper spray was found objectively reasonable because the plaintiff's refusal to comply with orders to remove his clothes and his "continual[ ]" physical resistance presented a security risk.

*Id.* at *6–7. And in *Vazquez v. Spear*, No. 12 Civ. 6883 (VB), 2014 WL 3887880 (S.D.N.Y. Aug. 5, 2014), the plaintiff, who was in the inmate waiting room awaiting a court appearance, physically resisted being handcuffed by crouching down, and continued to resist officers' attempts to handcuff him. *Id.* at *4. [12] The plaintiff in each of these three cases thus physically resisted the officers and presented a greater security risk to them than did Ross. That is clearly so if one credits Ross's factual account, as required here. Even crediting the officers' accounts, the plaintiff-inmate's acts of resistance in *Frost, Berman,* and *Vasquez* exceeded that here.

[12]   Importantly, *Vazquez* was decided before to the Supreme Court's decision in *Kingsley* eliminating the subjective prong of the excessive force standard. It thus relied on the fact that the officers' use of pepper spray had not been "malicious and sadistic" or in "bad faith." 2014 WL 3887880, at *4.

The video does not alter this outcome. Defendants depict the video as making clear that Ross was actively, physically resisting. *See* Willis Reply at 3; CO Reply at 9–10. Not so. It is undisputed that, prior to the use of pepper spray, one or more of the officers touched Ross once, in response to which he told the officers not to touch him. *See* Willis Tr. at 89; Ross Tr. at 101 (conceding that one or more officers must have touched him). It is further undisputed, and the audio component on the video reflects, that Ross told the officers multiple times not to touch him. *See* Video Tr. at 0:59–1:05. But Ross's actions during this period are all but fully obscured on the video by the probe team. Although the video thus does not preclude the possibility that the obscured Ross resisted in some fashion, there is no footage of Ross resisting once, let alone multiple times. And the audio evidence is as compatible with Ross's explanation that he was using loud words alone to induce the officers to ease up—to explain that he was sedated, Ross Tr. at 101–03—as it is with defendants' narrative that Ross resisted attempts to handcuff him.

Third, the distance from which the OC spray was used on Ross may enhance his claim of excessive force. *See Tracy*, 623 F.3d at 98 (denying summary judgment in part based on factual dispute about distance from which the pepper spray was deployed). Here, the parties dispute the distance between Willis and Ross at the moment Ross sprayed Willis. Willis testified that he was about six feet from Ross, *see* Willis Tr. at 151, but Monroe testified that there were only three to four feet between the door and Ross's bed, *see* Monroe Tr. at

Ross v. Willis, Not Reported in Fed. Supp. (2021)

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 43 of 77

2021 WL 3500163

79, appearing to narrow the potential space between them by several feet.

Fourth, at summary judgment, Ross's injuries are sufficient to sustain an excessive force claim. Defendants argue that because Ross did not sustain more serious injuries, his excessive force claim must fail. *See* Willis Mem. at 14; CO Mem. at 12–13. But the case law cautions wariness about granting summary judgment on this basis, on the ground that, if injuries of "limited duration" were enough to defeat an excessive force claim, "police and corrections officers would essentially be able to utilize pepper spray and similar chemical agents with impunity." *Lewis v. Clarkstown Police Dep't*, No. 11 Civ. 2487 (ER), 2014 WL 1364934, at *6 (S.D.N.Y. Mar. 31, 2014), *adhered to on reconsideration*, No. 11 Civ. 2487 (ER), 2014 WL 6883468 (S.D.N.Y. Dec. 8, 2014). Critical here, a plaintiff need not have sought medical attention to support an excessive force claim. *See Hodge v. Village of Southampton*, 838 F. Supp. 2d 67, 77 (E.D.N.Y. 2012) ("The fact that plaintiff did not require substantial medical treatment at the hospital following the incident does not necessarily mean that [defendant] is entitled to summary judgment."). And "[i]f the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987). Here, on the video, Ross can be heard gasping for air, *see* Video at 2:31–3:31, and stating multiple times that he could not breathe, Video Tr. at 3:44–49, 4:08. He also testified that he experienced symptoms akin to those in an asthma attack. *See* Ross Tr. at 70–71, 116. That Ross was relieved by the decontamination shower and that his medical report showed, several hours later, that he was no longer in distress does not entitle defendants to summary judgment. *See Lewis*, 2014 WL 1364934, at *6.

 **\*13** Accordingly, the undisputed facts, coupled with genuine issues of material fact, preclude granting Willis summary judgment on Ross's excessive force claim against him. *See Tracy*, 623 F.3d at 98 ("[A] reasonable juror could find that the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force[.]"); *Lewis*, 2014 WL 1364934, at *6 (S.D.N.Y. Mar. 31, 2014) (denying summary judgment where the parties disputed what triggered the plaintiff's behavior in the holding cell and the amount of pepper spray used).

Nor, viewing the undisputed facts in the light most favorable to Ross, is Willis entitled to summary judgment on the basis

of qualified immunity. Willis notes case law holding that, as of 2020, it had not been "clearly established that pepper spraying an uncooperative inmate is unlawful." *Ismael v. Charles*, No. 18 Civ. 3957 (GHW), 2020 WL 4003291, at *11 (S.D.N.Y. July 15, 2020). Accordingly, he argues, this right necessarily had not been clearly established as of June 14, 2016, the date of the incident. *See* Willis Mem. at 12. That argument, however, presupposes, factually, that prior to being sprayed, Ross was behaving "uncooperative[ly]," as addressed in *Ismael*. There, although the inmate was not "physically resist[ing] or threaten[ing] any of the officers," *Ismael*, 2020 WL 4003291, at *11, he refused to enter an isolation cell after having been ordered to do so, *see id.* at *1–2 (explaining that officers needed to secure Ismael to enable them to respond to a simultaneous, independent institutional alarm). By contrast, here Ross was secured in his cell, lying face down, threatening no one, and, on his version of events, not defying the officers at all, [13] and, as Willis acknowledges, the need to remove Ross from his cell for his court appearance was not an "emergency." Willis Tr. at 86.

[13]     George and Genoves argue that the fact that no officer thought Ross was a threat is irrelevant to the qualified immunity analysis because, after *Kingsley*, the operative test is objective, not subjective. *See* CO Reply at 10 n.9. But that no defendant found Ross threatening is germane to whether Ross was not resisting, which is germane to whether Willis, in spraying Ross, acted in a fashion that violated a clearly established right.

George and Genoves argue that there is "no Supreme Court or Second Circuit case law clearly establishing that a corrections officer who deploys a single, short, two-second burst of chemical agent on an unrestrained asthmatic inmate when the inmate physically resisted and repeatedly refused to comply with legitimate orders to be produced to court is objectively unreasonable." CO Mem. at 23. But even accepting this extremely narrow formulation of the right, the Court has found genuine issues of fact as to whether Ross did pull his arm away a single time, and if so, whether Ross was physically resisting. And, with the exception of *Ismael*, addressed above, each case in which pepper spraying was held objectively reasonable to which defendants point involved physical resistance, *see Frost*, 2019 WL 4512620, at *2 (S.D.N.Y. Sept. 18, 2019) (plaintiff "continue[d] physically to resist" throughout the encounter); *Vazquez*, 2014 WL 3887880, at *4 (inmate physically resisted being handcuffed by crouching down, and continued to resist

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

officers' attempts to handcuff him), or an individual suspected of a violent crime, *see Scoma v. City of New York*, No. 16 Civ. 6693 (KAM) (SJB), 2021 WL 230295, at \*12 (E.D.N.Y. Jan. 22, 2021) (officers entitled to qualified immunity for pepper spraying an "unrestrained individual actively resisting arrest for domestic violence, where the officers reasonably believed that such individual was dangerous"), *report and recommendation adopted*, No. 16 Civ. 6693 (KAM) (SJB), 2021 WL 1784385 (E.D.N.Y. May 4, 2021). *Brown v. City of New York*, 862 F.3d 182 (2d Cir. 2017), in which the Second Circuit found that the officers were entitled to qualified immunity for their use of physical force and repeated use of pepper spray, comes closer, but still involves an unrestrained arrestee who refused, even after being knocked to the ground, to offer her hands for handcuffing. *Id.* at 189.

**\*14** By contrast, it was well-established as of June 2016 that "no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." *Tracy*, 623 F.3d at 99 n.5; *see also id.* (it is well-established "that the use of entirely gratuitous force is unreasonable and therefore excessive"). Although Ross was unrestrained and an inmate, he was confined to his cell, lying face-down and, crediting Ross's version of events, passive and unable to comply with the officers' commands. And there are factual disputes that bear on whether Willis's use of force was gratuitous here, including whether he reasonably should have appreciated that Ross was drugged and unable to assist in being handcuffed or comply with the directive to leave to go to court, and whether Ross resisted the officers.

Instructively, a court in this District in *Lewis* found that factual disputes about the cause of plaintiff's disruptive behavior in the holding cell and the amount of OC gel used precluded summary judgment on qualified immunity grounds. *See* 2014 WL 1364934, at \*10. Defendants argue that *Lewis* is distinct because the plaintiff was "confined to his cell," while Ross was "actively resisting, making threats, flouting commands, and was unrestrained." CO Reply at 12–13. But Ross was similarly confined to his cell, and defendants say-so in their memorandum of law notwithstanding, there is no evidence, let alone undisputed evidence that Ross was "making threats" of any kind, and the video does not reveal any such defiance. *See* Video Tr. at 0:37–1:30. In such circumstances, as *Ismael* recognized, courts in this District have denied motions for summary judgment where "a jury could find, in accordance with [p]laintiff's version of the events, that it was unreasonable for [defendant] to have used pepper spray

on [p]laintiff while [p]laintiff was locked inside of his cell and neither physically resisting [defendant] nor posing an immediate threat." *Wiggan v. NYC Dep't of Correction*, No. 12 Civ. 1405 (GBD) (HBP), 2014 WL 4631456, at \*2 (S.D.N.Y. Sept. 16, 2014) (adopting report and recommendation in its entirety); *Wiggan*, No. 12 Civ. 1405 (GBD) (HBP), Dkt. 46 (S.D.N.Y. Aug. 21, 2014) ("The decisions that have considered whether the use of pepper spray ... on incarcerated individuals can constitute excessive force have [led] to mixed results.... [But] the cases seem to turn on whether the pepper spray ... was used ... to cause an inmate to cease engaging in dangerous or disruptive conduct." (collecting cases)), *report and recommendation adopted*, No. 12 Civ. 1405 (GBD) (HBP), 2014 WL 4631456 (S.D.N.Y. Sept. 16, 2014); *see also Ismael*, 2020 WL 4003291, at \*11 n.8 (although district court opinions cannot create "clearly established" law, they may be "relevant to the qualified immunity analysis if they signal that preexisting law Supreme Court or Second Circuit cases foreshadowed a ruling on an issue").

To be sure, the availability of qualified immunity remains an open issue in this case. At trial, Willis will be at liberty to ask that, in the event of a plaintiff's verdict, the jury make factual findings germane to the existence of qualified immunity (*e.g.*, whether Ross resisted and, if so, in what manner), so as to enable a determination on a clear factual record as to whether the facts justified Willis's use of a chemical agent. *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990) (where factual disputes preclude "early disposition of the [qualified immunity] defense, the jury should decide these issues on special interrogatories"); *see also Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003).

### B. Failure to Intervene
George and Genoves next pursue summary judgment on Ross's § 1983 claim against them for failure to intervene to stop Willis from engaging in excessive force towards him.

#### 1. Legal Standards

**\*15** An officer can be held liable under § 1983 for "the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that: (1) excessive force is being used, (2) a citizen has been unjustifiably arrested, or (3) any constitutional violation has been committed by a law enforcement official." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted).

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

A plaintiff cannot succeed on a claim for failure to intervene under § 1983 when there is no underlying constitutional violation. *Wieder v. City of New York*, 569 Fed. App'x 28, 30 (2d Cir. 2014) (summary order) ("Because the underlying constitutional claims were properly dismissed, we also affirm the district court's dismissal of plaintiff's failure to intervene claim."). "[F]or liability to attach" for failure to intervene, "there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557.

### 2. Application

Because the Court has denied summary judgment as to the underlying excessive force claim, George and Genoves are not entitled to summary judgment on the basis that there was no underlying constitutional violation. However, George and Genoves may still be entitled to summary judgment if (1) they did not have reason to know that Willis would use force, or (2) there was no realistic opportunity for them to intervene to prevent Willis's deployment of the pepper spray.

Whether the officer had a realistic chance to intervene "is normally a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) (cleaned up). "[T]he question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016). The duration of the allegedly unconstitutional conduct "will always be relevant and will frequently assume great importance." *Id.*

The audio of the video reveals that Willis's pepper-spraying of Ross lasted, at most, two seconds. *See* Video at 1:30–1:31. The short duration of the spraying suggests that, once Willis started spraying Ross, George or Genoves would not have had a realistic opportunity to intervene to curb the spraying. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (officers did not have realistic opportunity to intervene where three blows were struck in rapid succession). And Ross does not argue otherwise. Rather, he contends that George and Genoves had approximately 10 seconds between the point at which Willis warned Ross that he would be sprayed if he did not leave his cell and the point at which Willis began to spray. Ross Opp'n at 44–46. For their part, George and Genoves argue that they did not have reason to know that Willis would

use force, and, in any event, that they believed, mistakenly but in good faith, that Willis would not do so, entitling them to qualified immunity. *See* CO Mem. at 7–9; CO Reply at 5–8.

Although these arguments have potential to prevail at trial, defendants have not carried their burden on summary judgment. As Ross notes, there are a number of undisputed facts from which a reasonable jury could—but would not be required to—conclude that George and Genoves should have known that Willis was going to use allegedly excessive force.

At the outset, as the video shows, George and Genoves were positioned close to Willis and to Ross's bed. Willis testified that either George or Genoves obeyed his order to grab Ross, Willis Tr. at 89. This suggests that the officers were close enough to be able to communicate with one another. Accordingly, a reasonable juror could conclude that George or Genoves were in easy reach of Willis and physically capable of stopping him from spraying Ross.

**\*16** The focus of George and Genoves's argument is instead that they did not have reason to know in advance that Willis would spray Ross. *See* CO Mem. at 6–8; CO Reply at 5. Willis issued a warning that if Ross did not leave his cell, force would be used, thus conditioning the use of force on Ross's continued non-compliance. George and Genoves argue thus they are the prototypical officers who did not have "reason to know that [excessive force] [would] be used." *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). It is also possible, they note, that Willis might have reconsidered the use of force. They point to this testimony from George:

Q: Did you have any reason to think that Captain Willis was not going to follow through on using the chemical agent?

A: Sometimes— ... sometimes—sometimes an officer says I'm—I'm a spray you, and the inmate complies, he don't spray him, so it's 50/50 in a situation like that.

Q: But if—if Mr. Ross didn't comply, did you have any reason to think that Captain Willis wasn't actually going to use the chemical agent?

A: I don't—I mean, can you say that one more time?

Q: Yeah. In the moment when you were inside the cell with Mr. Ross and you heard Captain Willis say I'm going to spray you if you don't comply, did you have any reason to think that Captain Willis would not actually use the spray if Mr. Ross didn't comply?

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

A: Yes, because sometimes they don't use the spray and they just say I'm going to use spray and then the inmate do comply.

Q: But I'm asking you for the situation when the inmate doesn't comply. In that situation, do they follow through and use the spray?

A: It depends on the person. Sometimes they do, sometimes they don't.

George Tr. at 146–47. On this basis, George and Genoves argue that, notwithstanding Willis's explicit advance warning that he would use force if Ross did not leave his cell, it was possible that Willis would decide not to do so, and thus they could not have known that he would use force. They note that had Ross complied, or had Willis abandoned his stated intention to use force, force would not have been used.

Defendants do not, however, point to any authority that makes it a condition for liability for failure to intervene in advance to stop a constitutional violation that the defendant have been certain (here, the use of unjustified force) would occur. For this thesis, defendants cite only one case, *Henry v. Dinelle*, No. 10 Civ. 0456 (GTS) (DEP), 2011 WL 5975027 (N.D.N.Y. Nov. 29, 2011). There, an inmate was punched and kicked by officers while leaving the infirmary. *Id.* at *1. Although few factual details are recounted, the *Henry* court explained that "Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by [a defendant]) that [one of the defendants] punched him one time with a 'closed fist' in the side of his nose, causing him to immediately fall to the ground." *Id.* at *9. Accordingly, the court concluded, "a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in [defendant's] position to expect." *Id.*[14] But *Henry*, by its terms, does not require complete certainty that excessive force would be used; it merely held that, on the facts, it was "too uncertain" to anticipate a fellow officer's use of force to hold the accompanying officers liable for failure to intervene. Here, in contrast, Willis's words to Ross set out a one-factor precondition for the use of the pepper spray: that Ross fail to leave his cell. A reasonable juror could conclude that, with Ross remaining stationary if not immobile, George and Genoves had ample notice that Willis —if not stopped by his fellow officers—would pepper-spray Ross, as he had promised.

[14] Ross notes that in *Henry*, the docket reflects that the plaintiff testified that the defendant officer told him, "We're going to give you one more chance. You're not listening. We're going to f *** you up." Ross Opp'n at 43 (quoting *Henry*, No. 10 Civ. 0456, Dkt. 24-4 at 97–99 (N.D.N.Y. Dec. 21, 2010).

**\*17** Defendants next argue that Ross has not pointed to any precedent that holds that a 10-second window is sufficient to give an officer a realistic opportunity to intervene. CO Reply at 6. But that is a factual question—and a distinctly case-specific one at that. Indeed, the Second Circuit has rejected a rule holding that a span of fewer than 30 seconds does not give officers a realistic opportunity to intervene. *See Figueroa, 825 F.3d at 107* ("But this does not permit distillation of a hard-and-fast temporal cutoff of the kind relied on by the District Court."). Here, on their summary judgment motion, the burden is on George and Genoves to demonstrate that the evidence would not permit a rational trier of fact to find that 10 seconds notice gave them sufficient opportunity to intervene. They have not done so. On the contrary, the video, showing the close proximity of these two officers to Willis, would give a jury a solid factual basis on which to find a realistic opportunity—on recognizing that Ross, if still in bed, would imminently be pepper-sprayed—to intervene.

Accordingly, the Court denies George and Genoves's motion for summary judgment on Ross's failure-to-intervene claim.[15]

[15] Ross argues, in the alternative, that a reasonable jury could find George and Genoves liable for direct participation in the use of excessive force. *See* Ross Opp'n at 47. "It is axiomatic that claims under § 1983 for use of excessive force or failure to intervene require personal involvement to trigger liability." *Demosthene v. City of New York, 831 F. App'x 530, 535 (2d Cir. 2020)* (summary order). A plaintiff can establish personal involvement either through direct participation or failure to intervene. *See Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 229 (2d Cir. 2004).*
Ross, however, has not pointed to any facts supporting that George or Genoves directly participated in Willis's use of pepper spray. Ross notes that the officers stood at the threshold of his cell as Willis engaged with Ross, and did not notify medical or mental health services before or during the spraying. *See* Ross Opp'n at 48. But that

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 47 of 77

conduct does not establish direct participation. *Cf. Terebesi*, 764 F.3d at 236 n.19 (officer could be held liable as a direct participant despite not throwing grenades into a house, where he "broke a window at the rear of the house and separated the curtains in order to allow the other officers to toss in their grenades"). To the extent Ross would premise § 1983 liability on the part of George and Genoves based on direct participation, as opposed to a failure to intervene, the record does not make such claims viable.

### C. Deliberate Indifference

All three defendants, finally, move for summary judgment on Ross's claims of deliberate indifference.

### 1. Legal Standards

It is well settled that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under [§] 1983." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To establish such a claim, a plaintiff must show, first, that the injury or illness constituted a "serious medical condition." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). A "serious medical condition" is generally understood to be "one that may produce death, degeneration, or extreme pain." *Holmes v. City of New York*, No. 17 Civ. 3874 (WHP), 2018 WL 4211311, at *6 (S.D.N.Y. Sept. 4, 2018). Next, the plaintiff must demonstrate that the defendant acted with deliberate indifference towards that medical condition, so as either to cause it or expose the plaintiff to risk from it. *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). To establish deliberate indifference under the Fourteenth Amendment,

> The plaintiff must show only that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety ....

*D.K. by L.K. v. Teams*, 260 F. Supp. 3d 334, 354–55 (S.D.N.Y. 2017) (quoting *Darnell v. Pinerio*, 849 F.3d 17, 35 (2d Cir. 2017)).

**\*18** Evidence of a defendant's "mere negligence is insufficient" for a plaintiff to succeed on a deliberate indifference claim. *House v. City of New York*, 2020 WL 6891830 (PAE), at *14 (S.D.N.Y. Nov. 24, 2020). And the determinations about "[w]hether the [defendant] knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Washington v. O'Mahony*, No. 16 Civ. 9546 (ER), 2020 WL 1285851, at *5 (S.D.N.Y. Mar. 18, 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

Importantly, these elements differ from deliberate indifference claims arising under the Eighth Amendment. The Second Circuit, in *Darnell, supra*, held that it is no longer required that a plaintiff bringing a claim based on the Fourteenth Amendment establish the officer's subjective intent. 849 F.3d at 35 (citing *Kingsley*, and holding that "the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm.").

### 2. Application

Viewing the facts in the light most favorable to him, Ross has not raised a genuine dispute as to whether Willis's actions with respect to his medical history were anything worse than negligent. It is undisputed that Willis was unaware of Ross's medical history or history of asthma. JSF ¶ 36. And probe teams are generally not informed about patients' medical conditions. *See* Stukes Tr. at 158–59.

Furthermore, Ross admitted that it "slipped [his] mind" to inform Willis and the rest of the probe team, before he was pepper-sprayed, that he was asthmatic. Ross Tr. at 185. Rather, as the video reflects, Ross first told Willis and the probe team that he was asthmatic approximately 25 seconds after being sprayed. Video Tr. at 1:58; JSF ¶ 46. Although captains like Willis can request and in non-emergency anticipated-use-of-force scenarios should request, contraindicators to chemical agents, Stukes Tr. at 24, 116–18, 168–69, and although Willis should have requested

Case 5:24-cv-01138-DNH-MJK   Document 12   Filed 10/29/24   Page 48 of 77

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

contraindicators before spraying Ross, Ross has not alleged any facts to suggest that Willis's actions rise to the necessary level of objective recklessness.

Ross also fails to adduce evidence permitting the conclusion that Willis knew or should have known that deploying pepper spray to Ross's face risked imposing a "serious medical condition." Once Willis's unawareness of Ross's medical condition is taken into account, the case law and the facts disfavor this claim. Although there is "no 'static test' to determine whether a deprivation [or medical condition] is sufficiently serious," *McNair v. Ponte*, No. 16 Civ. 1722 (LAP), 2019 WL 1428349, at *12 (S.D.N.Y. Mar. 29, 2019), "courts within this Circuit have previously found that the temporary discomfort caused by pepper spray or mace does not constitute a 'sufficiently serious' injury" within the meaning of deliberate indifference, *Lewis*, 2014 WL 1364934, at *7 (citations omitted); *Johnson v. Schiff*, No. 17 Civ. 8000 (KMK), 2019 WL 4688542, at *14 (S.D.N.Y. Sept. 26, 2019) (collecting cases) (If a plaintiff "does not allege facts suggesting that he suffered permanent effects or serious injury from [ ] pepper spray," then he has failed to allege any factual dispute regarding a "serious medical condition" produced by the deploying of the pepper spray.). Indeed, in *Lewis*, where the record supported that the defendant knew of the plaintiff's asthma, the court dismissed a deliberate indifference claim predicated solely on the use of OC gel because being asthmatic was not, by itself, a sufficiently serious condition. 2014 WL 1364934, at *7; *see also Patterson v. Lilley*, No. 02 Civ. 6056 (NRB), 2003 WL 21507345, at *4 (S.D.N.Y. June 30, 2003) ("Being an asthmatic ... is not a condition ... that is severe or 'sufficiently serious.' "); *Paschal-Barros v. Balatka*, No. 18 Civ. 2021 (VLB), 2020 WL 5230994, at *5 (D. Conn. Sept. 1, 2020) ("Courts within the Second Circuit have held that the fact that an inmate is asthmatic does not, by definition, constitute a serious medical need.") (collecting cases)).[16] The Court in *Lewis*, however, sustained the plaintiff's deliberate indifference claim based on his suffering an asthma attack in the defendant's presence because there were "genuine issues of material fact as to whether Plaintiff actually was experiencing an asthma attack while in pretrial detention" and at the time the gel was deployed. 2014 WL 1364934, at *7; *see also Patterson*, 2003 WL 21507345, at *4 ("The existence of the condition is distinct from the situation in which an inmate is suffering an actual attack.").

[16]   The claims in *Patterson* and *Paschal-Barros* were brought under the Eighth Amendment, and the claim in *Lewis* was brought under the Fourteenth Amendment before the decision in *Darnell*. But the standards for a "serious medical condition" are the same under the two amendments, and *Darnell* did not disturb this aspect of the analysis.

**\*19**  Here, as noted, Ross has not pointed to any evidence that he was exhibiting any asthma symptoms at the time the spray was deployed or that he, by then, had informed the officers of his asthma or breathing troubles. It is clear that being pepper sprayed in the face caused Ross great deal discomfort and pain. *See* Video at 2:31–3:31 (showing Ross began gasping for air as he was escorted from his cell); *id.* at 3:44–49, 4:08 (Ross telling officers, "I can't breathe. I can't breathe."); Ross Tr. at 70–71, 116 (Ross testifying that his symptoms were similar to those he experiences during an attack); JSF ¶¶ 50–51 (Ross had to be lifted onto a gurney and wheeled to intake); Video at 6:15 (showing Ross shaking and coughing on gurney in intake area). Had the officers thereafter denied Ross adequate care in response to these exhibited symptoms, or deployed the agent after Ross began to manifest them, Ross would have a viable basis to claim that Willis's spraying occurred in the face of a known sufficiently serious condition. But Ross does not point to such evidence. *See* Ross Opp'n at 32–36. Accordingly, his deliberate indifference claim against Willis based on the deployment of the pepper spray must be dismissed.

In any event, Willis would be entitled to qualified immunity because his conduct with respect to ascertaining Willis's medical condition did not violate a clearly established statutory or constitutional right. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Ross's theory is that "a reasonable officer should have known about Mr. Ross's medical condition before using MK-9 on him" because "DOC policies ... required officers to check an inmate's contraindications prior to deploying chemical agent in non-emergency anticipated-use-of-force scenarios." Ross Opp'n at 35. Ross's claim thus effectively treats the DOC policies as coextensive with his § 1983 claim for deliberate indifference, such that failure to comply with the policy establishes the requisite knowledge on Willis's part. And because Willis failed to comply with the policies and thereby was unaware of Ross's particular medical vulnerabilities, Ross argues, his decision to pepper spray Ross was objectively reckless and a violation of Ross's clearly established statutory or constitutional rights. *Id.*

The DOC policies on which this argument rests, however, do not provide Ross with a clearly established statutory or

constitutional right. *See Sandin v. Conner*, 515 U.S. 472, 481–82 (1995) ("[A] prison regulation primarily designed to guide correctional officials in the administration of a prison" is "not designed to confer rights on inmates."). And Ross has not cited a clearly established constitutional or statutory right to have an officer in the circumstances presented ascertain the inmate's medical profile before commencing pepper-spraying. Thus, once the DOC policies are put aside, Willis is entitled to qualified immunity on this claim. *See Quinones*, 2020 WL 6420181, at \*5 (quoting *Wesby*, 138 S. Ct. at 589).

It follows that the deliberate indifference claims against George and Genoves, whether based on a theory of direct participation or a theory of failure to intervene to prevent a § 1983 violation by Willis, [17] also fail. Ross has not adduced evidence that either of these officers, any more than Willis, knew of Ross's medical condition prior to Willis's pepper-spraying. [18]

[17]   *See Thawney v. City of New York*, No. 17 Civ. 1881 (PAE), 2018 WL 4935844, at \*4 (S.D.N.Y. Oct. 11, 2018) ("It is well established that an officer acts with deliberate indifference if he is aware of an attack, has an opportunity to protect the inmate, and does not intervene."); *Rosen v. City of New York*, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009) ("In the context of a failure to intervene claim, an officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." (cleaned up)).

[18]   In light of this ruling, the Court has no occasion to entertain defendants' belated argument that Ross's *pro se* complaint should not be read to encompass a deliberate indifference claim. *See* Willis Mem. at 22; CO Mem. at 19.

## CONCLUSION

**\*20**  For the foregoing reasons, the Court denies defendants' motion for summary judgment on Ross's excessive force and failure to intervene claims, and grants defendant's motion as to the deliberate indifference claims. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 146 and 149.

Barring settlement, the case will now proceed to a jury trial. Counsel are directed promptly to meet and confer to discuss potential settlement. If a stipulation of discontinuance has not by then been submitted, the parties are directed, by four weeks from this decision, to submit a joint pretrial order, consistent with the Court's Individual Rules.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3500163

---

**End of Document**      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Arminio v. Holder, Not Reported in Fed. Supp. (2019)

2019 WL 176804

2019 WL 176804
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Thomas ARMINIO, Plaintiff,

v.

Lysonia HOLDER, Defendant.

No. 15 Civ. 5812 (NSR)
|
Signed 01/11/2019

**Attorneys and Law Firms**

James Michael Lenihan, Lenihan & Associates, LLC, White Plains, NY, for Plaintiff.

Colleen Kelly Faherty, State of New York Office of the Attorney General, New York, NY, for Defendant.

OPINION & ORDER

Nelson S. Román, United States District Judge

*1 Plaintiff Thomas Arminio brings this action against Defendant Lysonia Holder. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § 2201 and compensatory and punitive damages for violations of his civil rights under 42 U.S.C. § 1983. Plaintiff's Amended Complaint asserts claims of excessive force and failure to intervene to prevent the alleged use of excessive force against Defendant Holder under the Fourth Amendment of the United States Constitution.

Presently before this Court is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, the motion for summary judgment is GRANTED.

BACKGROUND

The following facts are drawn from the parties' 56.1 submissions and the record, and they are undisputed unless otherwise noted.

On July 27, 2012, Plaintiff Thomas Arminio was involved in a motor vehicle accident at the Route 202 Hess gas station in Cortland, New York. (Pl.'s 56.1 ¶ 3, ECF No. 45.) Defendant Holder arrived at the scene and directed Plaintiff and the other individual involved in the accident, Alison Johnson, to park towards the west side of the gas station. (*Id.* ¶ 5.) Defendant separated Plaintiff and Ms. Johnson while she processed paperwork from the accident. (*Id.* ¶ 6.) While Defendant was in her vehicle working on paperwork from the accident, Plaintiff approached her to request that she "hurry up this process and get [him] out of here." (*Id.* ¶ 8); (Arminio Dep. 129:18 – 21.) When walking back to his vehicle after speaking with Defendant, Plaintiff either fell or sat down on the ground briefly because he felt unwell.[1] (Pl.'s 56.1 ¶ 10.) Defendant observed Plaintiff's behavior and called for backup and medical assistance for Plaintiff. (*Id.* ¶ 12.) Troopers Zerrle and Fontanelli, both male, were among the responding emergency personnel. (*Id.* ¶ 14.) At some point, Trooper Fontanelli observed a knife in the front console area of Plaintiff's vehicle and communicated this information to Defendant and Trooper Zerrle. (*Id.* ¶ 15 – 17); (Arminio Dep. 83:2 – 84:12.)

[1]  Plaintiff states that he "sat down on the ground next to his car for a second to collect himself and got up and got back in his car." (Pl.'s 56.1 ¶ 10.) From Defendant's perspective, Plaintiff fell when he was walking back from her car. (Def.'s 56.1 ¶ 10, ECF No. 39.)

After Defendant called for backup, Plaintiff's son, Thomas Arminio, Jr., arrived at the scene. (*Id.* ¶ 18.) Defendant stepped several yards away from Plaintiff and Plaintiff's vehicle in order to accompany Plaintiff's son to his vehicle so she could verify the validity of his driver's license. (*Id.* ¶¶ 19, 30.) Troopers Zerrle and Fontanelli remained with Plaintiff who was still in his vehicle. (*Id.* ¶ 20.) At some point, Plaintiff chose to exit his vehicle, and Troopers Zerrle and Fontanelli began approaching Plaintiff. (*Id.* ¶ 22.) Plaintiff then "quickly attempted to re-enter his vehicle." (*Id.* ¶ 23.) One of the troopers grabbed Plaintiff and attempted to pull him out of his vehicle. (*Id.* ¶ 25.) Plaintiff resisted the troopers and attempted to grab onto the vehicle's door handle and steering wheel. (*Id.* ¶ 26.) Troopers removed Plaintiff from his vehicle after a few seconds and the troopers took Plaintiff towards the back of Plaintiff's vehicle. (*Id.* ¶¶ 26 – 27.) Within a second of reaching the back of the car, Plaintiff and the troopers "ended up on the ground." (*Id.* ¶¶ 28 – 29.) During these incidents, Defendant was still several yards away with Plaintiff's son. (*Id.* ¶ 30.) At some point, Defendant approached the Plaintiff and the troopers. (Arminio Jr. ("Junior") Dep. 59:11 – 14); (Holder Dep. 181:2 – 6.) Plaintiff was handcuffed and the

Arminio v. Holder, Not Reported in Fed. Supp. (2019)

2019 WL 176804

Case 5:24-cv-01138-DNH-MJK   Document 12   Filed 10/29/24   Page 51 of 77

troopers then placed Plaintiff in a sitting position. (*Id.* ¶¶ 33, 35.) From the time Plaintiff was "placed on the ground until the handcuffs were applied took a matter of seconds." (*Id.* ¶ 34.) Plaintiff began to complain that his left arm was hurt or broken, and he was transported to a local hospital for treatment. (*Id.* ¶¶ 36, 39.) After an inventory search, two knives were discovered in Plaintiff's car. (*Id.* ¶ 44.) A blood test performed at the hospital later that day revealed that there was THC or cannabinoids substances in Plaintiff's system. (*Id.* ¶ 43.)

**\*2**  On January 20, 2016, Defendant moved to dismiss Plaintiff's Amended Complaint. (ECF No. 14.) The Court granted the motion to dismiss Plaintiff's claims under the New York Constitution for lack of subject matter jurisdiction and dismissed Plaintiff's claims against two John Doe defendants as barred by the statute of limitations. *Arminio v. Holder*, No. 15-CV-5812(NSR), 2016 WL 4154893, at \*1 n.1, 8 (S.D.N.Y. 2016). However, Plaintiff's § 1983 claims against Defendant survived the motion to dismiss. *Id.* at \*8.

## LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] ... affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by "showing ... that [the] adverse party cannot produce admissible evidence [in] support" of such a contention. Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations and citations omitted).

If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a motion for summary judgment should fail. *Id.* at 258. Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quotations and citations omitted). The party asserting that a fact is genuinely disputed must support

their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A)–(B). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotations and citations omitted). Similarly, "a party cannot create an issue of fact by submitting an affidavit in opposition to summary judgment that contradicts their prior deposition testimony." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104 (2d Cir. 2010) (citing *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ) (noting that such affidavits "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact"). But the mere fact that a non-movant's factual allegations in opposition are "self-serving" does not automatically render them insufficient to defeat summary judgment. *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998). Instead, summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," where "that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**\*3**  In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250. If the Court finds that one party to a case has "no real support for its version of the facts," a motion for summary judgment should be granted. *Community of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 498 (2d Cir. 1962).

## DISCUSSION

### I. Compliance with local rules

In her reply in further support of the motion for summary judgment, Defendant argues that her motion should be deemed unopposed because Plaintiff failed to comply with local rules and the rules of this Court. Specifically, Plaintiff did not serve a memorandum of law in opposition but only a declaration in opposition and Plaintiff submitted entire

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 52 of 77

Arminio v. Holder, Not Reported in Fed. Supp. (2019)

2019 WL 176804

transcripts from depositions taken in this case. Loc. Civ. R. 7.1(b); Individual Practices R. 3(G)(iv). District courts have broad discretion to decide whether to penalize a party for failure to comply with local rules. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 – 74 (2d Cir. 2001). If a court elects to disregard Plaintiff's submissions for lack of compliance with its local rules, the court must still determine whether Defendant has met the burden of establishing the absence of any genuine issue of material fact. *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 453 (S.D.N.Y. 2005).

While parties' compliance with the local rules is an important part of ensuring the efficient operation of the courts, the resolution of genuine disputes on their merits where possible is also significant. *Holford USA Ltd., Inc. v. Harvey*, 169 F.R.D. 41, 44 (S.D.N.Y. 1996) (citing *Traguth v. Zuck*, 710 F.2d 90, 94 (2d Cir. 1983) ). Parties depend on the court's careful consideration of each side of a case and on their counsel to comply with all procedural rules, including the local rules. Here, the violations of the local rules, while inconvenient, are not so grave as to prevent the Court from fully addressing both sides of a summary judgment analysis. Therefore, to avoid penalizing Plaintiff for the mistakes of his counsel, the court will consider Plaintiff's submissions. *Lorillard Tobacco Co.*, 378 F. Supp. 2d at 453 ("This Court endeavors to avoid penalizing parties harshly for the procedural errors of their attorneys; therefore, we will overlook the deficiencies of defendants' submission in opposition to the present motion.").

## II. Excessive force claims

Defendant asserts that she is entitled to summary judgment because there are no genuine disputes of material fact, and there is no evidence that Defendant used excessive force or failed to intervene in the use of excessive force by the troopers.

When considering excessive force claims under the Fourth Amendment, courts must "examine whether the use of force is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation.' " *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). Courts then "consider the *facts and circumstances* of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Id.*

In arguing that Defendant should be granted summary judgment for the excessive force and failure to intervene claims, Defendant asserts that she had no personal involvement in any use of force against Plaintiff. It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite for an award of damages under § 1983." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ). "A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Russo v. DeMilia*, 894 F. Supp. 2d 391, 414 (S.D.N.Y. 2012) (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003) ).

### A. Direct participation

**\*4** Here, the excessive force occurred when the troopers extracted Plaintiff from his vehicle, brought him to the ground, and handcuffed him, which resulted in Plaintiff's broken arm. It is undisputed that Defendant did not participate in removing Plaintiff from the car or bringing him to the ground. (Arminio Dep. 203:12 – 17, 204:14 – 24); (Holder Dep. 177:9 – 12, 182:23 – 24, 183:1 – 8.) In fact, Defendant was with Plaintiff's son, yards away from Plaintiff's car. (Junior Dep. 52:17 – 18, 58:17 – 19, 67:6 – 15); (Holder Decl. ¶ 27, ECF No. 41-1.) Once Plaintiff was on the ground, his "face was looking down into the ground" and he didn't "know who was doing what." (Arminio Dep. 250:4 – 9.) Plaintiff testified that at some point, Defendant rushed over to assist the troopers and that all three individuals, the troopers and Defendant, were on top of him when he was handcuffed, but Plaintiff could not identify the handcuffing officer, nor could Plaintiff testify as to what particular act Defendant undertook such that she applied excessive force upon Plaintiff (Arminio Dep. 203:18 – 22, 204:4 – 13, 248:13 – 25.) From the evidence in the record, no jury could reasonably conclude that Defendant handcuffed the Plaintiff or otherwise personally used excessive force against Plaintiff.

"[A]n arrestee's 'inability to positively identify those who allegedly violated his rights is not *per se* fatal to his claims.' " *Shankle v. Andreone*, No.06-CV-487(NG)(LB), 2009 WL 3111761, at *5 (E.D.N.Y. Sept. 25, 2009) (quoting *Davis v. Callaway*, No. 05-CV-00127, 2007 WL 1079988, at *8 (D. Conn. April 9, 2007) ); *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003) ("A plaintiff need not establish

Arminio v. Holder, Not Reported in Fed. Supp. (2019)

2019 WL 176804

Case 5:24-cv-01138-DNH-MJK   Document 12   Filed 10/29/24   Page 53 of 77

who, among a group of officers, directly participated in the attack and who failed to intervene."). This is particularly true where, as here, the officers' alleged actions would have prevented the plaintiff from identifying which of the officers specifically engaged in the bad acts. *Shankle*, 2009 WL 3111761, at *5 (citing *Davis*, 2007 WL 1079988, at *9). In those cases, the burden shifts to each defendant to disprove his or her involvement. *Universal Calvary Church v. City of New York*, 99-CV-4606(RPP), 2000 WL 1538019, *63 (S.D.N.Y. Oct. 17, 2000). "To shift this burden, however, plaintiff must demonstrate first that *each* of the defendants acted tortiously." *Paul v. City of Rochester*, 452 F. Supp. 2d 223, 228 (W.D.N.Y. 2006). In *Paul*, the plaintiff brought a § 1983 action against several police officers for injuries he sustained during a search. The officers ordered the plaintiff to lie on his stomach, then one officer handcuffed his hands behind his back and then stepped on his knee and back. *Id.* at 227. While the conduct described by the plaintiff was objectively unreasonable, the court granted summary judgment for the defendants in part because the plaintiff could not show that each of the defendants acted tortiously. *Id.* at 227 – 28. The court granted summary judgment for similar reasons in *Hunter v. County of Orleans.* No. 12-CV-6173, 2013 WL 6081761, at *8 – 10 (W.D.N.Y. Nov. 19, 2013). In *Hunter*, the plaintiff alleged that four officers used excessive force when they pushed the front door of her residence open so hard that the door slammed into her and pushed her across the room and into the refrigerator. *Id.* at *1. The court granted summary judgment for the defendants because the plaintiff could not identify who pushed open the door, and "the evidentiary proof before the Court on this motion does not show that each defendant acted tortiously." *Id.* at *8.

Here, similar to *Paul* and *Hunter*, there is no evidence that Defendant used excessive force or otherwise acted unlawfully. Plaintiff himself states that he "got [his] arm broken and ... the crap beat [sic] out of [him] by "two cops," which indicates that only two out of the three involved officers acted tortiously. (Arminio Dep. 197:5 – 14.) Neither Plaintiff nor any other witness can identify who handcuffed Plaintiff or identify any use of excessive force or other tortious action by Defendant. (*Id.* 250:2 – 9; 252:18 – 24, 253:2 – 18); (Junior Dep. 64:9 – 12); (Holder Dep. 177:7 – 16); (Jackson Decl. ¶¶ 13 – 14, ECF No. 41-3); (Fontanelli Decl. ¶ 23, ECF No. 41-2.)[2] Plaintiff's son testified that a male officer, not Defendant, had his knee in Plaintiff's back and another officer twisted Plaintiff's arm to put on the handcuffs. (Junior Dep. 65:11 – 25, 66:2 – 7.) He did not recall what Defendant did when she went to assist the troopers after Plaintiff was on

the ground, and he also could not recall which officer placed the handcuffs on the Plaintiff. (*Id.* 63:20 – 24, 64:9 – 12.) Defendant, however, offers testimony from three individuals that a male officer handcuffed Plaintiff.[3] (Fontanelli Decl. ¶ 23); (Holder Dep. 177:7 – 16); (Loprieno Decl. ¶ 13, ECF No. 41-4.)

2     At most, Plaintiff testifies that Defendant "jumped on the pile after [they] were already down on the ground" and that he knows that Defendant joined the troopers because he felt her weight. (Arminio Dep. 204:17 – 24.) However, this alleged use of force is not objectively unreasonable in light of the circumstances, and based on the evidence no reasonable jury could conclude that Defendant simply decided to join the troopers in beating Plaintiff. *See Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). At the time the troopers took Plaintiff to the ground, Defendant was yards away from Plaintiff with his son. (Junior Dep. 52:17 – 18, 58:17 – 19, 67:6 – 15); (Holder Decl. ¶ 27.) Defendant knew that Plaintiff had at least one knife in his vehicle, and she saw the troopers struggling with Plaintiff right outside of his vehicle. (Arminio Dep. 84:6 – 24, 85:14 – 16); (Holder Decl. 143:1 – 24.) It is objectively reasonable for an officer to intervene if she has reason to believe that an individual has a weapon. *Garcia v. Greco*, No. 05-CV-9587, 2010 WL 446446, at *7 (S.D.N.Y. Feb. 9, 2010) (granting summary judgment because the defendant's use of force against the plaintiff, hitting the plaintiff with fists and radios, was objectively reasonable due to the defendant's "interest in preventing the escape of a gun-wielding fugitive, as well as his interest in the safety of his fellow officers"); *Hardy v. Plante*, No. 06-CV-687(LEK) (RFT), 2009 WL 249787, *6 – 7 (N.D.N.Y. Feb. 3, 2009) (holding that the defendants' use of a taser was objectively reasonable as a matter of law because the defendants had reason to believe that the plaintiff had a knife and because the plaintiff was struggling with the officers); *see also Salim v. Pronlx*, 93 F.3d 86, 92 (2d Cir. 1996) (holding that an officer who shot an individual during a struggle over the officer's weapon was entitled to qualified immunity in an excessive force action).

2019 WL 176804

3

Plaintiff's son could not identify the gender or identity of the individual who handcuffed Plaintiff. (Junior Dep. 65:11 – 25,66:2 – 7.)

**\*5** Despite Plaintiff's speculative assertions, the record is devoid of any evidence from which a reasonable factfinder could find that Defendant used excessive force against Plaintiff. New York law enforcement officers, such as Defendant, have a sacred duty to uphold United States and New York law, and allegations of excessive force, so excessive as to break a plaintiff's arm, by an officer must be taken seriously. *See* N.Y. Const. art. XIII. However, where there is no evidence from which a reasonable jury could determine that an officer used excessive force, summary judgment must be granted on that claim. Here, at most, the evidence shows that Defendant joined the troopers once he was already on the ground. [4] (Junior Dep. 58:10 – 24, 59:2 – 20); (Holder Dep. 181:15 – 24.) This is insufficient to support a claim for excessive force. [5] Accordingly, Defendant's motion for summary judgment on Plaintiff's excessive force claim is granted. *See, e.g., Coleman v. Hauck*, No. 09– CV–1391(GTS)(GHL), 2012 WL 4480684, at \*9 (N.D.N.Y. Sept. 26, 2012) (granting summary judgment for certain defendants on personal involvement grounds where plaintiff argued that "[a]ll named Defendants responded to the scene where Plaintiff was repeatedly struck and kicked in the face" but failed to point to record evidence establishing that those defendants arrived at the scene before the use of force was applied). *Konovalchuk v. Cerminaro*, 11-CV-1344(MAD/ CFH), 2014 WL 272428, at \*14 (N.D.N.Y. Jan. 24, 2014) (granting summary judgment because the plaintiff's claim that the defendant participated in an assault was "speculative and conclusory" compared to the defendant's testimony that he was not present for the assault).

4

Parties dispute whether Defendant "jumped" onto the troopers and Plaintiff while they were on the ground. However, this is not a genuine dispute because no reasonable factfinder would find Plaintiff's account to be credible. *See Chapel Park Villa, Ltd. v. Travelers Ins. Co., Inc.*, 02-CV-407F, 2006 WL 2827867, at \*8 (W.D.N.Y. Sept. 29, 2006) (holding that no reasonable juror could find the plaintiff's account credible because the plaintiff's testimony was contradicted by other testimony and because there was no other direct evidence on the record to support the plaintiff's account). Plaintiff testifies that Defendant jumped on him, but he did not see her approaching him; he only felt

additional weight. (Arminio Dep. 204:17 – 24.) Plaintiff's son at one point referred to Defendant jumping on the troopers and Plaintiff, but when asked specifically what Defendant did when she arrived at the Plaintiff and troopers, he said, "I don't recall" and he was unable to provide any other details about her actions or movements. (Junior Dep. 63:14 – 24, 64:2 – 12.) Three other witnesses, not including Defendant, testified that Defendant never placed her hands on Plaintiff. (Loprieno Decl. ¶ 13); (Jackson Decl. ¶ 16.); (Fontanelli Decl. ¶ 26.) Because Plaintiff's version of events is only supported by his testimony and no other evidence on the record and is directly contradicted by testimony from three other individuals not including Defendant, no reasonable jury could decide that Plaintiff jumped on Defendant. There is no genuine dispute of material fact.

5

*See* n.2.

### B. Failure to intercede

Summary judgment must also be granted on Plaintiff's failure to intercede claim. "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). For an officer to be held liable, she must have (1) actual knowledge of the use of excessive force by other officers, (2) had a realistic opportunity to intercede and prevent the harm from occurring, and (3) intentionally refused or failed to take reasonable measures to stop the use of excessive force. *Cicio v. Lamora*, No. 08-CV-431, 2010 WL 1063875, at \*8 (N.D.N.Y. Feb. 24, 2010) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Haralambous v. Hubbs*, No. 13-CV-1916(JCH), 2015 WL 3444328, at \*3 (D. Conn. May 28, 2015). Of course, where the officer is a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is inapplicable. *See Simon v. City of New York*, No. 09–CV– 1302(ENV)(RER), 2011 WL 317975, at \*12 (E.D.N.Y. Jan. 3, 2011) (citing *Morgan v. County of Nassau*, 720 F. Supp. 2d 229, 240 (E.D.N.Y. 2010) ). Defendant argues that judgment should be granted in her favor as a matter of law because

Arminio v. Holder, Not Reported in Fed. Supp. (2019)

2019 WL 176804

she neither had actual knowledge that the troopers were using excessive force nor a realistic opportunity to intervene had she known that the troopers were using excessive force.

**\*6** As discussed above, the alleged excessive force occurred when Plaintiff was removed from the car, taken to the ground, and handcuffed. The parties do not dispute that Defendant and the troopers knew that Plaintiff had a knife and a tool resembling a knife in plain view in his car. (Arminio Dep. 84:6 – 24, 85:14 – 16); (Pl.'s 56.1 ¶ 17.) They also do not dispute that Defendant was with Plaintiff's son and yards away from Plaintiff and Plaintiff's vehicle when the troopers removed Plaintiff from his car and brought him to the ground. (Junior Dep. 52:17 – 18, 58:17 – 19, 67:6 – 15); (Holder Decl. ¶ 27.) However, there is scant evidence from which a reasonable jury could find that Defendant, who was verifying Plaintiff's son's license, actually observed the alleged use of excessive force as they happened. (Arminio Dep. 179:15 – 25, 181:3 – 11.) Rather, it appears that Defendant merely observed that the troopers were physically struggling with an individual who had access to a knife and intervened to secure the safety of the scene. (Arminio Dep. 84:6 – 24, 85:14 – 16); (Junior Dep. 58:10 – 24, 59:2 – 20); (Holder Dep. 143:1 – 11, 167:6 – 18.) "Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference [to taking reasonable steps to intervene] sufficient to support liability for failure to intervene." *Demosthene v. City of New York*, No. 14-CV-816(SJ)(VMS), 2015 WL 5093116, at \*10 (E.D.N.Y. June 26, 2015) (internal quotation marks omitted) (quoting *Cicio v. Lamora*, No. 08-CV-431(GLS)(DEP), 2010 WL 1063875, at \*8 (N.D.N.Y. Feb. 24, 2010) ).

Assuming Defendant had actual knowledge of the use of excessive force, there is still no evidence to support a failure to intercede claim because there is no genuine dispute that the evidence shows that the alleged excessive force happened too quickly to allow Defendant a meaningful opportunity to intervene. Plaintiff's son testified that Defendant was behind him when he saw the troopers pull Plaintiff from the car, and that she had not made it to the troopers when Plaintiff was taken down. (Junior Dep. 59:6 – 18.) Both of those events happened in less than a handful of seconds. (*Id.* 57:3 – 4); (Arminio Dep. 194:15 – 25, 195:1 – 6); (Holder Decl. ¶ 35). Plaintiff's son testified that "it all happens so fast. I don't remember exactly who was where and doing what." (Junior Dep. 51:6 – 8.) Plaintiff also testified, "This happened so fast. So many things were going on at the same time." (Arminio Dep. 199:23 – 25, 200:2.) By the time Defendant approached the troopers and Plaintiff, they were essentially a pile on the ground, and the handcuffing took place seconds after Plaintiff and the troopers were on the ground. (Arminio Dep. 204:17 – 24.) While officers must intervene when they see that other officers are using excessive force, *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994), intervention takes time. On some occasions, as in this case, the seconds it takes for excessive force to occur are not enough to provide an officer with a realistic opportunity to intervene. The evidence shows that the events here occurred in such rapid succession, no reasonable jury could infer that Defendant could have intervened in sufficient time to prevent Plaintiff's injuries. *See Raffaele v. City of New York*, 242 F. Supp. 3d 152, 158, 161 (E.D.N.Y. 2017) (dismissing the plaintiff's failure to intercede claim because the three-second duration of the alleged excessive force was not sufficient time to intercede); *Haralambous*, 2015 WL 3444328, at \*5 (granting summary judgment for the defendants because, although they were at the scene when the alleged abuses occurred, no reasonable jury could infer that they had sufficient time to prevent another officer from pulling the plaintiff up from the ground by his handcuffs); *Wright v. City of Waterbury*, 07-CV-306(CFD), 2011 WL 1106217, at \*6 (D. Conn. Mar. 23, 2011) (granting summary judgment for the defendant on the plaintiff's claim that he failed to intervene in a beating because, although he was close to the assault, the blows were struck in such rapid succession that Plaintiff had no meaningful opportunity to intercede). [6]

[6]   Because Defendant's motion for summary judgment is granted, the Court will not address Defendant's qualified immunity argument. However, had Defendant not otherwise been entitled to summary judgment for other reasons, she would have been granted qualified immunity. *See Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996).

### CONCLUSION

**\*7** For the foregoing reasons, Defendant Holder's motion for summary judgment is GRANTED. The Court respectfully directs the Clerk to terminate the motion at ECF No. 38 and to close the case.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2019 WL 176804

2019 WL 176804

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

705 Fed.Appx. 50 (Mem)
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.

United States Court of Appeals, Second Circuit.

John PANZELLA, Joemark
Enterprises, LLC, Plaintiffs-Appellants,
v.
CITY OF NEWBURGH, Defendant-Appellee.

No. 17-614
|
December 6, 2017

Appeal from the United States District Court for the Southern
District of New York (Karas, *J.*).

**ON CONSIDERATION WHEREOF, IT IS HEREBY
ORDERED, ADJUDGED,** and **DECREED** that the
judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

For Plaintiffs-Appellants: Michael H. Sussman, Sussman &
Watkins, Goshen, NY.

For Defendant-Appellee: David L. Posner, McCabe & Mack
LLP, Poughkeepsie, NY.

Present: ROBERT A. KATZMANN, Chief Judge, JOHN M.
WALKER, JR., GUIDO CALABRESI, Circuit Judges.

**SUMMARY ORDER**

Plaintiffs-Appellants John Panzella and Joemark Enterprises,
LLC, appeal from a final judgment entered by the district

court (Karas, *J.*) on February 13, 2017, dismissing their
complaint against the Defendant-Appellee City of Newburgh
for failure to state a claim under Rule 12(b)(6) of the Federal
Rules of Civil Procedure. We assume the parties' familiarity
with the underlying facts, the procedural history, and the
issues on appeal.

"To survive a motion to dismiss under Fed. R. Civ. P. 12(b)
(6), a complaint must allege sufficient facts, taken as true, to
state a plausible claim for relief." *Johnson v. Priceline.com,
Inc.*, 711 F.3d 271, 275 (2d Cir. 2013). "We review *de novo*
a dismissal for failure to state a claim, accepting as true all
material factual allegations in the complaint and drawing all
reasonable references in plaintiffs' favor," but "[t]he same
deference does not extend ... to pleaded legal conclusions." *Id.*
The facts below are drawn from the first amended complaint
in this matter.

Panzella is the owner and president of Joemark Enterprises.
In 2000, Panzella purchased the River Rose, a 64-foot boat
that he intended to use for passenger trips along the Hudson
River that were to depart from and return to a dock in
the City of Newburgh. Panzella began seeking approvals
necessary to install a dock on the City's waterfront in 2002,
culminating in a resolution passed by the City Council on
March 29, 2004 that authorized the city manager to enter into
an agreement with Joemark Enterprises, which was done on
April 5, 2004. At around the same time or shortly thereafter,
other Newburgh-based businesses began to bring political
pressure to bear on local government officials in order to
frustrate Panzella's ability to construct and eventually make
use of the dock, leading to the imposition of significant costs
and delays on the project. Eventually, on April 12, 2010, the
City of Newburgh revoked its earlier resolution and proposed
new terms that were inconsistent **\*51** with the parties' earlier
agreement. Panzella and Joemark Enterprises have continued
to operate the River Rose from the dock they built since that
time, but the parties have failed to reach a new agreement
governing the use of or responsibility for the dock. It is
further alleged that the City of Newburgh has given more
favorable treatment to other commercial enterprises located
along its waterfront. Based on the foregoing, Panzella and
Joemark Enterprises brought a single claim against the City
of Newburgh for violating the Equal Protection Clause of the
Fourteenth Amendment, which was dismissed with prejudice
for failure to state a cause of action. *Panzella v. City of
Newburgh*, 231 F.Supp.3d 1 (S.D.N.Y. 2017).[1]

1     The City of Newburgh also previously prevailed in a contract dispute with Joemark Enterprises in which it was determined that Joemark Enterprises had not adequately performed its obligations under the 2004 agreement. *See Joemark Enters., LLC v. City of Newburgh*, 62 A.D.3d 954, 878 N.Y.S.2d 907 (App. Div. 2009). We take judicial notice of that dispute and its resolution "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

"Under the Equal Protection Clause, a plaintiff must plausibly show that it was 'treated differently compared to others similarly situated.' " *Hampshire Recreation LLC v. Vill. of Mamaroneck*, 664 Fed.Appx. 98, 100 (2d Cir. 2016) (quoting *Church of Am. Knights of Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004)). Panzella fails to plead adequate facts to make such a showing.

The only comparator to the River Rose that is identified by the plaintiffs is the Pride of the Hudson, "another vessel which served food and drink," App. 21 ¶ 83, that is engaged in "sightseeing cruises and charter rides along the Hudson River," *id.* ¶ 82, and which "the City assisted in finding dock space during the 2014-15 time period," *id.* at 23 ¶ 91. Although this suit alleges unequal treatment by the City of Newburgh toward its contractual partners, the plaintiffs have alleged no facts establishing that the Pride of the Hudson's owner has a contract with the City of Newburgh, let alone that the terms of any such agreement are materially similar to those contained in the parties' 2004 agreement. Nor have the plaintiffs alleged that the owner of the Pride of the Hudson ever sought access to municipal utilities or to use a dock its owner constructed. In the absence of any such allegations, Panzella and Joemark Enterprises have failed to adequately allege that the Pride of the Hudson is similarly situated to the River Rose for equal protection purposes. Accordingly, they have failed to state a claim. *See Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 60 (2d Cir. 2010) (affirming dismissal where plaintiffs "fail[ed] to allege that properties sufficiently similar to theirs were treated more favorably").

We have considered all of the plaintiffs-appellants' arguments on this appeal and find in them no basis for reversal. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

705 Fed.Appx. 50 (Mem)

---

End of Document          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by    Johnson v. State of Vermont,    D.Vt.,    May 18, 2023

828 Fed.Appx. 801

This case was not selected for
publication in West's Federal Reporter.

RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.

United States Court of Appeals, Second Circuit.

Michael C. YANCEY, Plaintiff-Appellant,

v.

Douglas ROBERTSON, Corrections Officer, Albany
Correctional Facility, fka John Doe, Defendant-Appellee,
County of Albany, Daniel F. Lynch, County
Attorney, Correctional Medical Services, Inc.,
Corizon, Inc., Albany County Sheriff, Warden,
Albany County Correctional Facility, Defendants.

19-320-pr
|
October 8, 2020

**Synopsis**

**Background:** Pretrial detainee brought § 1983 action against
corrections officer, asserting claim for violation of his
Fourteenth Amendment rights arising out of medical care
received when he experienced an allergic reaction to a
multivitamin. The United States District Court for the
Northern District of New York, Brenda K. Sannes, J., 2019
WL 315048, adopting the report and recommendation of
Christian F. Hummel, United States Magistrate Judge, 2018
WL 7114888, entered summary judgment for corrections
officers. Detainee appealed.

**[Holding:]** The Court of Appeals, Jacobs, Circuit Judge,
held that detainee's symptoms were not serious enough
make denial of immediate care a violation of the Fourteenth
Amendment.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (1)

**[1]    Constitutional Law** 🔑 Fourteenth
Amendment in general

**Prisons** 🔑 Health and Medical Care

Pretrial detainee's symptoms from allergic
reaction to a multivitamin were not sufficiently
serious to make corrections officer's denial
of immediate medical care a violation
of the Fourteenth Amendment based on
deliberate indifference, where even assuming he
experienced some level of respiratory distress in
addition to hives and a rash, he did not indicate
any serious harm or risk of harm suffered because
of his allegedly respiratory distress other than an
inability to sleep. U.S. Const. Amend. 14.

15 Cases that cite this headnote

Appeal from a judgment of the United States District Court
for the Northern District of New York (Sannes, J.).

UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED that the
district court's order is AFFIRMED.

**Attorneys and Law Firms**

For Plaintiff-Appellant: Alexander Corson, Sarah Ungeheuer,
Law Students (Jon Romberg, Supervising Attorney, on the
brief), Seton Hall University School of Law Center for Social
Justice, Newark, NJ

For Defendant-Appellee: Michael J. Goldstein, Office of the
Albany County Attorney, Albany, NY

Present: Debra Ann Livingston, Chief Judge, John M. Walker, Jr., Dennis Jacobs Circuit Judges.

#### *802 **SUMMARY ORDER**

Plaintiff-Appellant Michael Yancey ("Yancey") appeals from a January 24, 2019 decision of the U.S. District Court for the Northern District of New York (Sannes, *J.*), granting summary judgment to Defendant-Appellee Douglas Robertson ("Robertson") as to Yancey's single claim arising out of the medical care he received as a pretrial detainee at the Albany County Correctional Facility ("ACCF"). Yancey initially sued several defendants in connection with his medical care, asserting claims under 42 U.S.C. § 1983, but his complaints as to all other defendants were dismissed by the district court in an order dated June 20, 2017.[1] Yancey asserts that Officer Robertson was deliberately indifferent to his serious medical needs and therefore violated his constitutional rights.

[1]    Yancey also asks us to reconsider the *sua sponte* dismissal of his claims against certain corporate medical service providers. He acknowledges, however, that his original complaint should not have named these providers as defendants and he does not seek to proceed against them now. Instead, he asks to be able to amend his complaint to name the correct defendant—who he now identifies as Dr. Silver Masaba—and argues that his amended complaint is subject to relation back under Federal Rule of Civil Procedure 15(c). Even assuming Yancey may amend his complaint and that his complaint adequately pleads a violation of the objective prong, and assuming *Darnell* provides the relevant legal standard, we agree with the district court that Yancey has at most alleged a claim of negligence or malpractice and not facts plausibly supporting an inference that the official "knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). Accordingly, we also affirm the *sua sponte* dismissal of these claims.

We review grants of summary judgment *de novo*, "construing the facts in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor." *Kazolias v. IBEWLU 363*, 806 F.3d 45, 49 (2d Cir.

2015). Furthermore, though he is represented by counsel in this appeal, Yancey proceeded *pro se* in the district court. His submissions before the district court are therefore to be "construed liberally and interpreted 'to raise the strongest arguments that they *suggest.*' " *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)). We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

\* \* \*

Yancey entered the custody of the ACCF on February 5, 2016. On his intake forms he noted several allergies in addition to his other medical information. Yancey alleges—and Robertson does not dispute—that on March 28, 2016 he was placed on a daily multivitamin regime that Yancey alleges caused a severe allergic reaction. On the night of April 13, 2016, Yancey claims that he began to experience respiratory distress and that hives on his skin opened and began to emit both blood and pus. Robertson was on the night shift. At around 2 A.M. on the morning of April 14, the parties agree that Yancey called out to Robertson. He told the officer, *inter alia*, that he couldn't breathe. The parties dispute the precise contents of this conversation, but they agree that Robertson agreed to write a note to the sergeant.

The parties do not dispute what happened next. Yancey was seen by the prison's medical staff at 6:15 P.M. on April 14 and, at that time, the staff noted hives on Yancey's forearms and neck—though no **\*803** respiratory distress—and prescribed him Benadryl. The next day, Yancey filled out an additional sick call form, complaining about the rash on his arms, face, and legs. He was seen on April 16 and his dose of Benadryl was doubled. Four hours later he was called down to the medical department for further evaluation and was prescribed Prednisone in addition to his dose of Benadryl. At that time, he was also admitted to the infirmary for observation; he remained there for three days.

\* \* \*

Yancey argues that the district court erred in granting summary judgment to Robertson as to his deliberate indifference claim. Because Yancey was a pretrial detainee, the Fourteenth Amendment supplies the relevant legal standard. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Pretrial detainees "may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing

that the officers acted with deliberate indifference to the challenged conditions." *Id.*; *see Charles v. Orange Cnty.*, 925 F.3d 73, 87 (2019) (noting that the same principles apply to medical treatment). This, in turn, requires a two-step inquiry. *Darnell*, 849 F.3d at 29. First, the plaintiff must satisfy the "objective prong" by showing a sufficiently serious need. *Id.* Second, the plaintiff must meet the "subjective prong" which requires the officer to have acted with "deliberate indifference" to the challenged condition. *Id.* [2] Here, Yancey has not adduced sufficient evidence to allow a reasonable jury to find that on the night of April 13 he suffered from medical symptoms that were "sufficiently serious" to meet his burden under the objective prong of the Fourteenth Amendment test. Accordingly, the district court did not err in granting summary judgment to Robertson.

[2]    *Darnell* was decided on February 21, 2017, after the events that form the basis of this appeal. *Darnell* clarified that "deliberate indifference" does not require proof of "a malicious or callous state of mind" and is instead akin to recklessness, requiring a plaintiff to show that the official knew or should have known of the excessive risk to the plaintiff's health. *See Charles*, 925 F.3d at 86–87. Prior to *Darnell*, this Court's decision in *Caiozzo v. Koreman* supplied the controlling law and required that "the government-employed defendant disregarded a risk of harm to the plaintiff of which the defendant was aware." 581 F.3d 63, 71 (2d Cir. 2009). Because we decide this appeal based on the objective prong, we need not address how the changed subjective prong may impact Robertson's entitlement to qualified immunity.

For a constitutional violation to occur based on deliberate indifference to a prisoner's medical need, the deprivation of medical care must be " 'sufficiently serious' in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)); *see Darnell*, 849 F.3d at 30 ("Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health,' which includes the risk of serious damage to 'physical and mental soundness.' " (first quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013); and then quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir.

1972))). Here, Yancey has consistently maintained that he suffered from breathing problems on the night of April 13, 2016, and Robertson admits that Yancey told him as much during their encounter. Even assuming, however, that Yancey did indeed suffer some level of respiratory distress, the surrounding record does include evidence that would permit a reasonable factfinder to conclude that his symptoms **\*804** were serious enough to satisfy the Fourteenth Amendment standard. While Yancey's medical records are consistent with an allergic reaction, no respiratory distress nor complaints of respiratory distress are noted in his medical records from April 14. And Yancey's own description of what happened after his conversation with Robertson does not indicate any serious harm or risk of harm suffered because of his alleged respiratory distress other than an inability to sleep.

To be clear, our conclusion does not rely on discounting Yancey's statements nor on a judgment about his credibility that would be impermissible at the summary judgment stage. At this point in the litigation, we presume that Yancey indeed suffered from an allergic reaction that caused him some level of respiratory distress. Instead, our decision is based on whether the surrounding record would allow a reasonable factfinder to find that Yancey met his burden to show that his medical condition was serious enough such that the delay in treatment here posed an unreasonable risk of severe damage to his health. Even drawing all inferences in Yancey's favor, we believe the record would not allow a reasonable jury to reach such a conclusion.

In sum, we conclude that Yancey has not shown that a reasonable factfinder could find that he meets the objective prong of the Fourteenth Amendment test. Even assuming that Yancey suffered from an allergic reaction that caused him *some* respiratory distress, Yancey has not shown that a reasonable jury could find that his symptoms were sufficiently serious to make a denial of immediate medical care a violation of the Fourteenth Amendment.

* * *

We have considered Yancey's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

### All Citations

828 Fed.Appx. 801

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 7986132
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jerry M. O'DELL, Plaintiff,

v.

Dr. Greg KAJAWSKI, et al., Defendants.

9:23-CV-1092 (TJM/DJS)
|
Signed November 17, 2023

**Attorneys and Law Firms**

JERRY M. O'DELL, Plaintiff, pro se, 5095, Delaware County Correctional Facility, 280 Phoebe Lane, Suite 6, Delhi, NY 13753.

**DECISION AND ORDER**

THOMAS J. MCAVOY, Senior United States District Judge

**I. INTRODUCTION**

*1 On August 29, 2023, pro se plaintiff Jerry O'Dell ("plaintiff") commenced this action by submitting a complaint pursuant to 42 U.S.C. § 1983 ("Section 1983"), the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and Section 504 of the Rehabilitation Act ("RA") with an application to proceed in forma pauperis ("IFP"). Dkt. No. 1 ("Compl."); Dkt. No. 2 ("IFP Application"). The complaint contained allegations of wrongdoing that occurred, if at all, while plaintiff was at Delaware County Correctional Facility ("Delaware County C.F."). *See generally* Compl.

By Decision and Order filed on September 13, 2023 (the "September Order"), this Court granted plaintiff's IFP Application and reviewed the sufficiency of the complaint in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b)(1). Dkt. No. 4. The Court dismissed all claims, without prejudice, for failure to state a cause of action. *Id.* In light of his pro se status, plaintiff was afforded an opportunity to submit an amended complaint. *Id.*

Plaintiff's amended complaint is now before the Court for review. Dkt. No. 6 ("Am. Compl.").

**II. SUFFICIENCY OF AMENDED COMPLAINT**

**A. Legal Standard**

The legal standard governing the dismissal of a pleading for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) was discussed at length in the September Order and it will not be restated in this Decision and Order. See Dkt. No. 4 at 2-4.

**B. Summary of Amended Complaint**

The factual allegations against defendants Dr. Greg Kajawski ("Kajawski"), Nurse Ira Fife ("Fife"), Nurse Bethany Brinkeroff ("Brinkeroff"), and Delaware County C.F. asserted in the amended complaint are substantially the same as those in the complaint. *Compare* Compl. *with* Am. Compl.

Upon entering the MAT Program [1], plaintiff was evaluated and found to be suffering from severe opiate withdrawal and addiction. Am. Compl. at 7. Beginning in December 2022, plaintiff filed "multiple sick call slips" complaining of headaches, depression, and suicidal thoughts. *Id.* at 6. Plaintiff "approached" Brinkeroff and Fife "on multiple occasions during med pass" and voiced his complaints. *Id.* Defendants "took vitals upon complaints." *Id.* Plaintiff told defendants that his "dosage of Bypenorphin needed to be increased." Am. Compl. at 7. Defendants declined plaintiff's request stating that "no increase would be given to any inmate per Dr. Greg Kajawski orders." *Id.* Plaintiff alleges that Kajawski "refus[es] to see [plaintiff]" and has made remarks such as, "your [sic] a junky who just wants to get high." *Id.* Plaintiff argues that Kajawski's remarks are "a violation of [the] ADA." *Id.*

[1]    The Medication-Assisted Treatment Program for inmates suffering from opioid use disorder. *See* http://www.co.delaware.ny.us (last visited Sept. 11, 2023).

Construing the amended complaint liberally, plaintiff asserts the following: (1) Fourteenth Amendment deliberate medical indifference claims; (2) ADA claims; and (3) claims related to New York State Minimum Standards. *See generally* Am. Compl. at 8. Plaintiff seeks monetary damages. *See id.* at 5.

**C. ANALYSIS**

### 1. Claims Against Delaware County C.F.

**\*2** The law related to the Eleventh Amendment was discussed in the September Order; it will not be restated here. *See* Dkt. No. 4 at 6-7. There, the Court dismissed plaintiff's section 1983 claims seeking monetary damages against Delaware County C.F. as barred by the Eleventh Amendment, with prejudice. *Id.* To the extent that plaintiff attempts to reassert section 1983 claims for money damages against Delaware County C.F. in the amended complaint, those claims are dismissed, with prejudice, for the reasons set forth in the September Order.

### 2. Deliberate Medical Indifference Claims

In the September Order, the Court dismissed plaintiff's deliberate medical indifference claims noting that, under the Eighth or Fourteenth Amendment, "plaintiff's ambiguous allegations" fail to plausibly suggest that defendants were personally involved with plaintiff's medical treatment or acted with deliberate indifference. Dkt. No. 4 at 11. The Court held:

> Plaintiff alleges that he reported his complaints to "medical staff" and "officers," but he has not pleaded that he directed any complaints to the named defendants. Plaintiff has not pleaded that the defendants were involved in any decision related to the MAT Program and the complaint lacks facts suggesting that plaintiff requested treatment from defendants, when he made his requests, and what response, if any, he received to the requests. Indeed, there are no allegations suggesting that plaintiff saw or spoke with defendants at any time since January 2023.

> Plaintiff's conclusory deliberate indifference claims are not supported by facts suggesting that defendants knew of and disregarded an excessive risk to plaintiff's safety or "recklessly failed to act" in response to his medical needs.

Dkt. No. 4 at 11.

With the amended pleading, plaintiff attempts to cure the deficiencies in his complaint and clarifies that his claims are pursuant to the Fourteenth Amendment, suggesting he was a pretrial detainee at the time of the alleged incidents. *See* Am. Compl. at 3.

Despite the additional allegations, the amended complaint lacks sufficient facts to suggest that Brinkeroff or Fife "recklessly failed to act" in response to plaintiff's medical needs. To wit, the amended complaint does not include facts related to when, where, or how many times he sought treatment from defendants. Further, plaintiff concedes that defendants "took his vitals" but complains that they would not increase his medication. At most, these allegations suggest nothing more than a dissatisfaction with a course of medical treatment, which is insufficient to satisfy the subjective element of Fourteenth Amendment claim. *See Meisel v. Westchester County*, No. 18-CV-7202, 2020 WL 3472500, at \*6 (S.D.N.Y. June 25, 2020) (dismissing Fourteenth Amendment deliberate indifference claim based upon the failure to increase medication and denial of requests to see a specialist); *see also Rutherford v. Correct Care Sols., LLC*, No. 18 CV 12049, 2020 WL 550701, at \*6 (S.D.N.Y. Feb. 4, 2020) (reasoning that Fourteenth Amendment claims based upon the defendant's refusal to refer the plaintiff to a specialist "amount[ed] only to mere disagreement over the proper treatment of his condition" and failed to suggest that the defendant consciously or recklessly disregarded a substantial risk of serious harm); *Jones v. Westchester Cnty.*, No. 19-CV-9553, 2020 WL 5770756, at \*4 (S.D.N.Y. Sept. 25, 2020) (dismissing pretrial detainee's allegations that medical personnel should have sent him to the hospital as a "mere disagreement over the proper treatment that does not rise to the level of a constitutional claim for deliberate indifference") (internal quotation marks omitted).

**\*3** With respect to Kajawski, plaintiff claims Kajawski is "biased against the MAT program and has said multiple times he will take no action to help any inmate," however, the amended complaint lacks facts suggesting that Kajawski personally treated, saw, or spoke to plaintiff. Moreover, although plaintiff alleges that Kajawski "made remarks like 'your [sic] a junky who wants to get high,' " *see* Am. Compl. at 7, the amended complaint lacks facts related to when or where Kajawski made these remarks. In fact, it is unclear from the allegations whether Kajawski actually made these remarks to plaintiff or if plaintiff overheard the remarks in some other manner. Simply put, the amended complaint lacks facts suggesting that Kajawski was personally involved in plaintiff's medical care. Plaintiff has not alleged when, where, or how often he sought, or received treatment, from Kajawski. Indeed, plaintiff claims Kajawski "refus[es] to even see [him] and screen [him] to evalute [his] symptoms[.]" *Id.* Thus, the Court has no basis to plausibly infer from the allegations in the amended complaint that defendant denied plaintiff access to medical treatment out of deliberate indifference to his serious medical needs

A prisoner is not entitled to the treatment of his choice. *See Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Without facts suggesting that defendants knew and disregarded an excessive risk to plaintiff's safety or acted recklessly in response to his medical needs, the complaint fails to state a deliberate indifference claim against them. Accordingly, plaintiff's deliberate medical indifference claims against defendants are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### C. ADA Claims

In the September Order, the Court dismissed plaintiff's ADA claims holding:

> ... plaintiff's one-sentence, cursory reference to the ADA and RA does not provide the Court will sufficient information to allow him to proceed. Plaintiff does not allege that he suffers from a disability and that he is being denied participation in Delaware County C.F. services, programs or activities due to a disability.

Dkt. No. 4 at 13.

Despite being afforded an opportunity to amend, the facts alleged in the amended complaint do not cure the deficiencies in plaintiff's ADA claims. Accordingly, for the reasons set forth in the September Order, plaintiff's ADA claims are dismissed.

### D. Violations of the New York State Minimum Standards

In the September Order, the Court dismissed plaintiff's claims related to violations of the New York Minimum Standards for County Jails, 9 N.Y.C.R.R. § 7011, reasoning that "[a] violation of the NYCRR, without more, does not establish liability under § 1983." Dkt. No. 4 at 13 (citing *Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir. 1985)).

Despite being afforded an opportunity to amend, the facts alleged in the amended complaint do not cure the deficiencies

in this claim. Accordingly, for the reasons set forth in the September Order, plaintiff's claims related to violations of the New York Minimum Standards for County Jails are dismissed.

### III. LEAVE TO AMEND TO CURE DEFICIENCIES

Ordinarily, a court should not dismiss a complaint filed by a pro se litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704–05 (2d Cir. 1991); see also Fed.R.Civ.P. 15(a) ("The court should freely give leave when justice so requires.").

An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

**\*4** In this instance, plaintiff has already been provided one opportunity to amend his complaint. The deficiencies with his original complaint, identified by the court in its decision, have not been cured with the amended complaint. Accordingly, the Court finds that any further amendment would be futile

### IV. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the amended complaint (Dkt. No. 6) is accepted for filing; and it is further

**ORDERED** that plaintiff's claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that the Clerk is directed to close this case; and it is further

**ORDERED** that the Clerk is directed to serve a copy of this Decision and Order on plaintiff.

**All Citations**

Slip Copy, 2023 WL 7986132

---

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    4

2019 WL 981850
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,

v.

SYRACUSE POLICE
DEPARTMENT, et al., Defendants.

Civil Action No. 5:18-CV-1471 (GTS/DEP)
|
Signed 01/07/2019

**Attorneys and Law Firms**

FOR PLAINTIFF: Jeramie White, Pro se, 18-B-0311, Cayuga Correctional Facility, P.O. Box 1186, Moravia, NY 13118.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

 **\*1**  This is a civil rights action brought by *pro se* plaintiff Jeramie White, a New York State prison inmate, pursuant to 42 U.S.C. § 1983, against the Syracuse Police Department ("SPD") and five of its officers. In his complaint, plaintiff alleges that defendants violated his constitutional rights during the course of his arrest on February 13, 2017. Plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP") have been referred to me for review. Based upon my consideration of those materials, I will (1) grant plaintiff's amended IFP application, (2) recommend dismissal of his claim against the SPD with leave to replead, and (3) recommend that his complaint otherwise be accepted for filing.

I. BACKGROUND

Plaintiff commenced this action on or about December 20, 2018. Dkt. No. 1. According to plaintiff, he and two friends were on their way to play indoor basketball when their vehicle was pulled over for a traffic infraction. *Id.* at 4; Dkt. No. 1-1 at 4. Plaintiff alleges that after the stop, defendant William Kittle forcibly removed White from the vehicle and that Kittle, in addition to defendants Abraham Mamoun and Shawn Hauck, proceeded to use excessive force against him during the course of his arrest. Dkt. No. 1 at 4-5, 6-7; *see also* Dkt. No. 1-1 at 4, 8. Plaintiff further alleges that defendants Altimonda

and Fiorini were present and had an obligation to intervene and prevent the unlawful use of force, but failed to do so. *Id.* at 5, 7.

Plaintiff was ultimately arrested and charged with resisting arrest, in violation of N.Y. Penal Law § 205.30, and second-degree obstruction of governmental administration, in violation of N.Y. Penal Law § 195.05. Dkt. No. 1-1 at 4. As relief, plaintiff seeks compensatory and punitive damages in the amount of $1,000,000. Dkt. No. 1 at 8.

A. Plaintiff's Amended IFP Application [1]

[1]
 Plaintiff filed both an original and amended motion to proceed in this action IFP. Dkt. Nos. 2, 6. While the two motions contain slightly different information concerning plaintiff's financial status, only the amended motion contains the required certification from an official at the correctional facility in which plaintiff is confined. *Compare* Dkt. No. 3 *with* Dkt. No. 7. Accordingly, plaintiff's original IFP application is denied as incomplete.

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $400, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP if it determines that he is unable to pay the required filing fee. 28 U.S.C. § 1915(a)(1). [2] Because I conclude that plaintiff meets the requirements for IFP status, his amended application for leave to proceed without prepayment of fees is granted. [3]

[2]
 The total cost for filing a civil action in this court is $400.00, consisting of the civil filing fee of $350.00, *see* 28 U.S.C. § 1914(a), and an administrative fee of $50.00. Although an inmate granted IFP status is not required to pay the $50.00 administrative fee, he is required to pay, over time, the full amount of the $350.00 filing fee regardless of the outcome of the action. *See* 28 U.S.C. § 1915(b)(3).

[3]
 Plaintiff is reminded that, although his IFP application has been granted, he will still be required to pay fees that he incurs in this action, including copying and/or witness fees.

B. Sufficiency of Plaintiff's Complaint

Case 5:24-cv-01138-DNH-MJK   Document 12   Filed 10/29/24   Page 68 of 77

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

2019 WL 981850

### 1. Governing Legal Standard

**\*2** Because I have found that plaintiff meets the financial criteria for commencing this case IFP, I must next consider the sufficiency of the claims set forth in his complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Similarly, 28 U.S.C. § 1915A(b) directs a court to review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("We have found both sections [1915 and 1915A] applicable to prisoner proceedings *in forma pauperis*.").

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at \*2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or

factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ).

### 2. Analysis of Plaintiff's Claims

**\*3** Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located. *See Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing *Orraca v. City of N.Y.*, 879 F. Supp. 148 (S.D.N.Y. 1995) ); *Turczyn ex rel. McGregor v. City of Utica*, No. 13-

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

2019 WL 981850

CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *see also Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department."). Although I would ordinarily recommend that, for the sake of judicial efficiency, the court substitute the City of Syracuse in place of the SPD, plaintiff's complaint contains no factual allegations that would support a *Monell* claim against the City of Syracuse. Accordingly, I recommend dismissal of plaintiff's claims asserted against the SPD.

With respect to his remaining claims, although plaintiff makes passing reference to his rights arising under the Eighth and Fourth Amendments, *see* Dkt. No. 1 at 6, it is clear from the factual allegations that he is asserting claims for excessive force and the failure to intervene arising under the Fourth Amendment. *See generally* Dkt. No. 1; *see also Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) ("Arrestees may invoke the Fourth Amendment's prohibition against 'unreasonable' seizures."). In light of the court's obligation to liberally construe a *pro se* litigant's pleadings, I find that plaintiff's complaint should be accepted for filing and the individual officer defendants should be required to respond in accordance with the local rules of practice for this court and the Federal Rules of Civil Procedure. [4]

[4]  The court expresses no opinion concerning whether plaintiff's claims can survive a properly filed motion to dismiss or motion for summary judgment, or whether he may prevail at trial.

C. Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see*

*also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this case, while I recommend dismissal of plaintiff's claim against the SPD, plaintiff could potentially amend his complaint to assert a cognizable cause of action against a defendant, such as the City of Syracuse, which is amenable to suit. Accordingly, I recommend that plaintiff be granted leave to amend his complaint. If plaintiff chooses to file an amended complaint, he must clearly and concisely set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted) ).

II. SUMMARY, ORDER, AND RECOMMENDATION

**\*4** Having reviewed plaintiff's amended application for leave to proceed in this action IFP, I conclude that he has met the applicable requirements for leave to proceed without prepayment of fees, and will therefore grant his application. Turning to the merits of his complaint, to the extent that it names five police officers and alleges a violation of 42 U.S.C. § 1983, I conclude that those claims are not subject to dismissal at this procedural juncture. I recommend a finding, however, that plaintiff's claim against the SPD is legally deficient and subject to dismissal, but that plaintiff should be afforded an opportunity to amend with respect to that claim. Accordingly, it is hereby

ORDERED that plaintiff's amended application for leave to proceed in this action without prepayment of fees (Dkt. No. 6) is GRANTED; and it is further

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

2019 WL 981850

ORDERED that plaintiff's original application for leave to proceed in this action without prepayment of fees (Dkt. No. 2) is DENIED as moot; and it is further

RECOMMENDED that plaintiff's complaint (Dkt. No. 1) be accepted for filing with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini; and it is further

RECOMMENDED that plaintiff's remaining cause of action against the Syracuse Police Department be otherwise DISMISSED with leave to replead within thirty days of the issuance of an order adopting this recommendation; and it is further

RECOMMENDED that, in the event plaintiff does not choose to file an amended complaint and the above recommendations are adopted, the case should move forward with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [5] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

[5]     If you are proceeding *pro se* and are served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 981850

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

2019 WL 974824

2019 WL 974824
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,

v.

SYRACUSE POLICE DEPARTMENT; Abraham
Mamoun, Syracuse Police Dept.; William Kittle,
Syracuse Police Dept.; Shawn Hauck, Syracuse
Police Dept.; Altimonda, Syracuse Police Dept.;
and Fiorini, Syracuse Police Dept., Defendants.

5:18-CV-1471 (GTS/DEP)
|
Signed 02/28/2019

**Attorneys and Law Firms**

JERAMIE WHITE, 18-B-0311, Plaintiff, Pro Se, Cayuga
Correctional Facility, P.O. Box 1186, Moravia, New York
13118.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Jeramie White ("Plaintiff") against the
Syracuse Police Department and five of its employees
("Defendants"), is United States Magistrate Judge David
E. Peebles' Report-Recommendation recommending that (1)
Plaintiff's Complaint be accepted for filing by the Court
with respect to Plaintiff's Fourth Amendment cause of action
against Defendants Mamoun, Kittle, Hauck, Altimonda and
Fiorini, and (2) Plaintiff's remaining cause of action against
the Syracuse Police Department be dismissed with leave to
replead within thirty days of the issuance of an Order adopting
the Report-Recommendation. (Dkt. No. 9.) Plaintiff did not
submit an objection to the Report-Recommendation, and the
deadline by which to do so has expired. (*See generally* Docket
Sheet.) [1]

[1]
The Court notes that, on January 11, 2019, Plaintiff
filed a letter from the City of Syracuse Citizen
Review Board dated December 31, 2018, outlining
its findings with respect to this matter. (Dkt. No.
10.) In its letter, the Citizen Review Board upheld

Plaintiff's claim for excessive force against "Det.
One," recommended a written reprimand against
that individual, and absolved "Det. Two," "Sgt.
One," and "Lt. One" from wrongdoing regarding
the use of excessive force. (*Id.*) The Court does not
liberally construe this letter as any sort of Objection
to the Report-Recommendation.

Based upon a review of this matter, the Court can find
no clear error in the Report-Recommendation: [2] Magistrate
Judge Peebles employed the proper standards, accurately
recited the facts, and reasonably applied the law to those
facts. As a result, the Court accepts and adopts the Report-
Recommendation for the reasons stated therein; Plaintiff's
Complaint is accepted for filing with respect to his Fourth
Amendment cause of action against Defendants Mamoun,
Kittle, Hauck, Altimonda and Fiorini; and Plaintiff's
remaining cause of action against the Syracuse Police
Department is dismissed with leave to replead within thirty
days of the issuance of this Decision and Order.

[2]
When no objection is made to a report-
recommendation, the Court subjects that report-
recommendation to only a clear error review. Fed.
R. Civ. P. 72(b), Advisory Committee Notes: 1983
Addition. When performing such a "clear error"
review, "the court need only satisfy itself that there
is no clear error on the face of the record in order to
accept the recommendation." *Id.*; *see also Batista
v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1
(S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am
permitted to adopt those sections of [a magistrate
judge's] report to which no specific objection is
made, so long as those sections are not facially
erroneous.") (internal quotation marks omitted).

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Peebles' Report-
Recommendation (Dkt. No. 9) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint is accepted for filing
with respect to Plaintiff's Fourth Amendment cause of action
against Defendants Mamoun, Kittle, Hauck, Altimonda and
Fiorini; and it is further

**\*2 ORDERED** that Plaintiff's remaining cause of action
against the Syracuse Police Department is **DISMISSED with**

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 72 of 77

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)
2019 WL 974824

**leave to replead within THIRTY (30) DAYS** of the issuance of this Decision and Order.

**ORDERED** that, in the event Plaintiff files an Amended Complaint within the above-referenced thirty-day period, it shall be referred to Magistrate Judge Peebles for review; and it is further

**ORDERED** that, in the event Plaintiff does not file an Amended Complaint within the above-referenced thirty-

day period, this action shall move forward with respect to his Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini, and the Clerk of the Court is directed to issue summonses and USM-285 forms at that time for service by the U.S. Marshal Service.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 974824

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 73 of 77

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

2014 WL 6685476

2014 WL 6685476
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kylie Ann TURCZYN, Deceased, by and through
Barbara McGREGOR, as Administratrix of
the Estate of Kylie Ann Turczyn, Plaintiff,
v.
CITY OF UTICA et al., Defendants.

No. 6:13–cv–1357 (GLS/ATB).
|
Signed Nov. 26, 2014.

**Attorneys and Law Firms**

Office of Frank Policelli, Frank Policelli, Esq., of Counsel,
Utica, NY, for the Plaintiff.

City of Utica—Corporation Counsel, Mark C. Curley, Esq.,
Merima Smajic, Esq., Zachary C. Oren, Esq., of Counsel,
Utica, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff Kylie Ann Turczyn, deceased, by and through
Barbara McGregor, as administratrix of the estate of Kylie
Ann Turczyn, commenced this action against defendants City
of Utica, City of Utica Police Dept., and Elizabeth Shanley
alleging substantive due process claims pursuant to 42 U.S.C.
§ 1983 and separate state law causes of action. (Am.Compl.,
Dkt. No. 12.) Pending is defendants' motion to dismiss for
failure to state a claim. (Dkt. No. 19.) For the reasons that
follow, the motion is granted in part and denied in part.

### II. *Background*

#### A. *Facts* [1]

[1]   The facts are presented in the light most favorable
to plaintiff.

Shanley, an Oneida County domestic violence investigator,
was at all relevant times assigned by the Police Department to
accomplish the goals of reducing "occurrence[s] of domestic
violence by increasing reporting and by identifying and
tracking repeat victims and/or offenders," and "increas[ing]
victims' access to supportive services by encouraging [them]
to report their abuse, thereby increasing arrest rates for
domestic offenders." (Am.Compl.¶ 10.) On June 22, 2012,
Thomas Anderson, Turczyn's former boyfriend and the father
of her daughter, broke into Turczyn's home armed with a 9
mm rifle. (Id. ¶ 11) Anderson repeatedly shot Turczyn, taking
her life in view of their four-year-old daughter, G.T. (Id.)
Anderson then dispatched himself. (Id.)

In the twelve months preceding this horrific event, Turczyn
made between five and ten complaints to Utica police
officers, "including informing them of a specific threat by
Anderson to kill her." (Id. ¶ 12.) Turczyn specifically told
Shanley "that Anderson was armed and had threatened to
kill her." (Id. ¶ 12(d).) Despite their knowledge of domestic
violence between Turczyn and Anderson, neither Shanley,
New York State Police, nor Utica Police took any steps to
arrest Anderson, investigate Turczyn's complaints, or follow-
up with Anderson "as is the policy and protocol of the
domestic violence unit." (Id. ¶ 14.)

On June 18, 2012, Shanley told Turczyn to seek an order of
protection, which she attempted to do, but was told by an
unknown person at the Oneida County Family Court to return
the following day because the court was " 'too busy.' " (Id.
¶¶ 15–16.) The following day, Turczyn left a voice message
for Shanley, explaining that she was unable to obtain an order
of protection and that Anderson had a gun and planned to
kill her that week. (Id. ¶¶ 16–18.) Despite her knowledge,
"Shanley took no action." (Id. ¶ 17.) Shanley also mistakenly
believed that Turczyn's issues with Anderson were outside of
the purview of Utica Police and should, instead, be dealt with
by New York State Police; however, "she did not inform any
other police agency or take any action herself." (Id. ¶¶ 18, 19,
20.)

#### B. *Procedural History*

Turczyn commenced this action by filing a complaint on
October 31, 2013. (Dkt. No. 1.) Defendants thereafter moved
to dismiss, (Dkt. No. 10.) In response, Turczyn filed an
amended complaint as of right, which is now the operative
pleading. (See generally Am. Compl.) In her amended
complaint, Turczyn alleges the following causes of action:
(1) a denial of substantive due process rights under the Fifth

2014 WL 6685476

and Fourteenth Amendments due to deliberate indifference; (2) a *Monell* [2] claim against the City; (3) negligence; (4) a "derivative action" on behalf of G.T.; and (5) negligent infliction of emotional distress. (*Id.* ¶¶ 37–74.) Defendants now move to dismiss the amended pleading pursuant to Rules 8(a)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 19.)

[2]     See *Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

### III. *Standard of Review*

**\*2** The standard of review under Fed.R.Civ.P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP,* 701 F.Supp.2d 215, 218 (N.D.N.Y.2010).

### IV. *Discussion*

#### A. *Preliminary Matters*

At the outset, it is noted that some of Turczyn's claims are deemed abandoned by her failure to oppose their dismissal. *See Barmore v. Aidala,* 419 F.Supp.2d 193, 201–02 (N.D.N.Y.2005) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion." (internal citations omitted)); *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 723 (S.D.N.Y.2005) ("[B]ecause [the] plaintiff did not address [the] defendant's motion to dismiss with regard to [a particular] claim, it [wa]s deemed abandoned and ... dismissed."). In particular, Turczyn squarely opposed dismissal of her substantive due process claim as against Shanley, (Dkt. No. 20 at 8–12), and scarcely, but sufficiently to save the claim from dismissal for abandonment, offered reasons why her substantive due process claim as against the City should survive defendants' motion, (*id.* at 5–7). Aside from the substantive due process claim, Turczyn failed to offer any opposition to defendants' motion, which also sought dismissal of her pendant causes of action. (Dkt. No. 19, Attach. 6 at 31–40 & n. 15.) Accordingly, Turczyn's pendant state law claims, (Am.Compl.¶¶ 59–74), are dismissed.

Additionally, it is clear that the Police Department must be dismissed as urged by defendants, (Dkt. No. 19, Attach. 6

at 2 n. 2), because "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Varela v. City of Troy,* No. 1:10–cv–1390, 2014 WL 2176148, at \*6 (N.D.N.Y. May 22, 2014) (internal quotation marks omitted). As such, all claims as against the Police Department are dismissed.

The court also notes that both parties have submitted certain evidence that is outside of the pleadings (Dkt. No. 19, Attachs. 3, 4; Dkt. No. 20, Attachs. 1, 2.) Beginning with defendants, they submitted a January 2, 2013 stipulation of discontinuance, which, on its face, purports to memorialize McGregor's agreement to withdraw the notice of claim filed on behalf of Turczyn and to discontinue with prejudice, (Dkt. No. 19, Attach.3), and a December 28, 2012 letter, which appears to memorialize a conversation regarding the discontinuation of legal action and execution of a stipulation, (Dkt. No. 19, Attach.4). Relying on a single out-of-Circuit decision, *see Raines v. Haverford Coll.,* 849 F.Supp. 1009, 1010 (E.D.Pa.1994), which does not appear directly to support their position nor does it give this court confidence that the kinds of documents at issue here were contemplated by that decision, defendants assert that the documents may be considered on their motion to dismiss as "part of the record of this case." (Dkt. No. 19, Attach. 6 at 25 n. 11.) Turczyn argues that defendants' reliance on the stipulation is inappropriate at this juncture, yet she offers the affidavit of McGregor, submitted to dispute the validity of the stipulation, (Dkt. No. 20, Attach.1), without any explanation as to why the court should or may consider it. (Dkt. No. 20 at 12–13.)

**\*3** The court has excluded from its consideration of this motion to dismiss the exhibits offered by defendants as well as the McGregor affidavit. *See* Fed.R.Civ.P. 12(d). The existence of some document or documents that may extinguish a plaintiff's claims, such as a release or stipulation of discontinuance, is an affirmative defense, *see Beede v. Stiefel Labs., Inc.,* No. 1:13–cv–120, 2014 WL 896725, at \*3 (N.D.N.Y. Mar.6, 2014), and " '[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b) (6) ... if the defense appears on the face of the complaint,' " *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 145 (2d Cir.2010) (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998)).

Here, the stipulation defense is not apparent from the face of the amended complaint. Moreover, the court refuses to consider the documents in question as part of the record of this case, a proposition for which no in-Circuit authority has

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 75 of 77

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

2014 WL 6685476

been offered nor has any been discovered by this court. As such, the documents offered by defendants, (Dkt. No. 19, Attachs.3, 4), are not properly before the court, and their argument that Turczyn's claims must be dismissed because of those documents is rejected. McGregor's affidavit, (Dkt. No. 20, Attach.1), which was also improvidently submitted for consideration, is likewise excluded. The court now turns to the merits of defendants' arguments regarding the substantive due process and *Monell* claims.

**B.** *Rule 8*

First, defendants argue that Turczyn's § 1983 due process claim is subject to dismissal under the Rule 8 plausibility analysis—specifically because of Turczyn's failure to allege facts supportive of a sufficient nexus between Shanley's omissions and Turczyn's death. (Dkt. No. 19, Attach. 6 at 23–24.) The court disagrees. The amended complaint plausibly alleges a causal connection between the conduct of defendants—their alleged conscience-shocking failure to protect Turczyn, (Am.Compl.¶ 49)—and her injuries, *i.e.*, the allegations plausibly suggest that defendants' acts were a substantial factor in bringing about Turczyn's injuries. *See Gierlinger v. Gleason,* 160 F.3d 858, 872 (2d Cir.1998) ("[I]n all § 1983 cases[ ] the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."). Accordingly, this argument is rejected.

**C.** *Rule 12(b)(6)*

Defendants argue that Turczyn has failed to state a substantive due process claim as against Shanley or the City. (Dkt. No. 19, Attach. 6 at 220, 26–31.) Defendants contend that Turczyn alleges only passive conduct on the part of Shanley that does not give rise to a substantive due process violation. (*Id.* at 10–12.) More generally, defendants assert that Turczyn has failed to plead facts to show "implicit prior assurances through repeated sustained inaction," and that, even if she did, the state action alleged does not rise to the level of conscience-shocking behavior. (*Id.* at 15–20.) Alternatively, defendants argue that Shanley is entitled to qualified immunity. (*Id.* at 20–23.) With respect to the City, defendants contend that Turczyn has failed to allege facts that support a claim of municipal liability. (*Id.* at 26–31.) For reasons explained below, defendants' motion is denied with respect to Turczyn's substantive due process claim against Shanley, but granted with respect to her *Monell* claim against the City.

**\*4** Only one relevant exception to the general rule that no substantive due process claim lies for a state's failure to protect an individual from private violence, *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), potentially applies in this case. That exception imposes liability for failure to protect where state actors in some way affirmatively assist "in creating or increasing the danger to the victim." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 428 (2d Cir.2009) (internal quotation marks and citation omitted); *see Pena v. DePrisco,* 432 F.3d 98, 110 (2d Cir.2005). "[R]epeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances,' rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin,* 577 F.3d at 428 (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 99 (2d Cir.1993)). Moreover, when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct" "even though none of the defendants [is] alleged to have communicated the approval explicitly." *Id.* at 428–29 (quoting *Pena,* 432 F.3d at 111)). In a nutshell, "[t]he affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Id.* at 429.

A successful substantive due process claim also requires that the plaintiff show "that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id.* at 431 (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). A hierarchy of intent provides guidance on the likelihood that a particular harm rises to the necessary level. Intentionally inflicted harms are most likely to meet the standard, while reckless and negligent inflictions of harm are each less likely, in graduated downward steps, to show conscience-shocking state action. *Id.* As for recklessly inflicted injuries, " '[d]eliberate indifference that shocks in one environment may not be so patently egregious in another.' " *Id.* (quoting *Lewis,* 523 U.S. at 850). Accordingly, the inquiry is highly fact specific.

Unlike *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), or *Neal v. Lee County,* Civil Action No. 1:08CV262, 2010 WL 582437 (N.D.Miss. Feb.12, 2010)—cases in which police had limited interaction with either the victim or killer prior to the

Case 5:24-cv-01138-DNH-MJK    Document 12    Filed 10/29/24    Page 76 of 77

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

2014 WL 6685476

victim's demise, and upon which defendants rely for dismissal of the claim against Shanley, (Dkt. No. 19, Attach. 6 at 3–5, 7–8)—the allegations here go substantially farther. Turczyn alleges several occasions [3] when Shanley knew of Anderson's threatening acts and did nothing, which arguably communicated to him prior assurances that there would be no penalty to pay for his conduct. (Am.Compl.¶¶ 12–13.) "This is so even though none of the defendants are alleged to have communicated the approval explicitly." *Pena,* 432 F.3d at 111. *Okin* has specifically recognized the liability that may arise under these circumstances. *See* 577 F.3d at 428–29 (explaining that liability under § 1983 attaches when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others" (quoting *Pena,* 432 F.3d at 111)).

[3]  In fact, Turczyn claims that she lodged five to ten complaints—of which Shanley was aware—with the Utica Police within the twelve months preceding the murder. (Am.Compl.¶¶ 12, 13.) So many occurrences may amount to "repeated [and] sustained inaction ... in the face of potential acts of violence." *Okin,* 577 F.3d at 428.

**\*5**  The amended complaint also pleads facts that demonstrate, at this juncture, egregious behavior that shocks the contemporary conscience. As in *Okin,* the allegations here tend to show that Shanley, who was tasked with accomplishing certain goals related to curbing domestic violence, was deliberately indifferent as to whether or not Anderson would make good on his multiple threats against Turczyn's life over a twelve-month-period. (Am.Compl. ¶¶ 10, 12.) These allegations sufficiently support that Shanley's affirmative conduct was the product of deliberate indifference that shocks the conscience, and would provide a reasonable jury with a valid basis to so find. *See Conradt v. NBC Universal, Inc.,* 536 F.Supp.2d 380, 394–95 (S.D.N.Y.2008).

Finally, Shanley is not entitled to qualified immunity at this juncture. Her argument on this issue is two-fold. First, Shanley asserts that no constitutional violation occurred, and, second, she claims that, even if a constitutional violation occurred, the right was not clearly established. (Dkt. No. 19, Attach. 6 at 20–23.) The first prong of the argument is easily swept aside by reference to the preceding paragraphs that explain that the amended complaint alleges a cognizable substantive due process violation. As for whether or not the right was clearly established, which is a prerequisite

to qualified immunity, *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), this question has been resolved by the Second Circuit. On the issue, the court has explained that it is "clearly established," under the state-created danger theory, "that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim, and as that is the substantive due process violation alleged here, qualified immunity does not apply." *Okin,* 577 F.3d at 434. Accordingly, Shanley is not entitled to qualified immunity at this time.

As for the City, defendants assert that Turczyn has failed to plead a *Monell* claim because the amended complaint merely alleges legal conclusions. (Dkt. No. 19, Attach. 6 at 26–31.) With respect to Turczyn's allegation that the City failed to properly train or supervise its employees, defendants contend that the amended complaint is too conclusory, but that, even if adequately pleaded, Turczyn's municipal liability claim must nonetheless fail because she has not alleged deliberate indifference. (*Id.* at 29–31.)

It is well settled that "the inadequacy of police training may serve as the basis for § 1983 liability ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Oh. v. Harris,* 489 U.S. 378, 380, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The deliberate indifference standard is "stringent" and requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* ——U.S. ——, ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (internal quotation marks and citation omitted). A showing of deliberate indifference requires that: (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of N.Y.,* 974 F.2d 293, 297–98 (2d Cir.1992) (quoting *City of Canton,* 489 U.S. at 390 n. 10).

**\*6**  Here, because Turczyn has failed to adequately plead that the City's failure to train and supervise amounted to deliberate indifference, she has failed to state a claim of municipal liability. The amended complaint uses the label "deliberate indifference" in reference to Turczyn's municipal liability

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

2014 WL 6685476

claim and generically references the City's failure to properly train and supervise, but it fails to allege facts that support either conclusory notion. (Am.Compl.¶¶ 45, 52.) Turczyn's pleading failure mandates dismissal of her *Monell* claim against the City. *See Gauthier v. Kirkpatrick,* Civil Action No. 2:13–cv–187, 2013 WL 6407716, at *10 (D.Vt. Dec.9, 2013) (dismissing failure to train *Monell* claim because the plaintiff failed to plead facts that supported the deliberate difference elements); *Santos v. New York City,* 847 F.Supp.2d 573, 577 (S.D.N.Y.2012); *see also Worrell v. City of N.Y .,* No. 12–CV– 6151, 2014 WL 1224257, at *13 (E.D.N.Y. Mar. 24, 2014).

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 19) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to all claims alleged as against the City of Utica Police Dept. and the Clerk is directed to terminate the City of Utica Police Dept. from this action; and

**GRANTED** with respect to Turczyn's *Monell* claim against the City (Am.Compl.¶ ¶ 51–58), which is hereby

**DISMISSED WITHOUT PREJUDICE,** and the Clerk is directed to terminate the City of Utica from this action; and

**GRANTED** with respect to all of Turczyn's pendant state law claims, (Am.Compl.¶ ¶ 59–74), which are hereby **DISMISSED;** and **DENIED** in all other respects; and it is further

**ORDERED** that the sole remaining defendant, Shanley, shall file an appropriate responsive pleading within the time allotted by the rules; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Andrew T. Baxter in order to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6685476

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.